SEAN P. REIS (SBN 184044)
sreis@edelson.com
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

JAY EDELSON (Admitted *Pro Hac Vice*)
jedelson@edelson.com
RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
brichman@edelson.com
CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Attorneys for Plaintiff* JAMES GROSS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

JAMES GROSS, individually and on behalf of all others similarly situated,

*Plaintiff*,

*v.*

SYMANTEC CORPORATION, a Delaware corporation, and PC TOOLS, LTD., an Irish limited company,

*Defendants*.

Case No. 3:12-cv-00154-CRB

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;**
2. **Fraudulent Inducement;**
3. **Breach of Express Warranties, Cal. Com. Code § 2313;**
4. **Breach of Contract;**
5. **Breach of the Implied Covenant of Good Faith and Fair Dealing; and**
6. **Unjust Enrichment.**

**DEMAND FOR JURY TRIAL**

**CLASS ACTION**

Plaintiff James Gross brings this First Amended Class Action Complaint ("Complaint") against Defendants Symantec Corporation ("Symantec Corp.") and PC Tools, Ltd. ("PC Tools") (collectively "Symantec" or "Defendants") to obtain redress for, and put an end to, Symantec defrauding consumers across the country through the deceptive design and sale of certain of its software products. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

**NATURE OF THE ACTION**

1. Defendant PC Tools is a wholly owned subsidiary of Symantec Corp. that functions as a Symantec Corp. brand, fully operated by and under the complete control of Symantec Corp. Symantec is among the world's largest developers of computer security software, and also sells a variety of products that it claims will increase the speed, performance, and stability of a consumer's personal computer ("PC"), protect against privacy risks, remove harmful errors, and "clean up" hard drives. Unfortunately for consumers, the methods used by Symantec to induce consumers to purchase such software, as well as the products themselves, are undeniably fraudulent.

2. Through a common deceptive scheme, Symantec uniformly defrauds consumers into purchasing the three products at issue in this lawsuit—PC Tools Registry Mechanic, PC Tools Performance Toolkit, and Norton Utilities (hereafter collectively referred to as the "Scareware").

3. Most often, the fraud is accomplished through the following uniform practice: First, Symantec represents to the consumer that the Scareware is capable of identifying and fixing a wide range of PC errors, privacy threats, and other computer problems. Next, to demonstrate the Scareware's supposed value to the consumer, Symantec allows the user to download the software and perform a "free diagnostic" scan, which purportedly detects whether the foregoing problems exist on the individual's PC. Then the Scareware reports, in alarmist fashion, that harmful errors and other threats exist on the user's PC (when, in reality, such errors do not exist). Finally, Symantec informs the consumer that a handful of these issues may be fixed for free, but the

individual must purchase the product to fully remove the remaining so-called errors.

4. As detailed below, the Scareware *does not conduct any actual diagnostic testing* on the computer. Instead, Symantec intentionally designed its Scareware to *invariably* report, in an extremely ominous manner, that harmful errors, privacy risks, and other problems exist on the user's PC, regardless of its real condition. Furthermore, the Scareware does not, and cannot, provide the benefits promised by Symantec. Accordingly, consumers are duped into purchasing software that does not function as represented by Symantec.

5. Symantec holds itself out as a reputable industry leader in developing software aimed to protect consumers' computers. Because average consumers lack the requisite technical expertise to understand the underlying functionality of Symantec's software, they trust Symantec to convey truthful information, and to honestly and accurately identify and remove harmful errors from their computers. Symantec has betrayed that trust, and as a result, millions of consumers have been, and continue to be, tricked into paying for its fraudulent Scareware. Due to the level of egregious and willful acts of fraud committed by Symantec, Plaintiff seeks punitive damages.

**PARTIES**

6. Plaintiff James Gross is a natural person and citizen of the state of Washington.

7. Defendant Symantec Corporation is a Delaware corporation with its headquarters and principal place of business located at 350 Ellis Street, Mountain View, California 94043. Symantec does business throughout the State of California and the United States.

8. Defendant PC Tools, Ltd. is an Irish limited company headquartered at South Bank House, 6th Floor, Barrow Street, Dublin 4. PC Tools is a wholly owned subsidiary of Defendnat Symantec Corp.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one Class member is a citizen of a different state than Defendants, (b) the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (c) none of

the exceptions under that subsection apply to this action.

10. This Court has personal jurisdiction over Defendants because both Defendants conduct significant business in California and the unlawful conduct alleged in the Complaint occurred in, was directed and/or emanated from California. Additionally, Symantec Corp. is headquartered in Mountain View, California.

