1  JAY EDELSON (Admitted *Pro Hac Vice*)
   jedelson@edelson.com
2  RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
3  BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
   brichman@edelson.com
4  CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
   cgivens@edelson.com
5  EDELSON MCGUIRE LLC
   350 North LaSalle Street, Suite 1300
6  Chicago, Illinois 60654
   Telephone: (312) 589-6370
7  Facsimile: (312) 589-6378

8  SEAN P. REIS (SBN 184044)
   sreis@edelson.com
9  EDELSON MCGUIRE LLP
   30021 Tomas Street, Suite 300
10 Rancho Santa Margarita, California 92688
   Telephone: (949) 459-2124
11 Facsimile: (949) 459-2123

12 *Attorneys for Plaintiff and the putative class*

13              **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15 JAMES GROSS, individually and on behalf of      Case No. 3:12-cv-00154-CRB
   all others similarly situated,
16                                                  **PLAINTIFF'S OPPOSITION TO**
                                                    **DEFENDANT SYMANTEC'S**
17              *Plaintiff*,                        **MOTION TO DISMISS**

18      *v.*                                        Date: June 8, 2012
                                                    Time: 10:00 a.m.
19 SYMANTEC CORPORATION, a Delaware                 Judge: Honorable Charles R. Breyer
   corporation, and PC TOOLS, LTD., an Irish
20 limited company,

21              *Defendants*.

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................................ 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 3

    A.   Symantec Misrepresents Its Scareware's Functionality Through Its Websites and Marketing Materials, and Through Its In-Software Statements ................ 3

    B.   Gross Relied on Symantec's Website and In-Software Misrepresentations and Purchased a Full Version of the Scareware Software ................................... 4

    C.   Plaintiff's Expert Exposes Symantec's Scareware ................................................ 4

    D.   Plaintiff's Complaint and Defendant's Motion to Dismiss .................................. 4

III. ARGUMENT ..................................................................................................................... 5

    A.   As an Initial Matter, Gross Alleges Sufficient Facts to Support a Finding that Symantec is Liable for Conduct Under the PC Tools Name ....................... 5

        1.   Gross's Complaint shows that PC Tools is the alter ego of Symantec and that treating PC Tools as a separate entity would result in injustice ........... 6

        2.   Gross sufficiently alleges, in the alternative, that PC Tools is Symantec's agent because PC Tools is an instrumentality under Symantec's control ..... 7

        3.   Gross alleges that Symantec directly participated in PC Tools' fraud through a civil conspiracy ........................................................................... 8

    B.   Plaintiff's UCL Claims Allege that Significant Wrongful Conduct Occurred in California ........................................................................................................... 9

    C.   Plaintiff has Satisfied Rule 9(b)'s Heightened Pleading Standard for his Fraudulent Inducement Claim ............................................................................ 10

    D.   Symantec Cannot Disclaim Warranties Derived From Its Express Representations Regarding the Scareware's Functionality that Appear in Its Advertising Materials and Within the Scareware Itself ............................... 12

    E.   Plaintiff Adequately Pleads His Breach of Contract Claim ............................... 16

    F.   Plaintiff Adequately Pleads a Breach of Implied Covenant Claim ................... 17

    G.   Plaintiff's Unjust Enrichment Claim Survives Because He has Adequately Pleaded a Claim for Restitution ....................................................................... 19

IV.  CONCLUSION ................................................................................................................ 20

# **TABLE OF AUTHORITIES**

**United States Supreme Court Cases:**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................................................5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) .......................................................5

*United States v. Bestfoods*, 524 U.S. 51 (1998) .................................................................8

**United States Circuit Court of Appeals Cases:**

*Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670 (3d Cir. 1991) ......................................13

*Doe v. U.S.*, 58 F.3d 494 (9th Cir. 1995) .........................................................................20

*Johnson v. Lucent Tech. Inc.*, 653 F.3d 1000 (9th Cir. 2011) ............................................5

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) .................................................................10

*Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649 (7th Cir. 1998) .............13

*Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989) .........................10

*RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir. 1985) ................................12-13

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550 (9th Cir. 2010) ........................................10

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986) .........20

*Walling v. Beverly Enters.*, 476 F.2d 393 (9th Cir. 1973) ...............................................10

*Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989 (9th Cir. 2006) .....................8

**United States District Court Cases:**

*AB Avnet EMG v. Sierra Semiconductor Corp.*,
     No. C-93-0087-VRW, 1993 WL 280504 (N.D. Cal. July 9, 1993) ...........................14

*Architectronics, Inc. v. Control Sys., Inc.*, 935 F.Supp. 425 (S.D.N.Y. 1996) ...............13

*Badella v. Deniro Mktg. LLC*,
     No. C 10-03908 CRB, 2011 WL 5358400, at *11 (N.D. Cal. Nov. 4, 2011)............9-10, 12

*Brooks v. ComUnity Lending, Inc.*,
     No. 07-cv-4501, 2010 WL 2680265 (N.D. Cal. July 6, 2010) .................................11

*Bros. v. Hewlett-Packard Co.*,
     No. 06-cv-02254-RMW, 2007 WL 485979 (N.D. Cal. Feb. 12, 2007).................13-14

*ePresence, Inc. v. Evolve Software, Inc.*, 190 F.Supp.2d 159 (D. Mass. 2002)...............13

*F.D.I.C. v. GB Escrow, Inc.*,
No. 11-cv-05318 ODW JCG, 2011 WL 4550831 (C.D. Cal. Sept. 28, 2011) .................. 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
MDL No. 1827, 2011 WL 4345435 (N.D. Cal. Sept. 15, 2011) ........................ 19

*Johnson v. Am. Cas. Co. of Reading Pennsylvania*,
No. 09-2125 SC, 2011 WL 3739032 (N.D. Cal. Aug. 23, 2011) .................... 6, 8

*Keilholtz v. Superior Fireplace Co.*,
No. 08-cv-00836, 2009 WL 839076 (N.D. Cal. March 30, 2009)...................... 19

*Lamke v. Sunstate Equip. Co., LLC*,
No. C–03–4956, 2004 WL 2125869 (N.D. Cal. Sept. 22, 2004)...................... 18

*Newcourt Fin. USA, Inc. v. FT Mortgage Cos.*, 161 F.Supp.2d 894 (N.D. Ill. 2001) ................... 13

*Nikoonahad v. Rudolph Technologies, Inc.*,
No. 5:08-CV-02290 JF PVT, 2010 WL 4340395 (N.D. Cal. Oct. 27, 2010).............. 18 n.9

*Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082 (N.D. Cal. 2006) ........................ 19

*Nw. Pipe Co. v. Travelers Indem. Co. of Conn.*,
No. C-02-04189JF, 2003 WL 24027882 (N.D. Cal. Feb. 12, 2003) ........................ 16

*Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177 (N.D. Cal. 2009).................. 6, 8

*Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D. Cal. 2008)........................ 9, 12

*Phoenix Solutions, Inc. v. Sony Electronics, Inc.*, 637 F. Supp. 2d 683 (N.D. Cal. 2009) ............. 12

*Reyes v. Wells Fargo Bank, N.A.*, No. C-10-01667, 2011 WL 30759 (N.D. Cal. Jan. 3, 2011) ..... 19

*Roman Catholic Archbishop v. Superior Court*, 15 Cal.App.3d 405 (Cal. Ct. App. 1971).............. 6

*Shaterian v. Wells Fargo Bank, N.A.*,
No. 11-00920 SC, 2011 WL 5358751 (N.D. Cal. Nov. 7, 2011) ........................ 18

*Teknekron Customer Info. Solutions, Inc. v. Watkins Motor Lines, Inc.*,
No. C-93-03422 MHP, 1994 WL 11726 (N.D. Cal. Jan. 5, 1994) ...................... 13

*TK Power, Inc. v. Textron, Inc.*, 433 F.Supp.2d 1058 (N.D. Cal. 2006) ........................ 12

*Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073 (N.D. Cal. 2011) ........................6-7

**State Court Cases:**

*Automotriz Del Golfo De Cal. v. Resnick*, 47 Cal.2d 792 (1957) ........................6

*Carma Developers (California), Inc. v. Marathon Dev. California, Inc.*,
2 Cal. 4th 342 (1992) ........................ 17

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371 (Cal Ct. App. 1990)............. 18

*Consolidated Generator-Nevada, Inc. v. Cummins Engine*, 971 P.2d 1251 (Nev. 1998) .............. 14

*Fundin v. Chicago Pneumatic Tool Co.*,
    152 Cal.App.3d 951 (Cal. App. Ct. 1984) .................................................13-14, 14 n.7, 15

*Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317 (2000) ........................................................... 18

*Keith v. Buchanan*, 173 Cal. App. 3d 13 (Cal. Ct. App. 1985)................................. 14 n.7

*Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136 (Cal. Ct. App. 1990)........................... 17

*Murray v. D&J Motor Co. Inc.*, 958 P.2d 823 (Okla. Civ. App. 1998)......................... 14

*Olcott Int'l & Co., v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063 (Ind. App. 2003)................. 13

*Perdue v. Crock Nat'l Bank*, 38 Cal. 3d 913, 923 (1985)......................................... 17

*Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269 (Cal. Ct. App. 1962)........................... 6

*Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Const., Inc.*,
    119 Wash. 2d 334, 348 (1992) ....................................................................... 12 n.5

**Statutory Provisions:**

Cal. Civ. Code § 1668........................................................................7 n.2, 15 n.8

Cal. Com. Code § 2105 ............................................................................... 12

Cal. Com. Code § 2313 ........................................................................... 14 n.7

Cal. Com. Code § 2316 ............................................................................14-15

**Miscellaneous Authorities:**

B.E. Witkin, *Summary of Cal. Law, Sales* § 79 (9th ed. 1987) ..................................... 14

I.        INTRODUCTION

This case challenges Defendant Symantec Corporation's ("Symantec" or "Defendant")

design and marketing of certain of its utility software products—PC Tools Registry Mechanic, PC

Tools Performance Toolkit, and Norton Utilities (the "Scareware"). Through the use of its websites,

online marketing materials, and the software itself, Symantec misrepresents to consumers the

functionality of its Scareware and falsely claims that their computers suffer from harmful errors so

as to trick them into purchasing the Scareware to "fix" the fake problems.

Plaintiff James Gross ("Gross" or "Plaintiff") is one of Symantec's many victims. He

alleges that Symantec misrepresents that the Scareware will accurately detect, identify and remove

harmful errors, protect users' privacy, improve their computers' efficiency and performance, and

increase their computers' overall stability. In reality, however, Symantec intentionally designed its

Scareware to report that a consumer's computer suffers from a "LOW" "System Health," "Privacy

Health" and "Disk Health," and other seemingly ominous problems, regardless of the computer's

actual condition, which in turn prompts consumers to purchase a full version of the software to fix

the supposed errors.

Symantec – one of the largest and most well known developers of computer utility software

in the world – argues it has no liability. According to Symantec, it had no involvement in the

alleged fraud whatsoever, and Plaintiff's transaction was with its co-defendant and wholly-owned

subsidiary, PC Tools, Ltd. ("PC Tools"). Based on that, Symantec argues its corporate shield

protects it from any liability. Failing that, Symantec contends that Plaintiff has not alleged sufficient

facts to maintain each of his causes of action or satisfy Rule 9(b)'s heightened pleading standard for

his claims based in fraud. In so doing, Symantec relies heavily upon the supposed PC Tools End

User License Agreement ("EULA") between the Parties, wherein PC Tools purports to disclaim all

warranties together with any other statements about the Scareware that could or might have been

uttered.

Fortunately for the thousands of consumers who have been duped by Symantec's

Scareware, none of Symantec's arguments justify dismissal. First, Symantec is properly a party-

1  defendant to this action because PC Tools is a wholly owned subsidiary and alter-ego of Symantec,

2  which Symantec used as a brand to sell Symantec products. Even if that were not true (it is), PC

3  Tools acted as an agent of Symantec in perpetrating the alleged fraud and therefore, Symantec may

4  properly be held vicariously liable.

5       Second, Symantec simply ignores the plain allegations of Plaintiff's Complaint, namely, that

6  he viewed Symantec's representations, downloaded a free trial version of its software, ran a free

7  "scan," and received ominous (and ultimately false) feedback regarding the status of his computer

8  that led him to purchase the software. Likewise, Plaintiff sufficiently pleads all of the elements

9  required to state a claim for breach of contract and details the who, what, where, when and how of

10  Symantec's false statements in satisfaction of Rule 9(b)'s heightened pleading standard.

11       Nor is Symantec able to disclaim all warranties through its EULA. As an initial matter, the

12  EULA is unenforceable and cannot be considered in resolving Defendant's motion—its only

13  purpose is to exempt Symantec from responsibility for its own fraudulent activities at issue in this

14  case. Even if the EULA could be considered, Symantec has not waived the representations in its

15  marketing materials (on its website and in the software), which provide the basis for the bargain

16  between the Parties and establish express warranties regarding the Scareware's performance.

17       Finally, Symantec's attacks on Gross's breach of the implied covenant of good faith and fair

18  dealing an unjust enrichment claims are unavailing. Contrary to Symantec's assertions, Gross

19  pleads the existence of an implied covenant in all contracts under California law and that Symantec

20  breached it by acting in bad faith and intentionally failing to provide software that would perform as

21  represented. Likewise, although California courts are split on whether unjust enrichment is a

22  separate cause of action, courts in this District have routinely permitted such claims to proceed

23  provided the plaintiff states a claim supporting restitution, as Gross does here.

