1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GROSS, individually and on behalf of all
other similarly situated,

          Plaintiff,

  v.

 SYMANTEC CORPORATION, a Delaware
corporation, and PC TOOLS, LTD., an Irish
limited company

          Defendants.
_____/

No. C 12-00154 CRB

**ORDER GRANTING MOTION TO
DISMISS**

      This is a putative class action brought by James Gross against computer security
software maker Symantec and its subsidiary PC Tools, Ltd.  Gross alleges the companies
fraudulently induced him to buy security software through a free trial that was supposed to
identify weaknesses in his computer's security.  He alleges that the free trial was essentially a
scam, and that the software does not increase security.  He claims (1) a violation of
California's Unfair Competition Law, Cal Bus. & Prof. Code § 17200; (2) fraudulent
inducement; (3) breach of express warranties, Cal. Com. Code § 2312; (4) breach of contract;
(5) breach of the implied covenant of good faith and fair dealing; and (6) unjust enrichment.
PC Tools, Ltd., an Irish company, has yet to be served.  Symantec moves to dismiss all
causes of action on the grounds that Plaintiff Gross fails to state a claim upon which relief
can be granted.

1   **I.      BACKGROUND**[1]

2       Founded in 1982, Symantec has become a household name for its anti-virus and other

3   security-related software.  First Amended Complaint (dkt. 33) ¶ 13.  In 1992, Symantec

4   merged with Peter Norton Computing, Inc. and has continued to sell products, such as

5   Norton Antivirus and Norton Utilities, under the Norton brand name.  Id. ¶ 13.  In August

6   2008, Symantec acquired an Australian PC utilities software company called PC Tools, Ltd.

7   Id. ¶ 15.  Symantec has since taken over the operations of PC Tools, but continues to sell

8   software under the PC Tools name.  Id. ¶ 16.

9       Through its websites and marketing materials, Symantec represents that its software

10  protects users' privacy, improves the efficiency and performance of a computer, increases PC

11  stability, repairs the hard drive, and cures other common computer errors and problems.  Id. ¶

12  38.  To demonstrate its software's supposed utility, Symantec recommends that consumers

13  download a free version of the software and conduct a "free diagnostic" scan, which purports

14  to detect errors and other problems existing on a user's computer.  Id. ¶¶ 39-40.  After the

15  user downloads the software and performs the free scan, the software allegedly invariably

16  reports that there are numerous – often "high priority" – errors and other problems on the

17  computer and represents that the software can "fix" the supposed problems, but only if the

18  consumer registers and pays for the full price version of the software.  Id. ¶¶ 41-45.

19      Despite Symantec's representations, Plaintiff alleges that the software is not designed

20  to accurately identify and fix computer errors and improve PC performance.  Id. ¶¶ 44-46.

21  Rather, Plaintiff alleges Symantec intentionally designed the software to misrepresent and

22  exaggerate the severity and existence of errors and the overall "System," "Privacy" and

23  "Disk" health of consumers' PCs, thereby inducing them, like Gross, to register and pay for a

24  full version of the software.  Id.

25      In April 2011, Plaintiff Gross searched the Internet for software that would enhance

26  the performance of his PC, and viewed an advertisement for Symantec's "Registry

27  _____

28          [1] These facts are taken from the First Amended Complaint.  Although Symantec contests the allegations made about the viability of its software, the Court must take the allegations in the Complaint as true at this stage in the litigation.

Mechanic" software.  Id. ¶ 48.  After reading representations in Symantec's advertisement and on its website that the software would accurately detect, report and repair errors and enhance the performance of his PC, Plaintiff downloaded a trial version of the software to run a "free scan."  Id. ¶¶ 48-49.  Plaintiff then ran Registry Mechanic's free diagnostic scan on his PC, which, to his chagrin, reported that his PC had numerous "High Priority" errors and other problems, and that his "System Health" was "LOW."  Id. ¶ 50.  The software further reported that in order to "fix all detected issues," Plaintiff would have to purchase a full version of Registry Mechanic.  Id.  Based on these representations, Plaintiff clicked on the "Purchase Online" button within the software and was directed to a website where he purchased the full version of Registry Mechanic for $29.99.  Id. ¶ 51.

Plaintiff, acting through his counsel, later engaged a computer forensic expert to examine the functionality of the software.  Id. ¶ 45.  The expert ran a series of diagnostic tests in a controlled environment and determined that Symantec had deceptively designed its software to invariably report that the computer's "System Health," " Privacy Health," and "Disk Health" are "LOW," and that "High Priority" errors exist on the system.  Id. ¶ 45. Plaintiff's expert further found that the software is designed to identify problems on a user's computer (even where none actually exist), and artificially inflate the number of errors detected, all without performing any actual assessment of these issues and regardless of the actual status of the system.  Id. ¶ 46.

On January 10, 2012, Plaintiff Gross filed his original class action complaint against Symantec alleging claims for violations of California's Unfair Competition Law, fraudulent inducement, breach of express warranties, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  Complaint (dkt. 1).  Plaintiff also filed his Motion for Class Certification at that time.  (Dkt. 2).  On March 12, 2012, Symantec filed its motion to dismiss Plaintiff's complaint pursuant to Federal Rule Civil Procedure 12(b)(6). (Dkt. 28).  In lieu of responding to Symantec's motion, Gross filed his First Amended Complaint, which alleged identical claims against Symantec and named as a party-defendant Symantec's subsidiary, PC Tools, Ltd.  FAC (dkt. 33).  Thereafter, Symantec again moved to

1   dismiss each of Plaintiff's causes of action pursuant to Fed. R. Civ. P. 12(b)(6).  Motion to

2   Dismiss (dkt. 38).  PC Tools, Ltd. is not party to this motion.

3        As explained below, the Court GRANTS Symantec's motion in its entirety but

4   permits Plaintiff leave to amend.

5   **II.   LEGAL STANDARD**

6        Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and

7   plain statement of the claim showing that the pleader is entitled to relief."  A complaint must

8   provide the defendant with "fair notice" of the claims against it and the grounds for relief.

9   Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A court may dismiss a complaint

10  under Rule 12(b)(6) when it does not contain enough facts to state a claim for relief that is

11  plausible on its face.  Id. at 570.  "A claim has facial plausibility when the plaintiff pleads

12  factual content that allows the court to draw the reasonable inference that the defendant is

13  liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

14  Allegations of material fact are taken as true and construed in the light most favorable to the

15  nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).

16       Under Federal Rule of Civil Procedure 9(b), the "circumstances constituting fraud" or

17  any other claim that "sounds in fraud" must be stated "with particularity."  Fed. R. Civ. P.