11. Venue is proper in this District because Symantec Corp. maintains its headquarters in this District and because the improper conduct alleged in this Complaint occurred in, was directed and/or emanated from this District.

## INTRADISTRICT ASSIGNMENT

12. This case has been assigned to the San Francisco Division.

## FACTUAL BACKGROUND

### I. A Brief Overview of Symantec.

13. Founded in 1982, Symantec Corp. has become a household name for its anti-virus and other security-related software. In August 1990, Symantec Corp. merged with Peter Norton Computing, Inc. and has since continued to sell products, such as Norton Antivirus and Norton Utilities, under the Norton brand name.

14. Symantec boasts that it is one of the "world's largest software companies with more than 18,500 employees in more than 50 countries"[1] and asserts that its mission is to help consumers "secure and manage their information-driven world against more risks at more points, more completely and efficiently than any other company."

#### A. Symantec Acquires PC Tools, Ltd.

15. In August 2008, Symantec Corp. acquired an Australian PC utilities software company called PC Tools, Ltd. At the time of acquisition, Symantec Corp. issued a press release stating that, "With the addition of PC Tools, Symantec will expand its consumer product portfolio

---

[1] Corporate Profile, http://www.symantec.com/about/profile/ (last visited March 23, 2012).

to include award-winning PC utilities software and point security technologies."[2]

16. Symantec Corp. has since taken over the operations of PC Tools and continues to sell software under the PC Tools name.

17. Thus, to the extent its subsidiary PC Tools can be said to have engaged in any of the wrong-doing described herein, Symantec Corp. orchestrated, directed and participated in all such wrong-doing.

**B. PC Tools is a Symantec Corp. Brand, Not a Separate Company.**

18. Although PC Tools purports to be an independent Irish company, in actuality it is simply a brand division operated entirely by Defendant Symantec Corp., as illustrated by the following facts:

(A) In its SEC filings, Symantec Corp. explains that its software is divided into two brands, PC Tools and Norton:

> Our Consumer segment provides Internet security and protection solutions, suites and services to individual users and home offices through a dual-brand strategy with Norton™ and PC Tools™. Our Norton brand offers premium, full-featured security suites as well as related services such as online backup, family safety, and PC tune-up across multiple platforms. PC Tools products are designed specifically for the value-minded consumer which allows Symantec to extend its reach into emerging and price-sensitive market segments.[3]

(B) The PC Tools website (www.pctools.com) is owned and administered by Symantec Corp., as evidenced by its registration information:

> Symantec Corporation
> Domain Manager
> 350 Ellis Street
> Mountain View, CA 94043[4]

---

[2] Symantec to Acquire PC Tools, http://www.symantec.com/about/news/release/article.jsp?prid=20080818_02 (last visited March 23, 2012, 2012).

[3] Symantec Fiscal Year 2010 10-K, http://investor.symantec.com/ (last visited March 23, 2012).

[4] PC Tools WHOIS Registration Information, http://www.networksolutions.com/whois-search/pctools.com (last visited March 25, 2012).

(C) The underlying source code for the PC Tools website shows that Symantec Corp. performs analytics on user traffic to the website.[5]

(D) On the Contact Page of its website, PC Tools lists Symantec Corp.'s corporate headquarters as the address to request customer support information: "For any customer support inquiry or questions concerning the product, End User Licensing Agreement, or other issues, please write to PC Tools Customer Service, PC Tools, Inc. 350 Ellis Street, Mountain View, CA 94043, United States of America."[6] Likewise, in California, PC Tools Inc. (presumably PC Tools' U.S. counterpart) has listed as its registered agent's address the same address as Symantec's corporate headquarters.[7]

(E) The hiring decisions at PC Tools are ostensibly made by Symantec Corp., as the PC Tools website encourages potential employees to submit their resumes to a Symantec employee.[8]

(F) When purchasing the software, Plaintiff's bank account was debited by "PC TOOLS US," and the charge was listed as originating from California—the situs of Symantec Corp.'s headquarters.