24       Accordingly, and as explained further below, the Court should deny Symantec's motion to

25  dismiss in its entirety.

26

27

28

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Symantec Misrepresents Its Scareware's Functionality Through Its Websites and Marketing Materials, and Through Its In-Software Statements.

Founded in 1982, Symantec has become a household name for its anti-virus and other security-related software (First Amended Complaint, Dkt. No. 33 [cited as "FAC"] ¶ 13), and boasts that it is one of the "world's largest software companies…." (*Id.* ¶ 14.) In 1992, Symantec merged with Peter Norton Computing, Inc., and has continued to sell products, such as Norton Antivirus and Norton Utilities, under the Norton brand name. (*Id.* ¶ 13.) In August 2008, Symantec acquired an Australian PC utilities software company called PC Tools, Ltd. (*Id.* ¶ 15.) Symantec has since taken over the operations of PC Tools, but continues to sell software under the PC Tools name. (*Id.* ¶ 16.)

Through its websites and marketing materials, Symantec represents that its Scareware protects users' privacy, improves the efficiency and performance of a computer, increases PC stability, repairs the hard drive, and cures other common computer errors and problems. (*Id.* ¶ 38.) To demonstrate its software's supposed utility, Symantec recommends that consumers download a free version of the Scareware and conduct a "free diagnostic" scan, which purports to detect errors and other problems existing on a user's computer. (*Id.* ¶¶ 39-40.) After the user downloads the software and performs the free scan, the Scareware invariably reports that there are numerous—often "high priority"—errors and other problems on the computer and represents that the Scareware can "fix" the supposed problems, but only if the consumer registers and pays for the full version of the software. (*Id.* ¶¶ 41-45.)

Despite Symantec's representations, the Scareware is not designed to accurately identify and fix computer errors and improve PC performance. (*Id.* ¶¶ 44-46.) Rather, Symantec intentionally designed the Scareware to misrepresent and exaggerate the severity and existence of errors and the overall "System," "Privacy" and "Disk" health of consumers' PCs, thereby inducing them, like Gross, to register and pay for a full version of the software. (*Id.*)

**B.** **Gross Relied on Symantec's Website and In-Software Misrepresentations and Purchased a Full Version of the Scareware Software.**

In April 2011, Plaintiff Gross searched the Internet for software that would enhance the performance of his PC and viewed an advertisement for Symantec's "Registry Mechanic" software. (*Id.* ¶ 48.) After reading representations in Symantec's advertisement and on its website that the software would accurately detect, report and repair errors and enhance the performance of his PC, Plaintiff downloaded a trial version of the software to run a "free scan". (*Id.* ¶¶ 48-49.) Plaintiff then ran Registry Mechanic's free diagnostic scan on his PC, which, to his chagrin, reported that his PC had numerous "High Priority" errors and other problems, and that his "System Health" was "LOW". (*Id.* ¶ 50.) The software further reported that in order to "fix all detected issues," Plaintiff would have to purchase a full version of Registry Mechanic. (*Id.*) Based on these representations, Plaintiff clicked on the "Purchase Online" button within the software and was directed to a website where he purchased the full version of Registry Mechanic for $29.99. (*Id.* ¶ 51.)

**C.** **Plaintiff's Expert Exposes Symantec's Scareware.**

Plaintiff, acting through his counsel, later engaged a computer forensic expert to examine the functionality of the Scareware. (*Id.* ¶ 45.) The expert ran a series of diagnostic tests in a controlled environment and determined that Symantec had deceptively designed its software to invariably report that the computer's "System Health", " Privacy Health", and "Disk Health" are "LOW," and that "High Priority" errors exist on the system. (*Id.* ¶ 45.) Plaintiff's expert further found that the Scareware is designed to identify problems on a user's computer (even where none actually exist), and artificially inflate the number of errors detected, all without performing any actual assessment of these issues and regardless of the actual status of the system. (*Id.* ¶ 46.)

**D.** **Plaintiff's Complaint and Defendant's Motion to Dismiss.**

On January 10, 2012, Plaintiff Gross filed his original class action complaint against Symantec alleging claims for violations of California's Unfair Competition Law, fraudulent inducement, breach of express warranties, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. (Dkt. No. 1.) Plaintiff also filed his Motion for

Class Certification at that time. (Dkt. No. 2.) On March 12, 2012, Symantec filed its motion to dismiss Plaintiff's complaint pursuant to Federal Rule Civil Procedure 12(b)(6). (Dkt. No. 28.) In lieu of responding to Symantec's motion, Gross filed his First Amended Complaint, which alleged identical claims against Symantec and named as a party-defendant Symantec's subsidiary, PC Tools, Ltd. (Dkt. No. 33.) Thereafter, Symantec again moved to dismiss each of Plaintiff's causes of action pursuant to Fed. R. Civ. P. 12(b)(6).[1] As explained below, none of Symantec's arguments require dismissal of this action and its motion should be denied in its entirety.

## III.   ARGUMENT

"On a motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Johnson v. Lucent Tech. Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011). While federal pleading standards require more than "formulaic recitation of the elements" of a claim or "naked assertions," a complaint survives dismissal where it allows the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555-57 (2007)). Gross's Complaint readily meets and exceeds these standards.

### A.   As an Initial Matter, Gross Alleges Sufficient Facts to Support a Finding that Symantec is Liable for Conduct Under the PC Tools Name.

Symantec first argues that it is not properly a party in this matter because it was PC Tools—not Symantec—that was involved in the underlying fraudulent activities that form the basis of Plaintiff's claims. Symantec is mistaken and is properly a party to this action for several reasons. First, PC Tools is a wholly owned subsidiary of Symantec and an alter-ego that Symantec uses as a brand to sell Symantec products. Second, even if the allegations of Symantec's involvement were not true (they are), it could still be held liable for the misconduct because, at the very least, PC Tools acted as an agent of Symantec in perpetrating the alleged fraud.

---

[1]   PC Tools, Ltd., an Irish company, has yet to be served with a summons and the First Amended Complaint. Gross originally requested that Symantec's counsel accept service on behalf of PC Tools, but received no response. As a result, Plaintiff initiated and is in the process of serving PC Tools in Ireland in accordance with the Hague Convention on Service Abroad.

For a parent to be held liable for the its subsidiary's conduct, a plaintiff must show that: (1) the parent and subsidiary have an alter ego relationship, *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1192 (N.D. Cal. 2009), (2) the subsidiary is the parent's agent, *id.*, or (3) the parent and subsidiary are jointly engaged in the illegal conduct. *Johnson v. Am. Cas. Co. of Reading Pennsylvania*, No. 09-2125 SC, 2011 WL 3739032 (N.D. Cal. Aug. 23, 2011). Gross's Complaint contains facts more than sufficient to demonstrate all three.