18  9(b); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  The purpose

19  of this heightened pleading requirement is to "give defendants notice of the particular

20  misconduct . . . so that they can defend against the charge and not just deny that they have

21  done anything wrong."  Neubronner v. Milken, 6 F.3d 666, 673 (9th Cir. 1993).  To comply

22  with Rule 9(b), a plaintiff must plead with particularity the time and place of the fraud, the

23  statements made and by whom, an explanation of why or how such statements were false or

24  misleading, and the role of each defendant in the alleged fraud.  KEMA, Inc. v. Koperwhats,

25  No. 09-1587, 2010 WL 3464737, at *3 (N.D. Cal. Sept. 1, 2010) (citations omitted).

26       A complaint should not be dismissed without leave to amend unless it

27  is clear that the claims could not be saved by amendment.  Swartz v. KPMG LLP, 476 F.3d

28  756, 760 (9th Cir. 2007).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   **III.   DISCUSSION**

2       Symantec moves to dismiss Plaintiff's FAC for failure to meet the pleading

3   requirements of each individual cause of action.  The Court will examine each in turn.[2]

4       **A.   Fraud**

5       As a preliminary issue, Symantec argues that the entire FAC fails because each of

6   Plaintiff's six claims arises from the same insufficiently pled fraudulent conduct.

7   Symantec's challenge to Plaintiff's fraud allegations rests on three propositions considered

8   here: (1) Plaintiff fails to plead fraud with the specificity required by Rule 9(b), (2) Plaintiff

9   cannot state a claim based on representations of future performance, and (3) the allegations

10  describing fraud are so contradictory as to make them implausible.  Mot. at 5-6.  As

11  explained below, Symantec's motion is GRANTED, but only for failure to comply with Rule

12  9(b).[3]

13      **1.   Rule 9(b) Particularity**

14      Because Plaintiff's allegations against Symantec "rely on a unified fraudulent course

15  of conduct," the pleading is "grounded in fraud . . . [and] as a whole must satisfy the

16

17

18  _____

19      [2] It its Motion to Dismiss, Symantec additionally moved for dismissal on the ground that it was
20  not a party to the underlying transaction and could therefore not be held responsible for the actions of
    PC Tools, Ltd.  Mot. at 3-4.  However, on June 4, 2012, Symantec filed a Notice of Withdrawal of
21  Certain Arguments, retracting this argument due to corporate restructuring at Symantec's headquarters.
    (Dkt. 44) (striking Section II of the Motion).
        Because Symantec's "nonparty theory" permeates its analysis of each individual claim, to some
22  extent the same argument still remains before the Court.  Mot. at 6 (fraudulent inducement claim); Mot.
    at 10 (express warranty claim); Mot. at 11 (breach of contract claim); Reply at 7-8 (UCL claim).
23  However, Symantec's concession that it no longer wishes to pursue this theory as a threshold issue
    undermines any attempt to reassert it against Plaintiff's individual claims, so the Court will disregard
24  it altogether.  Accordingly, in summarizing Symantec's position as to each cause of action, the Court
    will omit specific arguments premised on this "nonparty theory."

25

26      [3] Symantec's "nonparty" theory for dismissal, described above, affects choice of law, which
    informs the Court's fraud analysis.  Symantec initially argued that because only PC Tools (and Irish
27  company) and Plaintiff (a Washington resident) were party to the challenged transaction, Washington
    law should apply as it is "the only state with an interest in Plaintiff's claims."  Mot. at 6.  As such,
28  Symantec's briefing primarily uses Washington law.  However, to the extent that Symantec no longer
    asserts its "nonparty" theory, Plaintiff's allegations sufficiently implicate California-based Symantec
    in the fraudulent scheme.  Therefore, analyzing Plaintiff's FAC under California law is proper.

United States District Court
For the Northern District of California

1    particularity requirement of Rule 9(b)."  <u>Vess</u>, 317 F.3d at 1106; <u>Kearns v. Ford Motor Co.</u>,

2    567 F.3d 1120, 1125 (9th Cir. 2009).[4]

3         Symantec maintains that the FAC does not meet the heightened requirements of Rule

4    9(b) due to the following deficiencies: (1) failure to identify the specific content and location

5    of the misrepresentations concerning the functionality of software; (2) failure to identify the

6    location or description of the individual "high priority" errors allegedly detected by the free

7    trial scan on Plaintiff's computer; and (3) failure to identify a basis for believing that

8    Plaintiff's computer "health" was not "low" as reported.  Mot. at 7.

9         The two latter defects, which focus on Plaintiff's basis for believing Symantec's

10   statements to be false, are inapposite to the fraud inquiry.  The FAC alleges that the results of

11   an investigation by computer forensic experts, and not the actual status of Plaintiff's

12   computer, revealed the falsity of Symantec's representations.  FAC ¶¶ 45-46 ("The results of

13   this investigation confirm that Symantec's Scareware <u>always</u> reports that the user's

14   computer's "System Health" is "LOW," that "High Priority" errors exist on the system, and

15   that the user's "Privacy Health" and "Disk Health" are "LOW."); Opp'n at 11 (dkt. 39)

16   ("[T]he actual status of Plaintiff's computer is not at issue . . . [the software] would have

17   reported the very same information <u>regardless</u> of its status.").  As Plaintiff's belief derives

18   from the results of the forensic analysis, the allegations in the FAC sufficiently establish a

19   basis for believing Symantec's statements to be false.

20        However, Symantec is correct in concluding that Plaintiff fails to plead the content of

21

22

23

24        [4]  California recognizes five elements of common law fraud: "(a) misrepresentation . . . ; (b)
     knowledge of falsity . . . (c) intent to defraud, <i>i.e.</i>, to induce reliance; (d) justifiable reliance; and (e)
25   resulting damage."  <u>Small v. Fritz Cos., Inc.</u>, 30 Cal. 4th 167, 173 (2003).  The Washington Supreme
     Court, on the other hand, identifies nine elements of fraud, which are substantially the same: "(1)
26   representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity;
     (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its
27   falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and
     (9) damages suffered by the plaintiff."  <u>Stiley v. Block</u>, 130 Wash. 2d 486, 505 (1996).
28        Regardless of which state's laws the parties wish to apply, neither Plaintiff nor Symantec denies
     that the FAC embodies each of the elements of common law fraud.

the misrepresentations relating to software utility with particularity.[5]  The FAC does not provide any allegations indicating what Symantec <u>actually</u> said regarding the functional capabilities of its software. The following allegations are illustrative:

1.  "Symantec . . . sells a variety of products that it claims will increase the speed, performance, and stability of a consumer's personal computer, protect against privacy risks, remove harmful errors, and 'clean up' hard drives." FAC ¶¶ 1, 89.

2.  "Symantec represents to the consumer that the Scareware is capable of identifying and fixing a wide range of PC errors, privacy threats and other computer problems." <u>Id.</u> ¶ 3.