(G) PC Tools' website lists Dave Cole as its Vice President and General Manager, who is also a Vice President and General Manager of Symantec Corp. On the Symantec Corp. website, Mr. Cole's biography reads, in pertinent part, "Dave has also recently taken the role of General Manager for PC Tools business where he is responsible for go-to-market activities for the consumer division's 2nd brand."[9]

(H) After Symantec acquired PC Tools in 2008, it redesigned its Norton Utilities

---

5 PC Tools Homepage, http://www.pctools.com (last visited March 25, 2012).

6 PC Tools Contact Page, http://www.pctools.com/contact/ (last visited March 23, 2012).

7 California Entity Search, http://kepler.sos.ca.gov/cbs.aspx (last visited March 23, 2012).

8 PC Tools Careers Page, http://www.pctools.com/careers/ (last visited March 23, 2012).

9 *See* VP Dave Cole's Symantec Bio, http://www.symantec.com/about/news/resources/press_kits/bio.jsp?bioid=dave_cole (last visited March 23, 2012); *see also* VP Dave Cole's PC Tools Bio, http://www.pctools.com/press-room/ (last visited March 23, 2012).

software to mirror that of PC Tools, stating that the companies share proprietary source code, as evidenced by the screenshots below showing the similarities between Norton Utilities and PC Tools Performance Toolkit.







19. Accordingly, Plaintiff alternatively pleads that PC Tools is operating as an alter ego of Symantec Corp., is an agent of Symantec Corp., or the two companies are engaged in a civil conspiracy to defraud consumers.

*1. PC Tools is the Alter Ego of Symantec Corp.*

20. Symantec Corp. and PC Tools are not separate entities but in actuality are one business unit sharing ownership and control.

21. Rather than operating as a distinct company, PC Tools is in actuality a Symantec Corp. brand, a fact that Symantec admits in its SEC filing, *supra* Paragraph 17(A), and in its explanation that Symantec Corp.'s VP Dave Cole manages the PC Tools "brand," *supra* Paragraph 17(G).

22. Further, the companies share the same VP and General Manager, and Symantec Corp. effectively controls the day-to-day activities of PC Tools. *See supra* Paragraph 17(G).

23. PC Tools and Symantec Corp. jointly carry out the fraud described herein. Symantec claims that PC Tools is a separate company to mask its participation in the fraud it perpetrates through its Scareware. In this way, Symantec seeks to avoid legal attacks against its main holding company, and instead attempts to force potential U.S. plaintiffs to sue in Ireland, despite the fact that Ireland is an economically unfeasible choice of venue that deprives consumers of their day in court and serves little purpose other than exculpating the Defendants for their fraudulent and other wrongful conduct.

*2. PC Tools is an Agent of Symantec Corp.*

24. Plaintiff asserts in the alternative to Paragraphs 20-23 that PC Tools is an agent of Symantec Corp.

25. PC Tools functions as an incorporated arm of Symantec Corp., and thus Symantec Corp. is vicariously liable for PC Tools' misconduct. There is an extremely close relationship between the companies, as indicated by the fact that Symantec Corp. owns the PC Tools website, and the companies share management personnel, proprietary source code, and the same U.S. headquarters.

26. PC Tools engages in its misconduct as described herein with Symantec Corp.'s knowledge, for Symantec Corp.'s benefit, and at Symantec Corp.'s direction as its agent. Symantec

Corp. knows of PC Tools' fraudulent conduct and representations with respect to consumers and has ratified that conduct and those statements.

*3. Symantec Corp. and PC Tools are Engaged in a Civil Conspiracy.*

27. Plaintiff asserts in the alternative to Paragraphs 20-26 that PC Tools and Symantec Corp. are engaged in a civil conspiracy to defraud consumers through the design, marketing, and sale of its Scareware.

28. Symantec Corp. and PC Tools banded together and agreed to defraud consumers through their Scareware. In furtherance of their agreement, as shown in Paragraph 17(H), the companies utilize the same fraudulent design and functionality in their software products. This, in conjunction with their overlapping management personnel, *supra* Paragraph 17(G), demonstrates that both companies have actual knowledge of the plan to defraud consumers through the Scareware.

29. PC Tools aids Symantec Corp.'s fraud by allowing the corporation to sell products under the legal fiction that certain Scareware originates from a separate Irish company, in an attempt to defraud U.S. consumers with legal impunity.

*4. PC Tools' EULA Serves as an Extension of Defendants' Fraud.*

30. As explained above, Symantec Corp. falsely holds out the PC Tools brand as a wholly separate company headquartered in Ireland. To insulate Symantec Corp. from liability, Defendants included a forum selection clause in the PC Tools' End User License Agreement ("EULA") designating Dublin, Ireland as the venue for prosecution and resolution of all disputes related thereto.

31. This forum selection clause is part and parcel to Symantec's fraud. If PC Tools' EULA was enforceable, U.S. consumers would be forced to travel thousands of miles to Dublin, Ireland, to litigate over software that costs approximately $29.99.