> 1.   *Gross's Complaint shows that PC Tools is the alter ego of Symantec and that treating PC Tools as a separate entity would result in injustice.*

Symantec claims it should be dismissed from this action because the Complaint provides only "conclusory allegations" to show a legally significant connection between the Defendants. (Def.'s Mot., p. 4.) In reality, Gross devotes nearly 3 pages of the Complaint to explaining why and how PC Tools is an alter-ego that Symantec uses as a separate brand to sell its products (much like its Norton brand name). (FAC ¶¶ 18-33.)

Gross's allegations show (which will be borne out by discovery) that there is "such [a] unity of interest and ownership that the separate personalities of [PC Tools and Symantec] no longer exist, and…that if the acts are treated as those of [PC Tools] alone, an inequitable result will follow." *Pantoja*, 640 F. Supp. 2d at 1192 (citing *Automotriz Del Golfo De Cal. v. Resnick*, 47 Cal.2d 792, 795 (1957)). "The factors which may show the 'unity of interest' issue vary according to each case and are fact specific," *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1285-86 (Cal. Ct. App. 1962), but as in this case, include "commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Walsh v. Kindred Healthcare*, 798 F. Supp. 2d 1073, 1082 (N.D. Cal. 2011) (quoting *Roman Catholic Archbishop v. Superior Court*, 15 Cal.App.3d 405, 411-12 (Cal. Ct. App. 1971)).

In this case, Gross alleges that PC Tools is a Symantec brand, rather than an independent subsidiary (FAC ¶ 18), and that Symantec acknowledges as much in its SEC filings (*Id.* ¶¶ 18(A),

21), and on its website. (*Id.* ¶ 18(G).) Gross further alleges specific facts showing comingling of assets, employees, and ultimate control between the Defendants, including that:

- "the PC Tools website is owned and [operated] by Symantec" out of Mountainview, California (*Id.* ¶ 18(B)-(C));

- Symantec and PC Tools share corporate offices (*Id.* ¶ 18 (D));

- Symantec makes "[t]he hiring decisions at PC Tools…" (*Id.* ¶ 18 (E));

- Symantec and PC Tools share corporate officers and management personnel (*Id.* ¶¶ 18 (G), 21-22); and

- Symantec and PC Tools share proprietary source code (*Id.* ¶ 18(H)).

Thus, far from alleging facts showing Symantec's "mere ownership" of PC Tools (Def.'s Mot., pp. 3:17–28), Gross has established that Symantec and PC Tools are one and the same entity.

Moreover, Gross specifically alleges that PC Tools is merely a shell for Symantec, designed to shield it from liability. (FAC ¶ 23); *Walsh*, 798 F. Supp. 2d at 1082 (a parent can be held liable for subsidiary's actions where the subsidiary is "use[d] as a mere shell or conduit for the affairs of the [parent.]"). That is, PC Tools and Symantec jointly carry out the alleged fraud and Symantec claims that PC Tools is a separate entity only to mask its participation in and limit its liability for the fraud it perpetrates through its Scareware. (FAC ¶ 23.) In this way, Symantec seeks to avoid legal attacks against its main holding company and instead attempts to force potential U.S. plaintiffs to sue in Ireland, thus depriving consumers of their day in court and otherwise exculpating the Defendants for their fraudulent and willful conduct. The law does not permit such an inequitable result and this Court shouldn't either.[2]

   **2.** *Gross sufficiently alleges, in the alternative, that PC Tools is Symantec's agent because PC Tools is an instrumentality under Symantec's control.*

In the alternative, the Court may hold Symantec liable for conduct under the PC Tools brand name because PC Tools operates as an agent of Symantec. (*Id.* ¶¶ 24-28.) A parent company can be

---

[2] As discussed further below, Symantec's attempts to utilize the PC Tools EULA to avoid liability here are unavailing. That is, the EULA contains numerous so-called "get out of jail free" clauses – not the least of which is its venue provision requiring all disputes to be litigated in Dublin, Ireland – and is therefore, unenforceable. *See* Cal. Civ. Code § 1668, *et seq.*

liable for the actions of its subsidiary "when the subsidiary is the agent of the parent, which requires a showing that the parent so controls the subsidiary as to cause the subsidiary to become merely the instrumentality of the parent." *Pantoja*, 640 F. Supp. 2d at 1192.

In this case, there are ample allegations to support this theory. Gross alleges that Symantec controls PC Tools because it owns, operates, and administers the PC Tools website (FAC ¶¶ 18(B), 25), Symantec's management personnel oversee the day-to-day operations of PC Tools (*Id.* ¶¶ 18(G), 25), Symantec makes PC Tools' hiring decisions (*Id.* ¶ 18(E)), and Symantec is responsible for PC Tools' customer service operations. (*Id.* ¶¶ 18(D), 25.) Moreover, PC Tools undertakes its misconduct solely for Symantec's benefit. (*Id.* ¶ 26.) By showing that Symantec controls and uses the PC Tools brand to profit from its fraudulent scheme, Gross establishes that Symantec is liable under an agency theory as well.

> 3. *Gross alleges that Symantec directly participated in PC Tools' fraud through a civil conspiracy.*

Because Symantec directly participated in PC Tools' fraud, the Court may also hold it liable as a civil conspirator. *See Johnson*, 2011 WL 3739032 at *2 ("A parent corporation may also be held directly liable if it participates in the wrongdoing of its subsidiary") (citing *United States v. Bestfoods*, 524 U.S. 51, 64-65 (1998)). To state a claim for civil conspiracy, a plaintiff "must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such acts." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). Gross has sufficiently outlined a civil conspiracy here because he alleges that Symantec acquired PC Tools and its products, (FAC ¶¶ 15-17), Symantec and PC Tools "agreed to defraud consumers through their Scareware" (*Id.* ¶ 28), and through uniform and deceptive marketing and sales tactics, Symantec and PC Tools actually sold the Scareware to consumers and profited as a result. (*Id.* ¶¶ 1-5, 16.) Indeed, the entirety of the Complaint focuses on these wrongful acts and the injuries Gross and the other members of the putative class suffered as a result. (*Id.* ¶¶ 1-5, 13-52, 61-116.) Thus, Symantec's assertion that Gross "fails to allege with

specificity…any facts showing" a civil conspiracy turns a blind eye to the allegations, and its motion should be denied. (*See* Def.'s Mot., p. 4.)

**B.    Plaintiff's UCL Claims Allege that Significant Wrongful Conduct Occurred in California.**

Unable to hide behind its "PC Tools did it" defense, Symantec attacks each of Plaintiff's causes of action in turn. First, Symantec contends that Plaintiff – a Washington resident – may not apply California's Unfair Competition Law "extraterritorially" on behalf of himself or any other persons beyond the borders of the State of California.[3] Symantec is incorrect. Because Plaintiff's claim properly challenges the conduct of Symantec, a California corporation, which occurred in and emanated from California, application of the UCL is appropriate here.