3.  "On the individual webpages for PC Tools Registry Mechanic, PC Tools Performance Toolkit, and Norton Utilities, Symantec displays affirmations about the software's functionality.  Specifically, Symantec asserts that the Scareware protects the user's privacy, improves the efficiency and performance of the computer, increases the PC's stability, repairs the hard drive, and cures common computer errors." <u>Id.</u> ¶ 38.

4.  "Symantec recommends that the viewing consumer download its Scareware and conduct a 'free scan' to detect the issues that the product is supposedly designed to fix. . . . such as harmful errors, privacy threats, and other performance-hindering problems." <u>Id.</u> ¶ 40.

5.  "Gross relied upon the representations made by Symantec through the PC Tools website about the functionality of the Registry Mechanic software . . . . that Registry Mechanic would truthfully scan and fix computer errors protect his privacy, and speed up his computer." <u>Id.</u> ¶ 49.

6.  "Symantec affirmatively represented to Plaintiff that PC Tools Registry Mechanic would honestly and accurately scan his computer for harmful problems, repair those problems, increase the speed and stability of his computer, and protect his privacy." <u>Id.</u> ¶¶ 67, 77.

Two cases from within this district inform the Court's analysis of these allegations under Rule 9(b).  In <u>Wenger v. Lumisys, Inc.</u>, the court held that paraphrased allegations, which "repackaged" various oral statements, were "too vague and impressionistic" to satisfy Rule 9(b), because they did not state, with particularity, what the defendants "actually" said. 2 F. Supp. 2d 1231, 1246 (N.D. Cal. 1998).  In that case, a plaintiff stock purchaser sued Lumisys and various insiders for allegedly making false and misleading statements about the commercial success of Lumisys products in order to artificially inflate the post-IPO price of

---

[5]  The Court finds, however, that Plaintiff satisfactorily alleges the "where" and "when" of these misrepresentations.  Plaintiff indicates in the FAC that he observed Symantec's statements in April of 2011 after navigating to a particular webpage on www.PCTools.com dedicated to a product called "Registry Mechanic." FAC ¶ 48.  This is enough to give notice to Symantec of the context of the alleged misrepresentations.

United States District Court
For the Northern District of California

Lumisys stock. Id. at 1238. In the complaint, the plaintiff had alleged that during various phone calls and roadshows in anticipation of the IPO, Lumisys executives represented that "Lumisys' business was performing very well and ahead of plan, with strong demand for its core digitizer products, that Imagraph's Imascan Precision product was succeeding and selling well, that Imagraph was successfully developing the ICE Clarity . . . ." Id. at 1246. The court rejected these allegations, and ruled that Rule 9(b) demands direct quotations. Id. at 1246-47 ("Plaintiff does not allege that [defendants] actually said that the Imascan Precision 'was succeeding' or 'selling well,' or that 'Imagraph was successfully developing ICE Clarity,' . . . . What did [defendants] actually say about [their products]? Plaintiff does not inform us.").[6]

On the other hand, in TransFresh Corp. v. Ganzerla & Assoc., Inc., a plaintiff whose complaint included direct quotations from the website of a defendant competitor, who had allegedly misrepresented the environmental friendliness of products designed to keep produce fresh during transport, had complied with Rule 9(b). No. 11-6348, 2012 WL 994674, at *7 (N.D. Cal. Mar. 23, 2012). The complaint restated text from the defendant's website describing its product as "environmentally friendly" and "gas-free"; using "green methods" and "green technology"; and having the capacity to "reduce your carbon footprint." Brief in Support of Plaintiff TransFresh Corp.'s Opposition to Defendants' Motion to Dismiss Complaint, TransFresh, 2012 WL 664377 (Feb. 10, 2012) (quoting the complaint). The complaint also provided the defendant's tag line in verbatim, as well as direct quotations of alleged misstatements about the plaintiff's competing products. Id. Even though the

---

[6] In another recent case, however, a court in this district held that a plaintiff consumer, who sued computer manufacturer HP for false advertising after purchasing a defective printer, had met the pleading requirements of Rule 9(b) without providing direct quotations of the alleged misrepresentations on the HP website. Kowalsky v. Hewlett-Packard Co., 771 F. Supp. 2d 1138, 1143 (N.D. Cal. Dec. 13, 2010), vacated in part on other grounds, 771 F. Supp. 2d 1156 (Apr. 15, 2011). In that case, the plaintiff alleged that he had relied on various descriptions and specifications of the 8500 Printer, including "HP's representations that the HP 8500 Printer was able to scan and copy at speeds of up to 34 pages per minute in color, and 35 pages per minute in black and white via the 50-page capacity ADF." Id. Although Judge Koh acknowledged that the plaintiff could have provided quotes, she was satisfied with the technical precision of the allegations and ruled that there was "enough specificity to defend against the fraud charged." Id. Because the level of detail in those specifications distinguishes Kowalsky from the instant case, it is not inconsistent with the Court's conclusion here.

1    statements were "described in a somewhat cursory fashion," the plaintiff's complaint

2    survived dismissal under Rule 9(b) because it had "identifie[d] specific statements."

3    TransFresh, 2012 WL 994674, at *7.  This exemplifies what Plaintiff could have provided to

4    avoid dismissal under Rule 9(b).

5         As in Wenger, Plaintiff's allegations are too vague to be actionable in federal court.

6    Without direct quotations from the PC Tools website or other marketing materials, the Court

7    cannot determine exactly how Symantec advertised its products.  This is critical to the fraud

8    analysis because Plaintiff's entire suit turns on how Symantec's representations compare to

9    the actual funtionality of its software.  This defect, while curable, is fatal to all Plaintiff's

10   claims because the same allegations of fraudulent conduct support each claim.

## 2.    Future Performance

12        Symantec next argues that Plaintiff's fraud-based claims also fail because they depend

13   on alleged misrepresentations of future performance, not of an existing fact.  Mot. at 7.[7]

14   Symantec claims that the FAC alleges promises "of what the software would do for Plaintiff

15   in the future if he purchased it and how his computer would perform after using the software

16   . . . ."  Id.; Reply at 10 (identifying alleged promises, *e.g.*, "that his computer would run

17   faster, crash less, etc.").

18        Plaintiff indeed makes a number of allegations concerning the software's utility.[8]

19   While couched in language that may, at first blush, sound like a promise for future

20   performance, the alleged representations instead describe the software as it existed at the

---

[7]   Under California Law, "a mere promise of a future performance . . . is not actionable [as fraud]."  Miller v. City and County of San Francisco, 187 Cal. App. 2d 480, 483 (1960).  Similarly, under Washington law, "representation[s] of an existing fact must exist independently of: (1) any future acts or actions on the part of the party making the statement, (2) the occurrence of any other particular event in the future, and (3) the particular future uses of the person to whom the statement is made."  Wessa v. Watermark Paddlesports, Inc., No. 06-5156, 2006 WL 1418906, at *3 (W.D. Wash. May 22, 2006) (citation omitted).