32. By way of illustration, for Plaintiff to travel from the Seattle-Tacoma International Airport in his home state of Washington to Dublin, Ireland, airfare alone would cost him at least

$800.[10]

33. In this way, Defendants knowingly seek to prohibit consumers from pursuing legal claims against Symantec Corp., and thus continue to exact their fraud upon U.S. consumers with legal impunity. As a contract clause that has as its "object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent" PC Tools' forum selection clause cannot be enforced. *See* Cal. Civ. Code § 1668.

**C. Symantec's Researchers Publish a Report Warning Consumers about Scareware—Yet Fail to Mention That It Produces Similar Software.**

34. In addition to developing software, Symantec employs a team of researchers who investigate emerging cyber threats to consumers. Approximately one year after acquiring PC Tools, Symantec's researchers published a whitepaper detailing a new threat to consumers—scareware.

35. In what can only be described as supreme irony, or a clever attempt by Defendants to persuade consumers to choose their own "legitimate" computer utility software, the results of Symantec's research succinctly capture the fraud at issue in this lawsuit: "Once installed on a user's computer—and to induce payment—rogue security applications often misrepresent the computer's security status or performance, displaying fake or exaggerated claims of threats."[11] In industry parlance, these "rogue" applications are called "scareware."

36. As explained below, the foregoing description aptly describes the exact deception Symantec uses to trick consumers into purchasing its own Scareware.

**II. Symantec Tricks Consumers into Purchasing its Scareware Through a Common Deceptive Scheme.**

37. When a consumer searches the World Wide Web for software to increase the speed or performance of a computer, to remove harmful PC errors, or to protect their privacy, the

---

[10] Average airfare based upon rates from Kayak.com, http://www.kayak.com/#/flights/SEA-DUB/2012-04-06/2012-04-08 (last visited March 26, 2012).

[11] Symantec Report on Rogue Security Software, http://eval.symantec.com/mktginfo/enterprise/white_papers/b-symc_report_on_rogue_security_software_WP_20100385.en-us.pdf (last visited March 26, 2012).

individual will likely encounter advertisements for Symantec's Scareware. Upon clicking on a hyperlink to one of its websites, Symantec presents the consumer with misrepresentations about the utility of the Scareware, thus triggering the initial phase of Symantec's deceptive scheme.

**A. Regardless of the Software Product or Website Viewed by a Consumer, Symantec Uniformly Misrepresents the Utility of its Scareware.**

38. On the individual webpages for PC Tools Registry Mechanic, PC Tools Performance Toolkit, and Norton Utilities, Symantec displays affirmations about the software's functionality. Specifically, Symantec asserts that the Scareware protects the user's privacy, improves the efficiency and performance of the computer, increases the PC's stability, repairs the hard drive, and cures common computer errors.

39. With these representations as a backdrop, it becomes clear why the "free diagnostic" scan (the second phase of Symantec's deceptive scheme) offered to consumers is so misleading.

**B. Symantec Offers the Consumer a "Free Diagnostic Scan" With its Scareware.**

40. Through its websites, Symantec recommends that the viewing consumer download its Scareware and conduct a "free scan" to detect the issues that the product is supposedly designed to fix. The consumer is lead to believe that the scan will detect the sort of computer issues—such as harmful errors, privacy threats, and other performance-hindering problems—that Symantec claims the Scareware can remedy.

41. Once the consumer downloads and installs the Scareware, the third phase of the deceptive scheme begins: the software informs the user that dozens of harmful errors exist on the user's computer, and then offers to fix these problems—for a price.

**C. Plaintiff's Experts Uncover that Symantec Designed its Scareware to Invariably Report Harmful Errors to Induce Users to Purchase the Software.**

42. As introduced above, PC Tools Registry Mechanic, PC Tools Performance Toolkit, and Norton Utilities are substantially identical in functionality, yet have slightly varied graphical user interfaces (i.e., the display screens presented to the user). In particular, each software product

allows the user to perform a scan to detect certain computer problems. Once the scan is complete, the Scareware shows a list of errors identified by the software ranging from "Low Priority" to "High Priority." The Scareware also presents a graphical depiction of a meter, ranging from red to green, with a corresponding rating for the overall "System Health" of the computer. Additionally, the Scareware displays the "Privacy Health" and "Disk Health" of the computer, ranging from "LOW" to "HIGH."

43. The Scareware's scan results are presented in an extremely menacing fashion. For example, the displayed lettering is in red and bolded typeface, the screen contains warnings that errors need immediate repair, slowing down the computer, or exposing the user's privacy. Next, the Scareware offers to "fix" some of the detected errors, but requires the user to purchase the full, registered version of the software to fully "fix" the identified computer problems.[12]

44. The truth, however, is that the Scareware does not actually perform any meaningful evaluation of the user's computer system, or of the supposed "errors" detected by the software, and cannot perform any of the other valuable tasks represented by Symantec through its websites, advertising, and in-software display screens.