It is well-settled that "extraterritorial application of the UCL is not barred where the alleged wrongful conduct occurred in California." *Badella v. Deniro Mktg. LLC*, No. C 10-03908 CRB, 2011 WL 5358400, at *11 (N.D. Cal. Nov. 4, 2011) (extraterritorial application of UCL permitted through claims challenging the defendant's allegedly fraudulent website scheme, where plaintiff alleged defendant conducted significant business in California). Even the authorities cited favorably by Symantec support this rule. *See Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (extraterritorial application of UCL permitted where plaintiff contended that "defendant's relevant operations, including its headquarters, marketing department, warranty department, customer affairs department, and engineering department, are located in California").

Here, the Complaint focuses, in large part, on Gross's and the class's interactions with Symantec—a corporation based in California—through its PCTools.com website. (FAC ¶¶ 48-49.) Those interactions, which included numerous misrepresentations about the functionality of the Scareware made by Symantec to Gross and the class, a free trial and "free scan" provided by Symantec, and the purchase of the Scareware, emanated entirely from California. Further, and as noted above, that the PCTools.com website (where the entirety of the interactions relevant to

---

[3]    Notably, Symantec does not challenge the pleading of Gross's UCL claim beyond the mistaken contention that the statute's proscriptions may not be applied extraterritorially.

Plaintiff's claims occurred) is owned, operated and registered to Symantec at its California

headquarters and that the charges for the Scareware of which Gross now complains were levied

from California, should put to rest any doubts that the challenged conduct in fact emanated from

California. (*See* FAC ¶ 18); *Badella*, 2011 WL 5358400 at *11.

Accordingly, and because *all* the challenged conduct emanated from Symantec and its

California business operations, the mere fact that Plaintiff is not a California resident does not

defeat his UCL claim. Symantec's motion should be denied.

### C.   Plaintiff has Satisfied Rule 9(b)'s Heightened Pleading Standard for his Fraudulent Inducement Claim.

Symantec next incorrectly argues that Plaintiff's fraudulent inducement claim fails to satisfy

the rigors of Rule 9(b). Rule 9(b) requires an "identification of the circumstances constituting fraud

so that the defendant can prepare an adequate answer from the allegations." *Walling v. Beverly

Enters.*, 476 F.2d 393, 397 (9th Cir. 1973) (Rule 9(b) "does not require nor make legitimate the

pleading of detailed evidentiary matter," but alleging in conclusory fashion that defendant's

conduct is fraudulent is insufficient); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994), *cert.

denied*, 516 U.S. 810 (1995); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir.

1989). To "avoid dismissal for inadequacy under Rule 9(b), [the] complaint [must] state the time,

place, and specific content of the false representations as well as the identities of the parties to the

misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).

In this case, Gross's Complaint provides the requisite time, place, content, and parties

involved in Symantec's fraudulent conduct. Specifically, Plaintiff alleges that in April 2011

("when") while searching on the Internet ("where"), he came across, downloaded and utilized a

"free diagnostic scan" of his PC provided by Symantec through its Registry Mechanic software,

viewed specific representations regarding the supposed health and performance of his PC made

within the software and, as a result, purchased a full version of the software ("what") from

Symantec ("who"). (FAC ¶¶ 45-52.) Symantec's misrepresentations (the "content") are detailed

throughout the Complaint, including that Symantec—under the PC Tools brand name—made

uniform misrepresentations—to Plaintiff specifically and the putative class generally—about what the Scareware does (*Id.* ¶¶ 38-39), how it purports to identify and fix errors on a consumer's computer (*Id.* ¶¶ 40-41), how Symantec notifies consumers of such errors and promotes its retail products (*Id.* ¶¶ 42-43), and why Symantec engages in such deceptive practices—i.e., to deceive consumers into believing their computers suffer from errors so as to induce them to purchase (and enable Symantec to profit from) the Scareware. (*Id.* ¶ 47.)[4] These allegations undoubtedly give Symantec specific notice of the "particular misconduct which is alleged to constitute the fraud charged," and at the same time meet Rule 9's pleading standards. *See Brooks v. ComUnity Lending, Inc.*, No. 07-cv-4501, 2010 WL 2680265, *9 (N.D. Cal. July 6, 2010).

Gross's allegations also show that the Scareware reported, in a menacing fashion, that the system, privacy and disk health of his PC was "LOW", regardless of its actual condition. Indeed, Plaintiff engaged the services of a computer forensics expert to examine the functionality of the Scareware—including Registry Mechanic—who determined that Symantec had deceptively designed its software to invariably report that a computer's "health" was "LOW" without performing any true diagnosis. (FAC ¶¶ 45-46.) Thus, the actual status of Plaintiff's computer is not at issue – Plaintiff contends that the software did not perform any credible diagnosis of his computer and would have reported the very same information *regardless* of its status. (*Id.*)

Ultimately, the Complaint carefully details Symantec's misrepresentations as well as the way it used the Scareware as part of its scheme to trick people into buying its products under false pretenses. Rule 9(b)'s heightened pleading requirements don't demand anything more.

---

[4]      Symantec also mistakenly relies upon Washington law for the proposition that Gross may not maintain a cause of action for fraud based upon statements regarding what the Scareware might do for him in the future. (Def.'s Mot., p. 7.) Symantec's arguments misconstrue the allegations of the Complaint. That is, Gross does not take issue with representations by Symantec of what the Scareware *might* do or *may* be capable of doing, but instead, its affirmative representations that upon downloading and installing the Scareware it could and would accurately detect, report and repair numerous computer errors and other problems. (FAC ¶¶ 38-41.) As Plaintiff's computer forensics expert found, the Scareware simply cannot and does not perform those functions (at any time) and therefore, Symantec's objections to the Complaint in this regard are unavailing.

1

2

### D.    Symantec Cannot Disclaim Warranties Derived From Its Express Representations Regarding the Scareware's Functionality that Appear in Its Advertising Materials and Within the Scareware Itself.

3       Symantec also asserts that Plaintiff's claim for breach of express warranties cannot stand

4   because, purportedly: (1) California's Uniform Commercial Code cannot be applied

5   extraterritorially, (2) Cal. Com. Code § 2313 does not apply to software licenses, (3) Plaintiff fails

6   to adequately plead the existence of an express warranty, and (4) the PC Tools EULA expressly

7   disclaims any warranties. Each of these arguments fails and is taken in turn below.