[8]   See ¶¶ 77-78 ("Symantec represented that the PC Tools Registry Mechanic would honestly and accurately scan his computer for harmful problems, increase the speed and stability of his computer, and protect his privacy. . . . [T]he Scareware does not actually speed up the performance and stability of computers in the manner described by Symantec, nor does it protect the user's privacy as represented.").  See also ¶¶ 40, 42 (explaining that the "free diagnostic scan" purports to detect errors "that the product is supposedly designed to fix" and generate a report to accurately reflect those errors).

United States District Court
For the Northern District of California

9

time they were made.  Specifically, Symantec's product marketing identified a number of specific tasks that the software had been programmed to perform.  The design of the software code is properly characterized as an existing fact subject to scrutiny in a fraud claim, not a promise to produce certain results in the future.  Therefore, the Court resolves this issue in favor of Plaintiff.

### 3.        Contradictory Allegations

The Motion to Dismiss seizes on a handful of specific allegations included in the FAC, which, Symantec argues demonstrate inconsistencies as to whether the free trial version does or does not perform "an evaluation" as promised.  Mot. at 8 (comparing FAC ¶ 68 (alleging software "did not perform an actual evaluation of Plaintiff's computer") with ¶ 50 ("the 'free scan' was performed")).  Consequently, Symantec contends, the FAC fails to meet the plausibility requirement of Rule 8 under Twombly.  Twombly, 550 US. at 556.

This argument is unpersuasive because it loses sight of the central argument presented in the FAC.  As the Motion acknowledges, Plaintiff alleges that the "free trial" software does not perform a "meaningful evaluation" or perform any of the "other valuable tasks" as Symantec promised.  FAC ¶ 44 (emphasis added).  According to the FAC, even if the software does perform some function, it cannot perform those specific functions advertised.  This does not present a contradiction that defeats plausibility.  As with Symantec's "future performance" theory, this argument does not warrant dismissal of Plaintiff's FAC.

Although Symantec's second and third arguments fail, the Court nevertheless GRANTS Symantec's Motion to Dismiss as to all claims without prejudice for failure to plead the alleged "functionality" misrepresentations with particularity.  Should Plaintiff choose to amend, he must allege exact language used by Symantec in describing the utility of its software, including the individual tasks it purports to perform.

### B.        Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

Section 17200, California's Unfair Competition Law ("UCL"), prohibits any "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Plaintiff alleges that Symantec violated the "fraudulent" and "unfair" prongs of the UCL by

United States District Court
For the Northern District of California

(1) misrepresenting the utility of its software, (2) misrepresenting the results of the "free scan" to induce consumer purchases of the software, and (3) selling software that lacks the advertised utility.  FAC ¶¶ 66, 70-71.[9]  Symantec contends that Plaintiff cannot bring a UCL claim because the factual allegations lack any connection to California, as (1) Plaintiff is a non-resident and (2) the alleged wrongful conduct occurred outside of California.  Mot. at 6.

The UCL allows claims by non-California plaintiffs when the alleged misconduct or injuries occurred in California.  Doe v. Nestle, 748 F. Supp. 2d 1057, 1122 (C.D. Cal 2010); In re Intel Laptop Battery Litig., No. 09–2889, 2010 WL 5173930, at *2 (N.D. Cal. Dec. 15, 2010).  "[A] California court may properly apply California laws to non-California members of a nationwide class where the defendant is a California corporation and some or all of the challenged conduct emanates from California."  Red v. Kraft Foods, Inc., No. 10–1028, 2011 WL 4599833, at *6 (C.D. Cal. Sept 29, 2011) (quoting Wershba v. Apple Comp., Inc., 91 Cal. App. 4th 224, 243 (2001)).  Application of California state law is impermissible where the alleged misconduct "simply has no connection to California."  See Safjr v. BBG Commc'ns, Inc., No. 10-2341, 2012 WL 398991, at *4 (S.D. Cal. Jan. 10, 2012).  In short, the location of the alleged conduct giving rise to liability controls application of UCL, not the domicile of the plaintiff or defendant.  Id. ("The fact that Plaintiffs are California residents does not change [the court's] conclusion" that the UCL does not apply extraterritorially to the defendants' international conduct).

In Parkinson, cited by both Plaintiff and Symantec, a federal district court permitted a nonresident plaintiff to bring a UCL claim against a car distributor for failure to disclose defects in the clutch of a particular car model, because the plaintiff successfully alleged that the decisions controlling the alleged nondisclosure emanated from the defendant's offices in

---

[9]  Each prong of the UCL is "a separate and distinct theory of liability" that offers "an independent basis for relief."  Kearns, 567 F.3d at 1127.  Accordingly, each prong requires a unique set of allegations in order to survive dismissal under Rule 12(b)(6).  See Sybersound Records, Inc. v. UAV Corp, 517 F.3d 1137, 1151-52 (9th Cir. 2008) (a "fraudulent" business act or practice involves a misrepresentation that (1) is likely to deceive reasonable members of the consuming public and (2) induced actual reliance to the plaintiff's detriment); Davis v. Ford Motor Credit Co., 179 Cal. App. 4th 581, 593-97) (detailing multiple tests that have developed in California to determine whether a business act or practice is "unfair").  Symantec's Motion to Dismiss does not challenge the FAC for failure to fulfill these elements, so the Court will not conduct such an analysis here.

1   Orange County, California.  <u>Parkinson v. Hyundai Motor Am.</u>, 258 F.R.D. 580, 598 (C.D.

2   Cal. 2008).  Specifically the Plaintiffs had alleged that the "defendant's relevant operations,

3   including its headquarters, marketing department, warranty department, customer affairs

4   department, and engineering department, [were] located in California."  <u>Id.</u>[10]

5          Plaintiff attempts to bring similar allegations against Symantec, contending that the

6   challenged conduct "occurred in, was directed and/or emanated from" Symantec's California

7   offices. FAC ¶ 10; Opp'n at 10.  However, as Symantec points out, Plaintiff does not

8   describe the geography of Symantec's "relevant operations" with the same degree of

9   specificity as in <u>Parkinson</u>.  Reply at 7; <u>Parkinson</u>, 258 F.R.D. at 598.  While Plaintiff does

10  allege that Symantec is headquartered in Mountain View, CA, FAC ¶ 10, several courts have

11  found that this allegation is not enough to create a plausible inference that the unlawful

12  conduct emanated from that location.  <u>See</u> <u>Tidenberg v. Bidz.com, Inc.</u>, No. 08-5553, 2009