45. Through his attorneys, Plaintiff has engaged computer forensics experts to examine Symantec's Scareware. The results of this investigation confirm that Symantec's Scareware *always* reports that the user's computer's "System Health" is "LOW," that "High Priority" errors exist on the system, and that the user's "Privacy Health" and "Disk Health" are "LOW." The sum total of these representations is that the computer is damaged, or at risk, and that purchase of the Scareware is necessary to "fix" these problems. Worse, Plaintiff's experts revealed that the errors detected as "High Priority" *are not credible threats* to a computer's functionality.

46. The experts' investigation further uncovered that Symantec programmed its

[12] The Norton Utilities software's method of inducement is even more devious. Instead of providing a free scan followed by an immediate offer to purchase the software to fix "errors," the consumer is offered a 30-day free trial. At the completion of the trial, the user must purchase the product to continue using it. Therefore, for a full 30 days the consumer is tricked into believing that Norton Utilities is detecting and removing harmful errors from the individual's computer, and that purchase of the product is necessary to continue protecting the PC.

Scareware to always, *inter alia*, (i) identify problems on a user's computer (even where none exist), (ii) artificially inflate the number of errors detected on a user's computer, (iii) characterize innocuous files as "High Priority" errors, and (iv) arbitrarily report that the user's "System Health," "Privacy Health," and "Disk Health" are "LOW" without any actual assessment of these issues.

47. By and through the deceptive scheme described above, Symantec has profited, and continues to profit, by defrauding consumers into believing that their computers are severely damaged, and/or at risk, and that purchase of its Scareware is necessary to "fix" these problems.

**III. Plaintiff James Gross's Experience**

48. In April of 2011, Gross performed an Internet search for software that would enhance the performance of his computer. After seeing a link that seemed promising, Gross navigated to www.PCTools.com and clicked on a link for a software product called "Registry Mechanic" that Symantec claimed would perform a "free scan" of his computer.

49. Gross relied upon the representations made by Symantec through the PC Tools website about the functionality of the Registry Mechanic software. In particular, Gross reasonably believed that Registry Mechanic would truthfully scan and fix computer errors, protect his privacy, and speed up his computer. For that reason, Gross performed Symantec's "free scan."

50. After the "free scan" was performed, Registry Mechanic indicated that Gross's computer possessed numerous "High Priority" errors, and that his "System Health" was "LOW." After clicking "repair" to fix these supposed problems, a display box informed Gross that only some of the errors would be fixed with the trial version, and that he must purchase the product to "fix all detected issues." But for these misrepresentations—that his "System Health" was "LOW," and that "High Priority" errors existed on his computer—Gross would not have purchased Symantec's software. Similarly, but for Symantec's "free scan," Gross would not have purchased the Registry Mechanic software.

51. As requested by Defendants, Gross clicked on the "Purchase Online" button and was directed to a website where he purchased Registry Mechanic for the price of $29.99.

52. However, as discussed above, the "errors" purportedly "detected" by Registry Mechanic on Gross's computer were not "High Priority," and his "System Health" was not actually "LOW." Rather, because Registry Mechanic was designed to always return these results, Gross was misled into believing that his computer was at-risk, and that he needed to purchase Registry Mechanic in order to repair his computer.

**CLASS ALLEGATIONS**

53. **Definition of the Class:** Plaintiff James Gross brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All individuals and entities in the United States and its territories that have purchased any of the following software from Symantec: PC Tools Registry Mechanic, PC Tools Performance Toolkit, and Norton Utilities.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, and (5) the legal representatives, successors, or assigns of any such excluded person.

54. **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but on information and belief, Symantec has sold its software to thousands of Class members throughout the country, making joinder of each individual member impracticable. Ultimately, the Class members will be easily identified through Symantec's records.

55. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Symantec's uniform wrongful conduct during transactions with Plaintiff and the Class. Plaintiff's claims are typical of the claims of all of the other members of the Class.

56. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Symantec has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

57. **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members:

a) whether Symantec intentionally designed its software to deceive consumers into purchasing its products;

b) whether Symantec breached its express warranties;

c) whether Symantec's conduct described herein constitutes a breach of express warranties pursuant to the California Commercial Code;

d) whether Symantec's conduct described herein constitutes a violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*);

e) whether Symantec's conduct described herein constitutes fraudulent inducement;

f) whether Symantec's conduct described herein constitutes a breach of contract;

g) whether Symantec unjustly received and/or continues to receive money as a result of its conduct described herein, and whether under principles of equity and good conscience, it should not be permitted to retain those monies.