8       As an initial matter and as discussed above, any suggestion that California's U.C.C. may not

9   be applied here is misplaced. As explained above, Gross's claims are based entirely upon his

10  interactions with Symantec—a corporation based in California—through its PCTools.com website,

11  which itself is operated and maintained by, and registered to Symantec in California, and which

12  ultimately resulted in charges to Plaintiff that emanated from and were paid in California. (FAC ¶

13  18.) As such, this case has a more than sufficient nexus to California and the laws of the state may

14  properly be applied. *See Badella*, 2011 WL 5358400 at *10 (citing *Parkinson*, 258 F.R.D. 580).[5]

15      Symantec counters that software is not considered a "good" under the U.C.C. That is also

16  incorrect. The California Code defines "goods" as things "which are movable at the time of

17  identification to the contract for sale." Cal. Com. Code § 2105; *TK Power, Inc. v. Textron, Inc.*, 433

18  F.Supp.2d 1058, 1061 (N.D. Cal. 2006). In determining whether a transaction involves goods or

19  services, "the courts must [consider] which predominates by examining the essence of the

20  agreement." *Phoenix Solutions, Inc. v. Sony Electronics, Inc.*, 637 F. Supp. 2d 683, 694 (N.D. Cal.

21  2009) (citing *TK Power*, 433 F.Supp.2d at 1061; *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543,

22  546 (9th Cir. 1985)). In making such a determination, courts throughout the country, including in

23

24

25

26

---

[5]      In any event, the elements for breach of an express warranty are virtually identical under Washington and California law. *See, e.g., Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Const., Inc.*, 119 Wash. 2d 334, 348 (1992) (citing RCW 62A.2-313) (Washington law defines "express warranties as (1) '[a]ny affirmation of fact or promise', (2) '[a]ny description' or (3) '[a]ny sample or model' by a seller relating to or describing the goods, when such representation forms the 'basis of the bargain'".). Thus, regardless of the law that is applied, Gross has adequately alleged a claim for Symantec's breach of express warranties.

27

28

California, have consistently distinguished cases such as this, where the transaction involves the mere purchase of a software package, from those cases that involve the design of a software product and/or a transfer of the corresponding intellectual property rights. In the latter, as in this case, the software has properly and consistently been classified as a "good" for purposes of the U.C.C.[6] *See, e.g., RRX Indus., Inc.*, 772 F.2d at 546-47 (applying California law); *ePresence, Inc. v. Evolve Software, Inc.*, 190 F.Supp.2d 159, 163 (D. Mass. 2002) (applying California law); *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) (applying New Hampshire law); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675–76 (3d Cir. 1991) (applying Pennsylvania law); *Newcourt Fin. USA, Inc. v. FT Mortgage Cos.*, 161 F.Supp.2d 894, 897 (N.D. Ill. 2001) (applying Illinois law); *Dahlmann v. Sulcus Hospitality Technologies, Corp.*, 63 F.Supp.2d 772, 775 (E.D. Mich. 1999) (applying Michigan law); *Architectronics, Inc. v. Control Sys., Inc.*, 935 F.Supp. 425, 432 (S.D.N.Y. 1996) (applying New York law); *Olcott Int'l & Co., v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1071 (Ind. App. 2003). Thus, because Symantec does not and cannot seriously contend that this case involves the transfer of any rights to the intellectual property underlying its Scareware, the software at issue is properly considered a good and California's U.C.C. may be applied.

Finally, Plaintiff properly alleges the existence of express warranties Symantec made regarding the Scareware, which cannot be disclaimed. Under California law, disclaimers of express warranties are "generally void," *Teknekron Customer Info. Solutions, Inc. v. Watkins Motor Lines, Inc.*, No. C-93-03422 MHP, 1994 WL 11726 (N.D. Cal. Jan. 5, 1994), and "[s]trict construction against the person who has both warranted a particular fact to be true and then attempted to disclaim the warranty is especially appropriate in light of the fact that [a] disclaimer of an express warranty is essentially contradictory." *Bros. v. Hewlett-Packard Co.*, No. 06-cv-02254-RMW, 2007 WL 485979, *7 (N.D. Cal. Feb. 12, 2007) (citing *Fundin v. Chicago Pneumatic Tool Co.*, 152

---

[6] Each of Symantec's cited authorities support this contention. Indeed, they each were decided in the context of a dispute over the design and/or intellectual property rights to the software at issue, rather than simply the sale of a consumer software product.

Cal.App.3d 951, 957-58 (Cal. App. Ct. 1984)); *see also* 3 B.E. Witkin, *Summary of Cal. Law, Sales* § 79 (9th ed. 1987) ("disclaimer of an express warranty is essentially contradictory"). Indeed, the California Commercial Code explains that "creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other" and "negation or limitation is inoperative to the extent that such construction is unreasonable." *See* Cal. Com. Code § 2316(1).

Courts agree that express warranties by description[7] cannot be disclaimed because such warranties constitute the basis of the bargain. *See, e.g., Murray v. D&J Motor Co. Inc.*, 958 P.2d 823, 829 (Okla. Civ. App. 1998) (finding "[e]ven in cases of blanket disclaimers of all warranties there remains a warranty of description. A buyer and seller transact about some 'thing' which [is]…the essence of their transaction"); *Consolidated Generator-Nevada, Inc. v. Cummins Engine*, 971 P.2d 1251, 1255 (Nev. 1998) ("[U]nder California law, a manufacturer cannot disclaim express descriptions of certain detailed capacities in brochures.").

California courts have reached comparable decisions. For example, in *Fundin* the court held that express warranties in a manufacturer's sales brochure could not be disclaimed or excluded. The court reasoned, "when a product has been expressly described by its manufacturer as having certain detailed capacities under certain conditions, it would be both unfair and unreasonable to construe the language [of the disclaimer] as negating the express description." 152 Cal.App.3d at 957 (citation omitted); *see also Bros.*, 2007 WL 485979 (refusing to dismiss breach of express warranty claim, noting that "disclaimers to exclude a manufacturer's express representations of product specifications would be unfair"); *see also AB Avnet EMG v. Sierra Semiconductor Corp.*, No. C-93-0087-VRW, 1993 WL 280504 (N.D. Cal. July 9, 1993) *aff'd*, 81 F.3d 167 (9th Cir. 1996) (favorably

---

[7]    Symantec's express warranties arose from affirmations of fact contained within Symantec's advertising materials, on its websites, and in-software representations. Under California law, express warranties arise by "[a]ny description of the goods which is made part of the basis of the bargain." Cal. Com. Code § 2313(b)(1). Because such descriptions are "presumptively part of the basis of the bargain, the burden is on the seller to prove that the resulting bargain does not rest at all on the representation." *Keith v. Buchanan*, 173 Cal. App. 3d 13, 23 (Cal. Ct. App. 1985). Warranties by description may arise through advertisements, catalogs, brochures, labels, etc. *See, e.g., Fundin*, 152 Cal.App.3d at 957 (warranty created through description in brochure).