13  WL 605249, at *4-5 (C.D. Cal. Mar. 4, 2009) (holding that plaintiffs residing in Texas lacked

14  standing under the UCL to bring suit against a California-based company because, absent

15  "any specific facts linking Defendants' contacts with California to the claims asserted against

16  them," the court cannot "presume that any false or misleading statements emanated from

17  California").

18         An earlier case from this Court clarified the plaintiff's burden of linking the alleged

19

20         [10]   Symantec improperly relies on the Ninth Circuit's holding in <u>Sullivan v. Oracle</u> to urge
    dismissal of Plaintiff's UCL claim. Mot. at 5.  There, the Court held that Section 17200 "does not apply
21  to overtime work performed outside California for a California-based employer by out-of-state plaintiffs
    . . . ."  <u>Sullivan v. Oracle Corp.</u>, 662 F.3d 1265, 1271 (9th Cir. 2011) (citing the California Supreme
    Court's answers to certified questions on this issue as conclusive).
22         According to Symantec, <u>Sullivan</u> stands for the proposition that the UCL "does not apply to
    decisions and policy set by [a] California-based company where policy was implemented against
23  plaintiffs out-of-state." Mot. at 5.  However, Symantec's interpretation overlooks the notable fact that
    the plaintiff's UCL claim in <u>Sullivan</u> depended on the applicability of the Fair Labor Standard Act
24  (FLSA), because the alleged FLSA violation rendered the defendant's conduct "unlawful" for the
    purposes of the UCL.  <u>Sullivan</u>, 662 F.3d at 1269.  The conduct relevant to the FLSA inquiry was the
    plaintiff's overtime work, not the defendant's conduct, as is the case here.  <u>See id.</u> at 1270-71 ("§ 17200
25  does not reach Plaintiffs' FLSA claims for <u>work performed [by the plaintiff]</u> outside California . . . .")
    (emphasis added).  Thus, it did not matter in that case that the employer's principal place of business
26  was California when it allegedly violated the FLSA.  <u>See, e.g.</u>, <u>id.</u> at 1267.  In the present case, the
    location of the Symantec's alleged misconduct matters because that is the conduct which gives rise to
27  liability under the "fraudulent" and "unfair" prongs of the UCL because it forms the basis of the fraud
    claim.  <u>See Parkinson</u>, 258 F.R.D. at 598 (distinguishing itself from <u>Sullivan v. Oracle Corp.</u>, 547 F.3d
28  117, 1187 (9th Cir. 2008), <u>aff'd</u> 662 F.3d 1265, in light of defendant's alleged in-state conduct).

1    misconduct to California in order to take advantage of California state law.  In <u>Badella v.</u>

2    <u>Deniro Mktg. LLC</u>, this Court denied certification of a nation-wide class for California state

3    law claims (including the UCL) because, apart defendants' California residency, the

4    plaintiffs did "not present [any] types of <u>actual evidence</u> regarding Defendants' actions in

5    California . . . ."  No. 10-3908, 2011 WL 5358400, at *9, *11 (N.D. Cal. Nov. 4, 2011)

6    (emphasis in original).  The case involved the owners of an online dating website who

7    allegedly created and controlled fake user profiles to induce free trial customers to upgrade to

8    paid memberships.  In describing the deficiency of the plaintiff's Motion to Certify this Court

9    wrote:

> For example, Plaintiff does not point to particular proof that the alleged
> misrepresentations emanated from California, besides its statement that
> [defendants] Deniro and Henning reside in California.  There is no evidence the
> businesses are run out of California, nor that the marketing policies and
> decisions regarding the alleged misrepresentations emanated from California.
> This may actually be the case, but Plaintiffs have not met their burden of
> suggesting and demonstrating it.  Thus, the Court is not convinced that on the
> evidence provided at this time the application of California law to a nationwide
> class would be constitutional.

15   <u>Id.</u> at *11.

16         Even though the FAC does take one step beyond the complaint in <u>Badella</u> by alleging

17   generally that Symantec runs its business in California, it is nevertheless deficient because it

18   fails to allege the state in which Symantec's fraudulent conduct occurred.  FAC ¶¶ 7,10.

19   Specifically, because the fraudulent scheme materialized "during the marketing and sale of

20   [Symantec's] computer software products," Plaintiff should allege that Symantec's sales and

21   marketing departments operate out of it California offices.  <u>Id.</u> ¶ 72.[11]

22         Accordingly, while the Court already dismisses Plaintiff's UCL claim under the fraud

---

[11]    One could infer from the FAC that Symantec's human resources, customer service, and accounting departments are located in California.  According to the FAC, the PC Tools website lists Symantec's Mountain View address for employment inquires and customer questions related to products, the End User License Agreement (EULA), or other issues. FAC ¶ 18 (D-E). Similarly, credit card statements reflecting purchases of PC Tools software list the charges as originating from California. <u>Id.</u> ¶ 18(F). However, since the alleged misconduct directly implicates Symantec's marketing and sales departments, the allegations involving other departments are not enough to merit application of the UCL. <u>Id.</u> ¶ 72. Furthermore, the FAC acknowledges that Symantec, despite having its headquarters in California, is a Delaware corporation that "does business throughout . . . the United States," so it is entirely possible that the relevant operations exist outside of California. <u>Id.</u> ¶ 7.

13

analysis, it additionally instructs Plaintiff to amend the FAC to allege specific conduct that occurred in California.

### C.     Fraudulent Inducement

Symantec moves to dismiss Plaintiff's claim for Fraudulent Inducement on the single ground that it insufficiently pleads the factual allegations supporting a claim for fraud.  Mot. at 5-8.  As discussed above in Section A(1), Symantec's argument is persuasive because Plaintiff fails to plead the circumstances surrounding fraud with particularity.  Accordingly, the Court GRANTS Symantec's Motion to Dismiss Plaintiff's fraudulent inducement claim without prejudice.

### D.     Breach of Express Warranties, Cal. Com. Code § 2313

In his third cause of action Plaintiff alleges that Symantec violated California Commercial Code Section 2313 for breach of an express warranty that the software could perform accurate diagnostic tests on consumers' computer systems.  FAC ¶ 90.  Symantec contends that this claim fails for four reasons: (1) California law does not apply to a software license transaction between a Washington resident and an Irish company; (2) Section 2313 does not apply to software licenses generally; (3) Plaintiff has failed to plead the elements of an express warranty; and (4) the express warranty was disclaimed in the EULA agreement. Mot. at 8-11.

#### 1.     Application of California Law

In challenging the applicability of California state law to Plaintiff's express warranty claim, Symantec reiterates the same argument it asserted in the context of the UCL.  Mot. at 8.  Like Plaintiff's UCL claim, Plaintiff's express warranty claim is dismissed because the allegations fail to tie Symantec's relevant operations to California.