58. **Superiority**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class will likely be small relative to the burden and expense of

individual prosecution of the complex litigation necessitated by Symantec's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Symantec's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

59. **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Symantec has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Symantec's policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Symantec's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Symantec has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class.

60. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Definition of the Class" based on facts learned in discovery.

**FIRST CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

61. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

62. California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

(“UCL”), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

63. The UCL prohibits any unlawful, unfair or fraudulent business act or practice. A business practice need only meet one of the three criteria to be considered unfair competition.

64. The utility of a consumer product is a material term of any transaction because it directly affects a consumer’s choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the utility of a product is materially misleading.

65. Likewise, the price of a consumer product is a material term of any transaction because it directly affects a consumer’s choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the price of a product is materially misleading.

66. As described herein, Symantec engaged in fraudulent and unfair business practices, as defined by the UCL, by, *inter alia*: (i) misrepresenting the utility of its Scareware products to consumers, (ii) misrepresenting the results of the “free scan” to consumers, (iii) scaring consumers with false scan results for the purpose of tricking them into purchasing the Scareware, and (iv) selling Scareware that lacks the advertised utility.

67. Specifically, Symantec affirmatively represented to Plaintiff that PC Tools Registry Mechanic would honestly and accurately scan his computer for harmful problems, repair those problems, increase the speed and stability of his computer, and protect his privacy. Furthermore, through the software itself, Symantec affirmatively represented that Plaintiff’s “System Health” was “LOW” and that “High Priority” errors existed on his computer.

68. The above affirmative representations were in fact false. In particular, Symantec’s software cannot actually perform the tasks described in Paragraph 67. Likewise, the results of the “free diagnostic scan” provided by the software were false, because PC Tools Registry Mechanic did not perform an actual evaluation of Plaintiff’s computer or any problems contained on it.

69. Furthermore, the *only reason* for consumers to purchase the Scareware products is to “fix” the supposed “errors” that the free scans “detected.” As such, the false results of the free scans

were, in every case, necessarily the impetus that caused the consumers to purchase the Scareware. It follows that Symantec's free "scan" and false marketing practices were likely to mislead reasonable consumers.

70. Thus, Defendants have violated the "fraudulent" prong of the UCL by intentionally designing the Scareware to report fake errors and misrepresent the "System Health" of consumers' computers, and misrepresenting the actual utility of the Scareware, with the intent to defraud consumers into purchasing their software products. A reasonable consumer is likely to, and Plaintiff and the Class did, believe and rely on Defendants' misrepresentations regarding the benefits conferred by the Scareware inasmuch as they purchased the software, which ultimately lacked the advertised utility.

71. Symantec has also violated the "unfair" prong of the UCL by causing substantial injury to consumers through the conduct alleged above. The injuries caused by Defendants' unfair conduct are not outweighed by any countervailing benefits to consumers or competition, and could not reasonably have been known and avoided by consumers. Further, Symantec's fraudulent marketing practices violate California's public policies favoring enforcement of implied and express warranties.

72. Symantec's fraud and unfair conduct occurred during the marketing and sale of computer software products, and therefore occurred in the course of Symantec's business practices.

73. Plaintiff and the Class have suffered harm in the form of actual monetary damages as a proximate result of Symantec's fraudulent and unfair conduct.

74. Plaintiff seeks an order (1) enjoining Symantec from continuing to engage in the unfair and unlawful conduct described herein, (2) awarding Plaintiff and the Class all appropriate damages, and (3) awarding them reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

**SECOND CAUSE OF ACTION**
**Fraudulent Inducement**
**(On Behalf of Plaintiff and the Class)**

75. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

76. As described with particularity in paragraphs 13 through 52 and throughout all Counts of this Complaint, Symantec has used, and continues to use, marketing tactics it knows or reasonably should know are false and misleading.

77. To induce Plaintiff to purchase the Scareware, Symantec affirmatively represented to Plaintiff that the Scareware possessed certain utility. Specifically, Symantec represented that the PC Tools Registry Mechanic would honestly and accurately scan his computer for harmful problems, increase the speed and stability of his computer, and protect his privacy. Furthermore, through the software itself, Symantec affirmatively represented that Plaintiff's "System Health" was "LOW" and that "High Priority" errors existed on his computer.