1   discussing legal principles in *Fundin*, but refusing to adopt for distributor-plaintiff "because

2   consumers, unlike merchants, are generally unable to bargain for risk allocation with the

3   manufacturer of a product").

4          Here, the supposed "express disclaimer" of all warranties found in the PC Tools EULA is

5   completely at odds with the representations in Symantec's advertising materials and in the

6   Scareware itself. Symantec advertised and represented that the Scareware would accurately identify,

7   report and repair PC errors, protects the user's privacy, improve the efficiency and performance of

8   the computer, increase the PC's stability, repair its hard drive, and cure other common computer

9   errors. (FAC ¶¶ 38.) Despite these representations, the software does not actually "perform any

10  meaningful evaluation of the user's computer system" or otherwise perform the functions Symantec

11  represents. (*Id.* ¶ 44.) Symantec's affirmations were part of the "money-for-software bargain"

12  between the Parties because Plaintiff "reasonably believed that [he was] purchasing software that

13  would accurately" identify and correct errors on his PC. (*Id.* ¶¶ 49-52.) As with the attempted

14  disclaimer in *Fundin*, it would be "unfair and unreasonable to construe the language of the

15  [EULA]" as negating the express affirmations as to the Scareware's functionality. *See Fundin*, 152

16  Cal.App.3d at 957; *see also* Cal. Com. Code § 2316(1) ("negation or limitation" of disclaimer "is

17  inoperative to the extent that such construction is unreasonable").[8] Thus, Symantec has not and

18  cannot disclaim its express representations, and this Court should refuse to dismiss Plaintiff's

19  breach of express warranty claims.

20

21

22  _____

    [8]      California contract law would also prohibit enforcement of the EULA's purported waiver of express warranties insofar as the provision would exculpate Symantec for its willful and fraudulent
23  conduct. *See* Cal. Civ. Code § 1668 ("All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person
24  or property of another, or violation of law, whether willful or negligent, are against the policy of the law."). Indeed, Plaintiff alleged as much in his Complaint. (FAC ¶¶ 30-32.) Additionally, Plaintiff
25  alleges that "[t]o insulate Symantec [] from liability, Defendants [also] included a forum selection clause in the [EULA] designating Dublin, Ireland as the venue for prosecution and resolution of all
    disputes related thereto." (*Id.* ¶ 30.) Of course, the venue provision of the EULA is similarly
26  unenforceable because it would require U.S. consumers to travel thousands of miles to Dublin, Ireland, to litigate over software that costs approximately $30, and in that way, effectively prohibits
27  them from pursuing legal claims against Symantec related to its alleged fraud.

28

1

### E.    Plaintiff Adequately Pleads His Breach of Contract Claim.

2     Defendant next contends that Plaintiff's breach of contract claim should be dismissed

3  because Plaintiff has not entered into any contract with Symantec, does not allege the terms of any

4  contract with Symantec, and the PC Tools EULA disclaims the obligations Plaintiff alleges to have

5  been breached by Symantec. Notwithstanding and as explained above, the crux of Plaintiff's claims

6  are its transactions with Symantec—even if through PC Tools—and thus, there should be no

7  question that there exists a valid and enforceable agreement between Gross and *Symantec*.

8  Moreover, regardless of the EULA or its disclaimers—which are unenforceable and which Plaintiff

9  specifically alleges to be unlawfully exculpatory—Plaintiff's breach of contract claim stands

10  because he has pled all of the required elements to maintain the claim.

11     To state a claim for breach of contract, Plaintiff was required to (and did) allege: "(1) a

12  contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

13  damage to the plaintiff." *F.D.I.C. v. GB Escrow, Inc.*, No. 11-cv-05318 ODW JCG, 2011 WL

14  4550831, *4 (C.D. Cal. Sept. 28, 2011); *see Nw. Pipe Co. v. Travelers Indem. Co. of Conn.*, No. C-

15  02-04189JF, 2003 WL 24027882, *3 (N.D. Cal. Feb. 12, 2003).

16     Here, Plaintiff alleges the existence of a valid contract whereby Symantec agreed to sell, and

17  Plaintiff and the class agreed to purchase, software that would accurately identify, report and repair

18  legitimate computer errors found on Plaintiff's and the class's PCs (the "contract"). (*See* FAC ¶ 95.)

19  Plaintiff also alleges that he and the class paid, and Symantec accepted, the purchase price of the

20  software ("performance") (*Id.* ¶ 97), that Symantec failed to provide software that performed the

21  agreed-upon functions ("breach") (*Id.* ¶ 98), and damages resulting from this breach, including the

22  amount paid by Plaintiff and the class members to purchase the software. (*Id.* ¶ 99.) Plaintiff thus

23  adequately pleads the elements of his breach of contract claim.

24     Defendant also asserts that the breach of contract claim fails absent an allegation that the

25  software failed to "remove legitimate computer errors" from his computer. (*See* Def.'s Mot., p. 13.)

26  This again misses the point of this lawsuit—Plaintiff's claims are predicated on the fact that even if

27

28

there were errors or other problems on his computer, the Scareware was simply incapable of accurately detecting, reporting and repairing those errors and problems, despite Symantec's representations to the contrary. Moreover, Plaintiff engaged the services of a computer forensic expert who determined that the Scareware does not perform any credible diagnosis as it plainly purports to do—this applies to Plaintiff's experience and the experience of all putative class members. (FAC ¶¶ 45-46.) Accordingly, that the software may have incidentally fixed this or that error—of which there is no evidence that it did—is hardly dispositive.

As a result, the Court should find that Plaintiff has adequately stated a claim for breach of contract.

### F. Plaintiff Adequately Pleads a Breach of Implied Covenant Claim.

Additionally, Plaintiff properly alleges that implicit in his contract with Symantec is an implied covenant that Symantec will honestly and accurately diagnose and remove threats from his and the class's computers, and that it comply with all applicable statutory guidelines, including Cal. Com. Code § 2313.

Under California law, a breach of the implied covenant of good faith and fair dealing occurs when one party to a contract exercises its discretion in such a way as to deprive the other party of the benefits of the bargain. *See Perdue v. Crock Nat'l Bank*, 38 Cal. 3d 913, 923 (1985); *Auto. Vending Co. v. Wisdom*, 182 Cal. App. 2d 354, 358 (Cal. Ct. App. 1960); *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1147 (Cal. Ct. App. 1990) (covenant of good faith and fair dealing "implied in every contract as a method to protect the interests of the parties in having the contractual promises and purposes performed."). That is precisely what happened here: Symantec abused its discretion by intentionally designing the Scareware so that it would not honestly and accurately detect, report and repair legitimate errors and threats on users' computers. *See Carma Developers (California), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 372 n.11 (1992).