#### 2.     Application of Cal. Com. Code § 2313 to Software Licenses

Symantec next argues that the California Uniform Commercial Code ("UCC") does not govern Plaintiff's purchase of the Registry Mechanic software because it only covers the sale of goods, which excludes licenses for the use of intellectual property, like Symantec's software.

The California UCC defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." Cal. Com. Code § 2105. Software transactions often straddle the line between goods and services, so courts look to the "essence of the agreement" to determine how best to characterize the transaction. RRX Indus., Inc. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir. 1985). Furthermore, "because software packages vary depending on the needs of the individual consumer," the Ninth Circuit has ruled that such contracts merit a case-by-case analysis. Id.; Phoenix Solutions, Inc. v. Sony Elecs., Inc., 637 F. Supp. 2d 683, 694 (N.D. Cal. June 5, 2009).

Symantec cites Sys. Am., Inc. v. Rockwell Software, Inc., No. 03-2232, 2007 WL 218242, at *4 (N.D. Cal. Jan 26, 2007), to support its contention that the California UCC does not cover the "transfer of intellectual property rights." Mot. at 9. However, Rockwell is distinguishable because it concerns a contract for software development services, not a consumer sales transaction. Id. at 4 ("Under the SDA, Versant must develop new software to supplement existing Rockwell Software software" and "[grant] a license to Rockwell Software."). Significantly, the court in that case explicitly distinguished the software development contract from "the sale of a Windows CD at Best Buy," a "license for mass-produced [software]," much like Plaintiff's purchase Symantec's consumer software in the present case. Id. Although Plaintiff purchased and downloaded Symantec's software from the internet, and did not install the software from a CD, the "essence of the agreement" is the same. FAC ¶ 51; RRX Indus., 772 F.2d at 546.

In RRX Industries, the Ninth Circuit held that the California UCC covered computer software that the defendants had sold and installed in plaintiff's medical laboratories. RRX Indus., 772 F.2d at 545. Even though the software contract also provided for ancillary services, such as training, repair services, and system upgrading, the sale of the software

United States District Court
For the Northern District of California

1   package was paramount, so characterization as a "good" for the purposes of the California

2   UCC was proper.  Id. at 546.[12]

3          The software transaction in the case at hand resembles the sale in RRX Industries,

4   except that it doesn't include the installation, training, maintenance, and upgrading services

5   that might have jeopardized the applicability of the California UCC in that case.

6   Accordingly, Registry Mechanic shall be regarded as a "good," and the California UCC

7   applies.  The Court therefore permits Plaintiff to bring a claim under Section 2313, provided

8   Plaintiff can amend the factual allegations as already suggested above.

9                        **3.    Express Warranty Elements**

10         As an alternative to its challenges to the applicability of California law, Symantec

11  argues that the FAC inadequately alleges the elements of an express warranty claim.

12  Specifically Symantec contends that Plaintiff fails to provide the exact terms of the alleged

13  warranty, as well as where and when Symantec stated them. Mot. at 10. Furthermore,

14  Symantec argues that the representations alleged in the FAC are "vague, highly subjective,"

15  and amount to "mere statements of opinion and puffery."  Id.

16         To prevail on a breach of express warranty claim under California law, "a plaintiff

17  must prove (1) the seller's statements constitute and 'affirmation of fact or promise' [which

18  relates to the goods] or a 'description of the goods'; (2) the statement was 'part of the basis

19  of the bargain'; and (3) the warranty was breached."  Weinstat v. Dentsply Int'l, Inc., 180

20  Cal. App. 4th 1213, 1227 (2010) (quoting Cal. Com. Code § 2313(1)(a-b)).  "Statements

21  constituting 'mere puffery' cannot support liability under a claim for breach of warranty."

22  Sanders v. Apple, Inc., 672 F. Supp. 2d 978, 987 (N.D. Cal. 2009).  "The distinguishing

23  characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed

24

25         [12]  In its Reply, Symantec claims that the Registry Mechanic software license is different from licenses of so-called "software packages" because the EULA defines it as a "revocable license to use the software for a temporary subscription period."  Reply at 10 (citing EULA ¶¶ 1.2-1.3).  However,

26  Symantec does not explain how a distinction between a "software package" and a "license with a temporary subscription period" might affect applicability of the California UCC.  Furthermore, the

27  Court should not consider the EULA in this analysis, as a copy of that agreement was not attached to the Complaint.  See discussion infra Section D(4).  Rather, the Court should look only to the FAC,

28  which states simply that Plaintiff "purchased Registry Mechanic for the price of $29.99."  FAC ¶ 51. There is nothing to suggest that Registry Mechanic is not a "software package."

United States District Court
For the Northern District of California

1   factual assertions." Id. (quotation omitted).

2       Defendant's first argument, that Plaintiff failed to express the exact terms of the

3   express warranty, is coextensive with its argument that Plaintiff failed to plead with

4   particularity the misrepresentations at the heart of Symantec's alleged fraudulent conduct.

5   Both concern the way in which Symantec described the functionality of its software. To the

6   extent that Plaintiff amends his FAC pursuant to Rule 9(b), those amendments should address

7   Symantec's concerns regarding specificity of the express warranty as well.

8       As to the second argument, Symantec is incorrect that the challenged statements are

9   too vague to rise above "mere puffery" or "opinion." According to the FAC, Symantec

10  marketed its software to suggest an ability to perform specific functions related to computer

11  security and system optimization. FAC ¶¶ 38, 40. This is not opinion about the quality of

12  the software's performance or a "vague superlative" that a "consumer could not reasonably

13  believe." Sanders, 672 F. Supp. 2d at 987. Rather, the alleged statements offer objective

14  descriptions of software utility, which inform the consumer of the specific functions that

15  Symantec's software has been programmed to perform. Representations of "a particular

16  product's performance specification based on its design" are the substance of an express

17  warranty. Bros. v. Hewlett-Packard Co., No. 06-2254, 2007 WL 485979, at *7 (N.D. Cal.

18  Feb. 12, 2007) (holding that a statement that a computer product was compatible with a

19  particular graphics card constituted an express warranty).

20      Thus, should Plaintiff take the opportunity to identify what exact statements Symantec

21  made about its software, the Court will be satisfied that the elements of this cause of action

22  have been sufficiently pled.

23              **4.    Disclaimer of Warranty**

24      Finally Symantec argues that Plaintiff's express warranty claim must fail because the

25  EULA explicitly disclaimed all warranties pertaining to the effectiveness of the software.

26  Mot. at 10-11. As proof, Symantec submitted a copy of the EULA with its first Motion to

27  Dismiss. (Dkt. 28, Ex. 1). According to Symantec, the EULA states that "PC Tools does not

28  guarantee that the Software will detect, remove or rectify any errors on your computer . . . ."

and "PC Tools makes no warranties in relation to the software, including warranties as to the performance or fitness for purpose of the Software." EULA at ¶¶ 4.1, 4.5(a).  The Plaintiff did not attach the EULA to the FAC, nor did Symantec request judicial notice to place it on the record.