78. Symantec's affirmative representations were in fact false. In particular, the Scareware does not actually speed up the performance and stability of computers in the manner described by Symantec, nor does it protect the user's privacy as represented. Likewise, the results of the "free diagnostic scan" provided by the software were false because PC Tools Registry Mechanic did not perform an actual evaluation of Plaintiff's computer or any problems contained on it.

79. The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the utility of a product is materially misleading.

80. Likewise, the price of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the price of a product is materially misleading.

81. As the Scareware's creator, Symantec knew that their representations regarding the

Scareware's utility were false, and intentionally designed their public representations to mislead consumers about the Scareware's utility, and programmed their software to falsely report computer errors and to deceive users about the status of their computers.

82. Symantec intended that its misrepresentations would induce consumers to rely on, and act based on, the false claims of a computer's health or lack thereof. That is the very reason Symantec offered the free scans in the first place—to dupe unwary consumers into paying substantial amounts of money for products that do not perform as Symantec represented.

83. As a consumer lacking the requisite technical expertise to independently gauge the Scareware's underlying functionality, and taking Symantec's statements at face value, Plaintiff justifiably relied upon the above representations, and would not have purchased the Scareware but for Symantec's representations that it would perform the beneficial tasks listed above, and the representations that his computer's "System Health" was "LOW" and that "High Priority" errors existed on his computer.

84. By using false and fraudulent marketing tactics that misrepresent the actual utility of their Scareware, and inducing Plaintiff and the Class to purchase the Scareware based on those misrepresentations, Symantec has engaged in fraudulent practices designed to mislead and deceive consumers.

85. As a result of relying on Symantec's misrepresentations, Plaintiff has been damaged in the amount of the purchase price of Symantec's software.

86. Plaintiff therefore prays for relief in the amount of the purchase price of Symantec's software. Plaintiff further alleges that Symantec's conduct and misrepresentations were made with malice and in conscious disregard for Plaintiff's rights, thereby entitling him to punitive damages against Symantec in an amount sufficient to deter such conduct in the future.

**<u>THIRD CAUSE OF ACTION</u>**
**Breach of Express Warranties**
**Pursuant to Cal. Comm. Code § 2313**
**(On Behalf of Plaintiff and the Class)**

87. Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

88. Pursuant to California Commercial Code § 2313, Symantec's sale of the Scareware included express warranties created by Symantec's affirmations of fact and promises made through its advertising, websites, and in-software representations.

89. Symantec's express warranties included affirmations of fact and promises that its Scareware would truthfully identify and repair critical PC errors, increase computer speed, performance and stability; protect against privacy risks; remove harmful errors; and "clean up" hard drives. In actuality, Symantec fraudulently designed its software to falsely identify and/or exaggerate the presence of harmful errors, and to misrepresent the overall "System Health" of the computer to induce consumers to purchase their products.

90. Plaintiff and the Class relied on Symantec's affirmations and promises when purchasing the Scareware, and the affirmations formed the basis for the bargain, in that Plaintiff and the Class believed that they were purchasing software that honestly and accurately fixed their computer systems. But for Symantec's affirmations and promises, Plaintiff and the Class would not have purchased the Scareware.

91. Symantec breached its express warranties because the Scareware did not perform any real diagnostic test on Plaintiff's or the Class's computer systems, and instead artificially and arbitrarily reported harmful computer errors and reported the computer's "System Health" was "LOW."

92. Symantec's breach of express warranties injured Plaintiff and the Class because they purchased a product of diminished value—software that does not actually perform the beneficial tasks represented to them through Symantec's affirmations and promises about the utility of the Scareware.

93. By serving this Complaint, Plaintiff and the Class hereby give Symantec notice that it has breached its express warranty of merchantability and request maximum damages as provided by the California Commercial Code.

**FOURTH CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

94. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

95. Plaintiff and members of the Class entered into agreements with Symantec whereby Symantec agreed to sell, and Plaintiff and the Class agreed to purchase, software that would detect and remove legitimate computer errors from Plaintiff's and the Class's computers.

96. Symantec voluntarily assumed a contractual obligation to honestly diagnose problems on Plaintiff's and the Class's computer systems and remove or repair those problems. Although this obligation is a material term of the agreement, Symantec did not honor it.

97. Plaintiff and the Class paid, and Symantec accepted, the purchase price of the software products at issue, and therefore Plaintiff and the Class performed their obligations under the contracts.

98. Symantec breached its contracts with Plaintiff and the Class by failing to honestly and accurately inform them about the condition of their computers, and further by providing software that failed to offer the benefits promised, namely, resolution of problems detected, and improvements in performance, privacy protection, and security.