Symantec's argument that Plaintiff's breach of implied covenant claim is impermissibly duplicative of his breach of contract claim also fails. While it is well-settled under California law

that a breach of the implied covenant of good faith and fair dealing involves something more than breach of a contractual duty itself, there are three exceptions to this rule: (1) where a breach of a consensual contract claim is not alleged, *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1399 (Cal Ct. App. 1990); (2) where the plaintiff is seeking recovery in tort, *id.*; and (3) where the plaintiff alleges that the defendant acted in bad faith to frustrate the contract's benefits.[9] *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 353 n. 18 (2000); *Lamke v. Sunstate Equip. Co., LLC*, No. C–03–4956, 2004 WL 2125869 (N.D. Cal. Sept. 22, 2004); *see also Shaterian v. Wells Fargo Bank, N.A.*, No. 11-00920 SC, 2011 WL 5358751, *8 (N.D. Cal. Nov. 7, 2011) ("this rule does not apply where a plaintiff alleges that the defendant acted in bad faith to frustrate the contract's actual benefits").

Here, Plaintiff's breach of implied covenant claim falls easily within the exception. That is, the crux of each of Plaintiff's claims is that Symantec acted in bad faith by failing to provide software that honestly and accurately detected, reported and repaired errors and other problems on consumers' computers, as it represented that it would. (FAC ¶¶ 100-109.) Symantec does not (and could not reasonably) claim otherwise.

Finally, Symantec's contention that Plaintiff fails to allege that its breach of the implied covenant caused him any injury is absurd in light of the fact that, as explained above, he specifically alleges that the Scareware failed to accurately identify, report and repair legitimate errors and problems on his computer and therefore, he (like the other members of the class) got nothing in return for the money he paid to purchase the software. (*Id.*) Symantec's motion fails in this regard as well.

---

[9] Symantec fails to even recognize the existence of the exceptions to this rule and instead, cites only a single authority applying New Jersey common law in reaching the conclusion it urges here. *See Nikoonahad v. Rudolph Technologies, Inc.*, No. 5:08-CV-02290 JF PVT, 2010 WL 4340395 (N.D. Cal. Oct. 27, 2010) ("New Jersey law governs [the] claim for breach of the implied covenant of good faith and fair dealing."). Of course, the laws of the State of New Jersey have no bearing on these proceedings and not even Symantec would claim that they do.

1

2

### G.     Plaintiff's Unjust Enrichment Claim Survives Because He has Adequately Pleaded a Claim for Restitution.

Finally, Defendant misconstrues the status of California law on whether unjust enrichment

is a viable cause of action. Although courts are split on the question, a recent decision in this

District explained the current divergence of authority and allowed a claim for unjust enrichment to

proceed because, as many courts that have "rejected" such claims have found, the claims may

proceed under a different title. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827,

2011 WL 4345435, *3 (N.D. Cal. Sept. 15, 2011) ("Although perhaps not technically an action for

'unjust enrichment,' the Court finds that plaintiffs' allegations are sufficient to state a claim under

California law.") (citing *Reyes v. Wells Fargo Bank, N.A.*, No. C-10-01667, 2011 WL 30759, *17

n.7 (N.D. Cal. Jan. 3, 2011) ("The Court notes that even if there is disagreement as to whether there

is a claim for 'restitution,' the disagreement turns in large part on the label that is attached to the

claim on which restitution is sought; while some courts refer to claims for 'restitution,' others label

these claims according to the underlying theory attached to the claim.")); *Nordberg v. Trilegiant

Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006) (allowing cause of action to proceed because

although the "cause of action is entitled 'unjust enrichment' it is clear that plaintiffs are seeking

restitution"); *Keilholtz v. Superior Fireplace Co.*, No. 08-cv-00836, 2009 WL 839076, *5 (N.D.

Cal. March 30, 2009) ("Whether Plaintiffs' unjust enrichment cause of action is construed as a

claim for restitution…or is considered to be an independent cause of action…the allegations are

sufficient to state a claim under California law.").

Regardless of the label, this Court should permit Plaintiff's claim for unjust enrichment to

proceed because it is clear that Plaintiff has stated a claim for restitution under California law.

Gross alleges his Sixth Cause of Action in the alternative to breach of contract, and seeks restitution

and disgorgement of all monies unlawfully retained by Defendants. (FAC ¶¶ 110-116.) Therefore,

as with the unjust enrichment claim in *In re TFT-LCD*, Plaintiff's claim should be permitted to

proceed. *See* 2011 WL 4345435 at *3.

1

## IV.    CONCLUSION

2          For the foregoing reasons, Plaintiff James Gross, individually and on behalf of all others

3   similarly situated individuals, respectfully requests that the Court enter an Order (i) denying

4   Symantec's motion to dismiss in its entirety, (ii) requiring Symantec to answer Plaintiff's First

5   Amended Class Action Complaint, and (iii) providing such other and further relief as the Court

6   deems equitable and just.[10]

7
                                        Respectfully submitted,

8                                       **JAMES GROSS**, individually and on behalf of all
                                        others similarly situated,
9

10  Dated: May 1, 2012                  By: /s/ Benjamin H. Richman
                                            One of Plaintiff's Attorneys

11                                      JAY EDELSON (Admitted *Pro Hac Vice*)
                                        jedelson@edelson.com
12                                      RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
                                        rbalabanian@edelson.com
13                                      BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
                                        brichman@edelson.com
14                                      CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
                                        cgivens@edelson.com
15                                      EDELSON MCGUIRE LLC
                                        350 North LaSalle Street, Suite 1300
16                                      Chicago, Illinois 60654
                                        Telephone:  (312) 589-6370
17                                      Facsimile:  (312) 589-6378

18                                      SEAN P. REIS (No. 184044)
                                        sreis@edelson.com
19                                      EDELSON MCGUIRE LLP
                                        30021 Tomas Street, Suite 300
20                                      Rancho Santa Margarita, California 92688
                                        Telephone:  (949) 459-2124
21                                      Facsimile:  (949) 459-2123

22

23

24
    _____
    [10]     In the event the Court disagrees with Plaintiff and grants Defendant's motion to dismiss,
25  Plaintiff respectfully requests leave to add further detail, additional claims, or otherwise take steps
    necessary to cure any defects found by the Court in his pleadings. *See Schreiber Distrib. Co. v.*
26  *Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *Doe v. U.S.*, 58 F.3d 494, 497 (9th
    Cir. 1995) (leave to amend should be granted even if the plaintiff did not request leave, unless it is
27  clear that the complaint cannot be cured).

28

---

1

## CERTIFICATE OF SERVICE

2

3

I, Benjamin H. Richman, an attorney, hereby certify that on May 1, 2012, I served the above and foregoing *Plaintiff's Opposition to Defendant Symantec's Motion to Dismiss*, by causing a true and accurate copies of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this the 1st day of May 2012.

4

5

/s/ Benjamin H. Richman
Benjamin H. Richman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28