While federal district courts do not typically look beyond the complaint when adjudicating a 12(b)(6) motion to dismiss, they may take judicial notice *sua sponte* of documents containing adjudicative facts "not subject to reasonable dispute."  Fed. R. Evid. 201(b); United States v. Cantu, 12 F.3d 1506, 1509 n.1 (9th Cir. 1993).  Under the incorporation-by-reference doctrine, courts may consider relevant documents not physically attached to the plaintiff's pleading if (1) the contents are "central to the allegations" and (2) no party questions the authenticity of the documents.  Darensburg v. Metro. Transp. Comm'n, No. 05-1597, 2006 WL 167657, at *2 (N.D. Cal. Jan. 20, 2006); Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 1999).

Although the FAC does acknowledge the existence of the EULA, it does not include any factual allegations related to the content of the agreement, so the EULA cannot be "central to the allegations."[13] Darensburg, 2006 WL 167657, at *2.  Furthermore, Plaintiff challenges the enforceability of the EULA.  See Phillips Med. Capital, LLC v. Med. Insights Diagnostic Ctr., Inc., 471 F. Supp. 2d 1035, 1042 (N.D. Cal. 2007) (refusing to dismiss a breach of express warranty claim in light of a warranty disclaimer in contract for medical equipment because the contract might be "void because [it was] procured by fraud"); FAC ¶¶ 30-33 (alleging that the "EULA serves as an extension of Defendants' fraud").  Therefore, the Court declines to consider the EULA at this stage.

Finally, as Plaintiff points out, California courts generally regard warranty disclaimers as void when they contradict the express terms of the alleged warranty.  Teknekron Customer Info. Solutions, Inc. v. Watkins Motor Lines, Inc., No. 93-3422, 1994 WL 11726, at *5 (N.D.

---

[13]   The only exception is the EULA's forum selection clause, which Plaintiff describes for the sole purpose of illustrating Symantec's alleged proclivity for deception.  Specifically, Plaintiff alleges that the forum selection clause serves to intimidate and discourage customers from pursuing legal action against Symantec.  FAC ¶¶ 30-33.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Cal. Jan. 5, 1994) (citing <u>Hauter v. Zogarts</u>, 14 Cal. 3d 104, 119 (1975)); Cal. Com. Code §

2  2316(1).  Consistent with California law, the Court will not allow any disclaimers in the

3  EULA to trump the express warranty alleged in the FAC, especially at this stage of

4  litigation.[14]  Accordingly, the disclaimers stated in the EULA do not provide grounds for

5  dismissal of Plaintiff's claim for breach of express warranty.

6          **E.     Breach of Contract**

7          Symantec next disputes Plaintiff's breach of contract claim, which is predicated on the

8  theory that a contract formed when Plaintiff agreed to pay $29.99 in exchange for software

9  that Symantec had promised could "detect and remove legitimate computer errors."  FAC ¶

10  95.  According to Plaintiff, Symantec breached its promises by "failing to honestly and

11  accurately inform [customers] about the condition of their computers, and further by

12  providing software that failed to offer the benefits promised, namely, resolution of problems

13  detected, and improvements in performance, privacy protection, and security."  <u>Id.</u> ¶ 98.

14  Symantec argues that the above allegations cannot support a breach of contract claim because

15  (1) Plaintiff fails to allege the specific terms of an express contract and when those terms

16  became part of the contract, and (2) Plaintiff does not sufficiently allege breach.  Mot. at

17  11.[15]  As a point of clarification, Symantec does not contest Plaintiff's breach of contract

18

19          [14] In its Reply, Symantec attempts to reframe its "disclaimer" argument by contending that the
20  EULA disclaimer reveals the implausibility of the alleged express warranties, because it would be
    unreasonable to believe a "guarantee [of] success in removing errors from all computers because every
21  computer has unique problems."  Reply at 11.  This argument is unpersuasive because Symantec
    misstates the content of the alleged warranty.  At issue is intended software utility, not specific results.

22          [15] In addition to the arguments summarized above, Symantec asserts two additional reasons for
23  dismissal, which the Court need not consider here.  First, Symantec again attempts to use the EULA
    disclaimer to escape liability.  Mot. at 13-14.  As explained above, the Court does not take notice of the
24  EULA because it was not attached to the Complaint, its terms are not central to Plaintiff's allegations
    (and therefore cannot be incorporated by reference), and Plaintiff challenges enforceability of its terms.
25  <u>See</u> <u>Phillips</u>, 471 F. Supp. 2d at 1042 (denying a motion to dismiss a breach of contract claim because
    the agreement containing a warranty disclaimer might be void as having been "procured by fraud").
26          Second, Symantec argues that Plaintiff fails to allege the existence of an implied contract.  Mot.
27  at 12-13.  In defending against liability under an "implied contract" theory, Symantec argues that
    promises that the software would achieve specific results are too "aspirational" or "precatory" to
28  "demonstrate the requisite manifestation of assent to create an implied contract."  <u>Id.</u>  Not only does
    Symantec misconstrue the allegations of Symantec's representations about the software (the FAC
    describes promises of general software utility, not promises to produce certain results in its consumers
    computers), but Plaintiff also never alleges the existence of an implied contract in the first place.

United States District Court
For the Northern District of California

1   claim on the grounds that no contract formed at all when Plaintiff purchased the software.[16]

2   Rather, Symantec challenges Plaintiff's allegations as to which terms were incorporated into

3   that sales contract.  It theorizes that Plaintiff cannot allege breach without properly alleging

4   the terms that he claims were breached.

5       A complaint for breach of contract must plead: (1) the existence of a contract, (2) a

6   breach of the contract by defendant, (3) performance or excuse of non-performance on behalf

7   of plaintiff, and (4) damages suffered by plaintiff as a result of defendant's breach.

8   McDonald v. John P. Scripps Newspaper, 210 Cal. App. 3d 100, 104 (1989).  To sustain this

9   cause of action plaintiffs must either attach a copy of the contract to the complaint or plead

10  the essential terms of the contract.  McAfee v. Francis, No. 11-0821, 2011 WL 3293759, at

11  *2 (N.D. Cal. Aug. 1, 2011).

12      Some federal district courts in California have dismissed breach of contract claims for

13  failure to allege the exact terms that were allegedly breached, so Symantec's first argument

14  challenging the specificity of the pleadings has merit.  See, e.g., id.  However, this argument

15  is another species of its failure-to-plead-with-particularity theory (discussed above).  To the

16  extent that Symantec is unsatisfied with the specificity of the alleged express terms of the

17  contract, as well as when those terms were established, a new complaint amended to comply

18  with Rule 9(b) should suffice.