99. The aforementioned breaches of contract have proximately caused Plaintiff and the Class economic injury and other damages, because they purchased a product that does not perform as represented by Defendants, and lack the promised and paid-for utility.

**FIFTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

100. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

101. In order to benefit from Symantec's supposed threat-removal software products, Plaintiff and the Class affirmatively allowed Symantec to install the Scareware on their computer systems.

102. Symantec's agreement to install software to diagnose and remove threats from consumers' computers in exchange for fees is a valid and enforceable contract between Plaintiff and the Class on the one hand, and Symantec on the other.

103. Symantec breached the provisions of that agreement, specifically by not honoring its responsibilities to perform truthful diagnostic and remedial operations.

104. California contract law recognizes the implied covenant of good faith and fair dealing in every contract.

105. Implicit in the contract were provisions prohibiting Symantec from engaging in conduct that frustrated or injured Plaintiff's and the Class's rights to receive the benefits of the contract.

106. Further, Symantec was obligated to comply with the provisions of Cal. Com. Code § 2313.

107. Symantec voluntarily assumed a contractual obligation to honestly diagnose problems on consumers' computers and to honestly indicate whether problems exist. Although this obligation is a material term of the agreement, Symantec did not honor it.

108. Symantec breached the implied covenant of good faith and fair dealing by failing to honestly and accurately inform consumers about the true condition of their computers, and further by failing to fully comply with the proscriptions of applicable statutory law.

109. Symantec's misconduct and breach of the implied covenant of good faith and fair dealing as described herein resulted in injury to Plaintiff and the Class in the form of the price paid for the Scareware and/or the price paid in excess of the Scareware's actual utility, which Defendants knowingly and wrongfully retained.

## SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**(in the alternative to Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(On Behalf of Plaintiff and the Class)**

110. Plaintiff incorporates by reference allegations 1-60 as if fully set forth herein.

111. Count VI is expressly brought in the alternative to Count IV (breach of contract) and Count V (breach of the implied covenant of good faith and fair dealing).

112. Symantec has knowingly received and retained benefits from Plaintiff and the Class under circumstances that would render it unjust to allow Symantec to retain such benefits.

113. By falsely informing Plaintiff and the Class that they needed to pay to repair problems that did not exist on their computers, Symantec knowingly received and appreciated benefits at the expense and to the detriment of Plaintiff and the Class.

114. Symantec's receipt of monies from Plaintiff and the Class allowed it to utilize those monies for its own purposes, without providing Plaintiff and the Class anything of value in return.

115. Symantec appreciates or has knowledge of that benefit.

116. Under principles of equity and good conscience, Symantec should not be permitted to retain the monies belonging to Plaintiff and the Class that they were paid and that Symantec unjustly received as a result of its misconduct alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff James Gross, on behalf of himself and the Class, respectfully requests that this Court issue an order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing James Gross as class representative, and appointing his counsel as class counsel;

B. Declaring that Symantec's actions, as set out above constitute violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), fraudulent inducement, breach of express warranties in violation of Cal. Com. Code § 2313, breach of contract, breach of the implied covenant of good faith and fair dealing, and (in the alternative to breach of contract and breach of the implied covenant of good faith and fair dealing) unjust enrichment;

C. Awarding damages, including statutory and punitive damages where applicable, to Plaintiff and the Class in an amount to be determined at trial;

D. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*: (i) an order prohibiting Symantec from engaging in the wrongful and unlawful acts described herein; (ii) requiring Symantec to disclose and admit the wrongful and unlawful acts described herein; and (iii) requiring Symantec to fully disclose the true nature of its software products now and in the future;

E. Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F. Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

G. Providing such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

H. Awarding such other and further relief as equity and justice may require.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all claims so triable.

Respectfully submitted,

Dated: April 2, 2012

**JAMES GROSS**, individually and on behalf of all others similarly situated,

By: /s/ Sean P. Reis
One of Plaintiff's Attorneys

SEAN P. REIS (SBN 184044)
sreis@edelson.com
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

JAY EDELSON (Admitted *Pro Hac Vice*)
jedelson@edelson.com
RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
brichman@edelson.com
CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

**CERTIFICATE OF SERVICE**

I, Sean P. Reis, an attorney, hereby certify that on April 2, 2012, I served the above and foregoing ***Plaintiff's First Amended Class Action Complaint***, by a causing true and accurate copy of such paper to by filed and served upon all parties and their counsel of record via the Court's CM/ECF electronically filing system, on this the 2nd day of April, 2012.

/s/ Sean P. Reis