19      However, regardless of the whether Plaintiff pleads the existence and terms of a

20  contract as required under California law, Symantec is correct in concluding that the FAC

21  does not allege a plausible breach.  Mot. at 13-14.  This is because the allegations pointing to

22  breach concern software performance prior to Plaintiff's purchase of the full version of the

23  software.  Plaintiff's basis for challenging the functionality of Symantec's software arises

24

25  Instead, he predicates this cause of action on a number of express representations made about
26  Symantec's software and his subsequent purchase of its product.  Thus, the Court will not entertain any
    argument pertaining to breach of an implied contract.

27      [16] Nor could Symantec argue against the existence of a contract, as Plaintiff paid for the software
28  and Symantec delivered it, thereby establishing a contractual relationship.  Cal. Com. Code § 2204 ("A
    contract for the sale of goods may be made in any manner sufficient to show agreement, including
    conduct by both parties which recognizes the existence of such a contract.").

from a computer forensic expert's analysis of the Registry Mechanic "free diagnostic scan," not the full version of the software. FAC ¶¶ 45-47. Thus, the factual allegations only support a plausible theory that the <u>free trial version</u> did not function as advertised. Plaintiff alleges that the contract was formed at the point of sale, so any "breach" stemming from defects in the free trial version must have occurred before the contract formed. Unless Plaintiff can offer factual allegations establishing that the <u>full version</u> of the software failed to perform the advertised functions, the breach of contract claim must fail, for a breach cannot occur before contract formation.

### F.        Breach of the Implied Covenant of Good Faith and Fair Dealing

"To establish a breach of an implied covenant of good faith and fair dealing, a plaintiff must establish the existence of a contractual obligation, along with conduct that frustrates the other party's rights to benefit from the contract." <u>Rosal v. First Fed. Bank of Cal.</u>, 671 F. Supp. 2d 1111, 1129 (N.D. Cal. 2009).

Plaintiff claims that "Symantec breached the implied covenant of good faith and fair dealing by failing to honestly and accurately inform consumers about the true condition of their computers . . . ." FAC ¶ 108. Symantec moves to dismiss this claim on the grounds that (1) it duplicates the previous breach of contract claim, (2) Plaintiff has failed to demonstrate how he has been denied the benefit of the bargain, and (3) the EULA explicitly permits the conduct comprising the alleged breach.

Symantec's first argument is persuasive. "If the allegations in a breach of implied covenant claim do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." <u>Zepeda v. PayPal, Inc.</u>, 777 F. Supp. 2d 1215, 1221 (N.D. Cal. 2011) (citing <u>Malcolm v. JPMorgan Chase Bank, N.A.</u>, No. 09-4496, 2010 WL 934252, at *6 (N.D. Cal. Mar. 15, 2010)) (dismissing plaintiffs' cause of action for breach of implied covenant because the supporting allegations were the same as those alleged for their breach of contract claim, even though the breach of contract claim was dismissed for failure to state

1   a claim).

2       In the present case, the allegations supporting breach of the implied covenant are

3   identical to those supporting breach of contract.  FAC ¶¶ 98, 108 (alleging that Symantec

4   breached both by "failing to honestly and accurately inform the consumers about the true

5   condition of their computers").  Therefore, the implied covenant claim is superfluous.

6       Plaintiff, noting an exception recognized in California state and federal courts,

7   contends that this rule does not apply to his case because Symantec "acted in bad faith to

8   frustrate the contract's actual benefits."  Opp'n at 18 (citing Guz v. Bechtel Nat., Inc., 24 Cal.

9   4th 317, 353 n.18 (2000)).  However, this exception does not apply when the bad faith

10  alleged pertains only to a defendant's inducement of a plaintiff to enter into the contract.

11  Shaterian v. Wells Fargo Bank, N.A., 829 F. Supp. 2d 873, 884 (N.D. Cal. 2011)

12  (distinguishing between "actions presumably taken to induce [contract formation]" and those

13  taken "to frustrate the benefits of the contract").  Because the FAC only plausibly alleges

14  lack of functionality in the free trial version of the software, and not the full version, the only

15  bad faith conduct at issue relates to inducement.  Thus, the exception does not apply.

16      Accordingly, the Court GRANTS Symantec's Motion as to this claim without

17  prejudice, so that Plaintiff may have the opportunity to properly allege that he qualifies for

18  the "bad faith" exception permitted under Guz.

19      **G.    Unjust Enrichment**

20      As an alternative to his claims for breach of contract and breach of the implied

21  covenant of good faith and fair dealing, Plaintiff seeks relief for unjust enrichment.  He

22  alleges that Symantec benefitted from software purchases at the expense of its customers by

23  "falsely informing Plaintiff and the Class that they needed to pay to repair problems that did

24  not exist."  FAC ¶ 113.  Symantec responds that the facts of this case cannot support a cause

25  of action for unjust enrichment because an express contract existed between Plaintiff and

26  Symantec.  Symantec's conclusion is correct.

27      California recognizes unjust enrichment as an action for quasi-contract.  Paracor Fin.,

28  Inc. v. Gen Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996).  An action based on

1    quasi-contract "does not lie when an enforceable, binding agreement exists defining the

2    rights of the parties." Id.; Gerlinger v. Amazon, Inc., 311 F. Supp. 2d 838, 856 (N.D. Cal.

3    2004) (citations omitted).  Here, Plaintiff and Symantec indeed shared a contractual

4    relationship, thus barring Plaintiff's unjust enrichment claim.[17]

5         Accordingly, Symantec's Motion to Dismiss Plaintiff's unjust enrichment claim is

6    GRANTED with prejudice.

7    **IV.   CONCLUSION**

8         For the foregoing reasons, the Court GRANTS Symantec's Motion to Dismiss

9    Plaintiff's UCL, fraudulent inducement, express warranty, breach of contract, and breach of

10   implied covenant claims without prejudice, and GRANTS Symantec's Motion to Dismiss

11   plaintiff's unjust enrichment claim with prejudice.  If Plaintiff successfully serves PC Tools

12   in Ireland, PC Tools may move on its own to dismiss the substantive claims under Rule

13   12(b)(6).

14        **IT IS SO ORDERED.**

15

16   Dated:  July 31, 2012                          _____
                                                    CHARLES  R. BREYER
17                                                  UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

---

27        [17]  In his Opposition, Plaintiff cites a number of cases from this Court that have permitted unjust
     enrichment claims to proceed where the pleadings successfully stated a claim for restitution (which
28   Plaintiff claims to have done).  However, none of those cases involved parties engaged in a contractual
     relationship, so they do not control the case at hand.