JAY EDELSON
jedelson@edelson.com
RAFEY S. BALABANIAN
rbalabanian@edelson.com
BENJAMIN H. RICHMAN
brichman@edelson.com
CHANDLER R. GIVENS
cgivens@edelson.com
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

SEAN P. REIS (SBN 184044)
sreis@edelson.com
30021 Tomas Street. Suite 300
Rancho Santa Margarita. California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES GROSS, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>SYMANTEC CORPORATION, a Delaware corporation, and PC TOOLS, LTD., an Irish limited company,<br><br>*Defendants.* | Case No. 3:12-cv-00154-CRB<br><br>**PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: October 4, 2013<br>Time: 10:00 a.m.<br>Location: Courtroom 6, 17th Floor<br>Judge: Honorable Charles R. Breyer |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

   **PLEASE TAKE NOTICE** that on October 4, 2013 at 10:00 a.m., or as soon thereafter as counsel may be heard, Plaintiff James Gross will appear for a final Fairness Hearing, through counsel, before the Honorable Charles R. Breyer, or any judge sitting in his stead, in Courtroom 6, 17th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, and then and there move the Court for an Order (i) granting final approval of the Parties' class action settlement, (ii) dismissing Plaintiff's Second Amended Complaint with prejudice and releasing any and all Released Claims as provided in the Parties' Stipulation of Class Action Settlement, and (iii) granting such other and further relief as the Court deems reasonable and just.

   Plaintiff's Motion is based on this Notice of Motion, the authorities cited in the attached Memorandum in Support, oral argument of counsel, all of the documents in the record in this matter, and any other matter that may be submitted or raised at the Fairness Hearing on the Motion.

                                          Respectfully submitted,

                                          **JAMES GROSS**, individually and on behalf of all
                                          others similarly situated,

Dated: September 6, 2013                  By: /s/ Rafey S. Balabanian
                                              One of Plaintiff's Attorneys

                                          JAY EDELSON
                                          jedelson@edelson.com
                                          RAFEY S. BALABANIAN
                                          rbalabanian@edelson.com
                                          BENJAMIN H. RICHMAN
                                          brichman@edelson.com
                                          CHANDLER R. GIVENS
                                          cgivens@edelson.com
                                          EDELSON LLC
                                          350 North LaSalle Street, Suite 1300
                                          Chicago, Illinois 60654
                                          Telephone: (312) 589-6370
                                          Facsimile: (312) 589-6378

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................. 1

II.  FACTUAL BACKGROUND ............................................................ 3

    A.   Plaintiff Gross Alleges that Defendants Deceptively Designed and
        Marketed Their Software Products .............................................. 3

    B.   After Initial Discussions and Mediation, the Parties Proceed with
        the Litigation .............................................................................. 4

    C.   The Parties Kept the Lines of Communication Open, Which Led to a
        Second Mediation and Settlement ............................................... 5

    D.   The Court Grants Preliminary Approval of the Proposed Settlement ........... 6

III. TERMS OF THE SETTLEMENT ..................................................... 7

    A.   Class Definition ......................................................................... 7

    B.   Prospective Relief ...................................................................... 7

        1.   *Improvements to the Software Products* ............................ 7

        2.   *New Documentation Explaining the Software Products'
            Functionality* ................................................................. 7

    C.   Monetary Relief ......................................................................... 7

    D.   Other Relief ............................................................................... 8

        1.   *Anti-Virus Software* ........................................................ 8

        2.   *Payment of Notice and Administrative Expenses* ................ 8

        3.   *Compensation for the Class Representative* ....................... 8

        4.   *Payment of Attorneys' Fees and Expenses* ......................... 8

        5.   *Cy Pres Distribution* ....................................................... 8

    E.   Release ...................................................................................... 8

IV.  NOTICE WAS DISSEMINATED TO THE CLASS, SATISFYING
     DUE PROCESS .............................................................................. 9

V.   THE SETTLEMENT WARRANTS FINAL APPROVAL BECAUSE IT IS
    FAIR, ADEQUATE, AND REASONABLE ..................................... 11

    A.   Final Approval is Appropriate in Light of the Risks of Further
        Litigation .................................................................................. 12

**B.    The Risks Involved in Maintaining Class Action Status Render Final Approval Appropriate** ..................................................................... 15

**C.    The Settlement Offers an Appropriate Amount of Monetary and Prospective Relief** .................................................................................. 16

**D.    The Settlement is a Product of Significant Discovery and a Well-Developed Factual Record** .......................................................... 17

**E.    The Experience and Views of Counsel Favor a Finding that the Settlement is Fair, Reasonable and Adequate** .................................. 18

**F.    The Presence of a Governmental Participant** .................................... 19

**G.    The Reaction of Settlement Class Members** ...................................... 19

**H.    The Absence of Collusion in Reaching the Settlement Precludes Additional Scrutiny and Favors Final Approval** ............................... 20

**VI.    CONCLUSION** ................................................................................................ 22

# TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .......................................................... 9

*Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968) .......................... 12-13

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ................................................. 15

**United States Circuit Court of Appeals Cases:**

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) .................................... 11, 19

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .................................... 11

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) ................................. 10 n.15

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ................................... 11, 16, 20

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................................ 20, 21

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ................................. 12, 17, 19

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ..................................... 18

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ..................................... 17

*Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ................................................... 11, 13, 15, 16

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ....................... 12, 13, 16, 19

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ..................................................... 20

**United States District Court Cases:**

*Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413-W-AJB,
    2008 WL 5458986 (S.D. Cal. Dec. 10, 2008) ................................................. 17

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ................................................. 18

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC,
    2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ................................... 11-12, 13, 19

*Gardner v. GC Servs., LP*, No. 10-CV-0997-IEG CAB,
    2012 WL 111953 (S.D. Cal. Apr. 2, 2012) ................................................. 15, 17

*Hartless v. Clorox, Co.*, 273 F.R.D. 630 (S.D. Cal. 2011) ................................................. 10 n.15

*In re AT & T Mobility Wireless Data Serv. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ....... 19-20

*In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX,
    2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ................................................. 21

*In re Omnivision*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................. 12, 17, 18

*In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985) .......................................... 17

*LaGarde, et al. v. Support.com, et al.*, No. 3:12-cv-00609-JSC (N.D. Cal. 2013) ......... 1 n.2, 6 n.9

*Ledet v. Ascentive LLC*, No. 2:11-CV-295-PBT (E.D. Pa. Jan. 18, 2011)............... 1 n.2, 2, 14 n.8

*Martin v. Ameripride Serv., Inc.*, No. 08-cv-440-MMA (JMA),
    2011 WL 2313604 (S.D. Cal. June 9, 2011) ........................................................................ 18, 20

*McCubbrey v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62 (N.D. Cal. 1976) ................ 10 n.15

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ... 12, 17, 18, 19

*Romero v. Producers Dairy Foods, Inc.*, No. 05-cv-0484,
    2007 WL 3492841 (E.D. Cal. Nov. 14, 2007)......................................................................... 12

*Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC,
    2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ........................................................................ 12

*Webb, et al. v. Cleverbridge, Inc., et al.*,
    No. 1:11-cv-04141 (N.D. Ill. June 17, 2011) ............................................. 1 n.2, 2, 14 n.18

**State Court Cases:**

*Drymon, et al. v. Cyberdefender Corp.*,
    No. 11-CH-16779 (Cir. Ct. Cook County, Ill. May 6, 2011) ......................... 1 n.2, 14 n.18

**Miscellaneous:**

28 U.S.C. § 1715 ................................................................................................................. 19

Fed. R. Civ. P. 23 ............................................................................................................... 9

*Federal Judicial Center, Judges' Class Action Notice and*
    *Claims Process Checklist and Plain Language Guide* (2010) available at
    http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf .......... 9, 10 n.15

## I.    INTRODUCTION

The class action settlement reached in this case is an absolute success for the Settlement Class.[1] It provides for the opportunity to obtain complete monetary relief, valuable in-kind benefits, and requires modifications to the Software Products at issue, bringing their functional mechanisms and disclosures in line with Class member expectations. These results are consistent with (or stronger) than the benefits obtained through other settlements with Defendants' industry competitors[2] and ultimately, support a final determination that the settlement is fair, reasonable and adequate. Setting aside the settlement's substantive terms, the Parties' path to resolution also weighs in favor of granting final approval. Indeed, the settlement is the result of more than a year's worth of litigation, discovery, informal discussions and informational exchanges, and two private mediations presided over by one former judge and another well-respected neutral with decades of experience resolving complex class actions like this one.

Now, in accordance with the Court's Preliminary Approval Order, the Parties, with the assistance of Settlement Administrator Epiq Systems, have fully implemented the Court-approved Notice Plan, which included (i) direct e-mail notice that reached more than 83% of the Settlement

---

[1]     Unless otherwise stated herein, capitalized terms shall have the same meaning as set forth in the Parties' Stipulation of Class Action Settlement (the "Agreement"), attached as Exhibit 1.

[2]     The settlements reached with Defendants' industry competitors and finally approved are as follows: (i) *Ledet v. Ascentive LLC*, No. 2:11-CV-295-PBT (E.D. Pa. Jan. 18, 2011) (creating a $9.6 million settlement fund from which class members could make a claim for either $10.00 or $18.00 depending on the type of software purchased, and prospective relief prohibiting defendant from overstating the severity of errors and requiring additional disclosures to consumers about the nature of the software); (ii) *Drymon, et al. v. Cyberdefender Corp.*, No. 11-CH-16779 (Cir. Ct. Cook County, Ill. May 6, 2011) (creating a $9.75 million settlement fund from which class members could make a claim for $10.00 for each software product purchased, and prospective relief requiring defendant to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, as well as certain changes to the software itself); (iii) *Webb, et al. v. Cleverbridge, Inc., et al.*, No. 1:11-cv-04141 (N.D. Ill. June 17, 2011) (creating a $4 million settlement fund from which class members could make a claim for $8.50, and prospective relief requiring clear disclosure of any automatic renewal, information about the renewal dates and charges, and a simple method of cancelling future renewal charges); and (iv) *LaGarde, et al. v. Support.com, et al.*, No. 3:12-cv-00609-JSC, Dkts. 58, 61 (N.D. Cal. 2013) (creating an $8.59 million settlement fund from which class members could make a claim for $10, prospective relief requiring defendants to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, making certain changes to the software itself, and providing three months free access to anti-virus software).

Class, (ii) the publication of a Settlement Website, which allowed Class members to submit claims online or download Claim Forms to submit by mail and review all relevant Court documents, and (iii) CAFA notice to the U.S. Attorney General and other relevant governmental agencies.[3] The deadline to submit requests for exclusion and to file objections has now passed and the response from the Settlement Class has been overwhelmingly positive—not a single objection to the settlement has been raised, just six (6) Class members have requested to be excluded, and nearly two thousand claims for monetary relief have been made (with still more expected).

The Class's reaction to the settlement doesn't come as a surprise given that, under the terms of the settlement, Defendants have agreed to modify the Software Products so that they more accurately identify the functions they perform and the discrete errors detected and repaired on users' computers. Further, Defendants have agreed to include within the Software additional disclosures about its overall functionality, including explanations of the methodologies used in scanning and repairing users' computers, the types of errors and other problems the Software is capable of detecting, reporting and repairing, and the actual threat those issues pose to users' machines.

Additionally and setting this settlement apart from many of the other class action settlements reached with Defendants' industry partners—most recently in the cases of *Ledet v. Ascentive LLC*, No. 2:11-CV-295-PBT (E.D. Pa.) and *Webb, et al. v. Cleverbridge, Inc., et al.*, No. 1:11-cv-04141 (N.D. Ill.)—Defendants will automatically provide three months of free access to Symantec's award-winning Norton Antivirus software to each member of the Settlement Class regardless of whether they make a claim for any other Settlement Benefits. All told, this in-kind benefit represents an additional $6-$12 value to each Class member and more than $6-$12 million to the Class as a whole.

Finally, the settlement allows Settlement Class members to claim $9.00 for their purchase

---

[3] It is noteworthy that notice was sent to the appropriate officials of each state, as well as the Attorney General of the United States, and not a single concern about or objection to the settlement was raised. To be clear, this is not to say that the Attorney General or state officials have necessarily signed-off on the settlement, but as described further herein, the complete lack of opposition certainly informs the discussion of its fairness, reasonableness and adequacy.

1  of the Software Products, which represents a near complete recovery of the amounts they overpaid

2  for the Software. The settlement also accounts for additional monetary relief in the form of

3  payments for notice and claims administration expenses, attorneys' fees and costs, an incentive

4  award to Plaintiff as Class Representative, and any *cy pres* distribution the Court may award.

5  In the end, the relief provided under the settlement, when considered with the arms'-length

6  negotiations that led to it and the positive response from the Settlement Class, demonstrates that

7  the settlement is fair, reasonable and adequate, and warrants final approval by the Court. For these

8  reasons, and as discussed further below, Plaintiff respectfully requests that the Court grant the

9  instant motion and dismiss all Released Claims with prejudice.[4]

10 **II.    FACTUAL BACKGROUND**

11      **A.    Plaintiff Gross Alleges that Defendants Deceptively Designed and Marketed
              Their Software Products.**

12      On August 14, 2012, Plaintiff Gross filed his Second Amended Complaint (the

13 "Complaint") in this Court. (Dkt. 50, cited herein as "Compl.") In his Complaint, Gross alleges

14 that Defendants deceptively designed and marketed their PC Tools Registry Mechanic, PC Tools

15 Performance Toolkit, and Norton Utilities software (collectively the "Software Products," the

16 "Software," or the "Products") such that the Products are incapable of providing all of the

17 functions advertised. (Compl. ¶¶ 2-4, 40-42, 48-52, 96.)[5] Plaintiff alleges further that consumers

18 were induced to purchase the Software as a result of Defendants' urging them to perform

19 "diagnostic" scans with free versions of the Software that would supposedly detect and report any

20 errors or problems afflicting their computers. (*Id.* ¶¶ 3, 44-45.) The Software, however, would

21 inevitably report that various errors existed on users' machines and that in order to fix them, users

22 had to purchase full versions of the Software at an average cost of approximately $30. (*Id.*)

23

24

25  _____

[4]      A proposed Final Judgment Order is attached as Exhibit 2.

26

[5]      Although different in name, the Software Products, which have many similarities in
27 function and in the way Defendants marketed them, are referred to collectively throughout
Plaintiff's Second Amended Complaint and the instant motion. (*Id.* ¶¶ 40-42, 44-46, 51.)

28

Plaintiff's allegations are based in large part on the analysis performed by his counsel's computer forensic expert prior to the filing of this Action. (*Id.* ¶ 49.) In particular, the expert ran a series of diagnostic tests on the Software in a controlled environment and ultimately concluded that it was designed to invariably report the existence of numerous purported "errors," to characterize harmless files as "High Priority" problems, and to display the overall "System Health", "Privacy Health" and "Disk Health" of a computer as "LOW"—regardless of the computer's actual "health" or functionality. (*Id.* ¶ 52.) At all times, Defendants have disputed and continue to dispute these findings.

### B.   After Initial Discussions and Mediation, the Parties Proceed with the Litigation.

Prior to the Action being filed, the Parties held an initial meeting (through counsel) during which Class Counsel presented their expert's conclusions about the Software Products and their underlying methodologies, and the Parties otherwise discussed their respective views of the case. (*See* Declaration of Rafey S. Balabanian [cited as "Balabanian Decl."] ¶ 3, attached as Exhibit 3.) Based on those discussions, they agreed that there was at least some potential for an early resolution of the case and therefore, proceeded with an all-day mediation before Judge Ronald M. Sabraw (ret.) of JAMS on January 3, 2012. (*Id.*) At the end of the day though, the Parties were unable to reach a resolution and determined to proceed with the litigation. (*Id.*)[6]

Gross filed his original complaint on January 10, 2012, alleging claims solely against Defendant Symantec. (Dkt. 1.) Symantec moved to dismiss the complaint (Dkt. 28), and in lieu of filing an opposition, Plaintiff filed his first amended complaint and named Symantec's wholly owned subsidiary, PC Tools Ltd., as an additional party-defendant. (Dkts. 32-33.) Thereafter, Symantec filed another 12(b)(6) motion to dismiss arguing, *inter alia*, that it was not a proper party to the Action, that Plaintiff had failed to properly plead his claims under California law, and

---

[6]     At all times, Defendants have denied and continue to deny any and all wrongdoing. (*See* Settlement Agreement § III.) Nonetheless, Defendants have entered into the Settlement Agreement, determining that continued litigation would be risky, burdensome, and costly. Defendants thus agree that the immediate resolution of these claims and release from future claims (as defined in the Settlement Agreement) are desirable and beneficial. (*Id.*)

1  that he had also failed to plead fraud under the heightened pleading standard of Fed. R. Civ. P.

2  9(b). (Dkt. 38.) After full briefing by the Parties, on July 31, 2012, the Court granted Symantec's

3  motion to dismiss the amended complaint, but gave Plaintiff leave to plead additional factual

4  information to support his claims. (Dkt. 49.) Plaintiff ultimately filed his Second Amended

5  Complaint per the Court's Order (Dkt. 50) and in response, Symantec filed its third motion to

6  dismiss. (Dkt. 51.)[7]

7      As briefing on Symantec's several motions to dismiss proceeded, Plaintiff also served and

8  Symantec responded to written discovery requests. (Balabanian Decl. ¶ 5.) Thereafter, the Parties

9  exchanged correspondence and met and conferred regarding Plaintiff's perceived deficiencies in

10  those responses, and whether discovery-related motion practice was necessary. (*Id.*) In the end, the

11  Parties worked through the issues without resorting to Court-intervention, and eventually reached

12  the instant settlement, which mooted their discovery disputes.

### C.  The Parties Kept the Lines of Communication Open, Which Led to a Second Mediation and Settlement.

14      Throughout the litigation, the Parties also kept the lines of communication open and

15  eventually, as a result of their formal discovery, informal exchanges of information and additional

16  discussions, believed that they had each obtained enough information to appropriately evaluate their

17  respective claims and defenses and make resolution a real possibility. (*Id.* ¶ 6.) Accordingly, they

18  agreed to proceed with a second mediation before third-party neutral John B. Bates of JAMS (San

19  Francisco) on November 12, 2012. (*Id.*) With the assistance of Mr. Bates, the Parties were able to

20  reach an agreement in principle as to the primary terms of a class-wide settlement. (*Id.*) After three

21  months of additional negotiation to finalize the ancillary terms of the settlement, the Parties

22  reduced their Agreement to writing in the form of their Stipulation of Class Action Settlement (the

23  "Agreement") now before the Court. (*Id.*)[8]

---

[7]   Although that motion has now been fully briefed, no argument has been heard and no ruling has been issued by the Court in light of the instant settlement. (Dkts. 52, 54.)

[8]   As previously explained, it was only after the Parties agreed upon the Settlement Benefits to the Class that they negotiated and reached agreement on the amount of Class Counsel's Fee

### D.     The Court Grants Preliminary Approval of the Proposed Settlement.

Plaintiff moved for preliminary approval of the settlement on March 15, 2013, and the Parties appeared before the Court for the preliminary approval hearing on April 19th. (Dkt. 67.) At the hearing, the Court found that the Agreement was within the range of possible approval in terms of the Settlement Benefits to the Class, the Notice Plan, and the negotiations leading to the Agreement. (Dkt. 70 at 2.) But, before granting preliminary approval, the Court requested that the Parties prepare an appropriate addendum to the Agreement allowing it the discretion to designate for *cy pres* distribution a portion of the Settlement Fund equal to or less than the difference between the maximum allowable Fee Award contemplated by the Agreement and the actual Fee Award ultimately granted by the Court (in the event that it is less than that amount). (Dkt. 68-1 at 2.) Having no objections to the Court's proposal and per its instructions, the Parties negotiated and executed an Addendum to their Agreement implementing the potential *cy pres* component and presented it to the Court for consideration. (Dkt. 68-1.) Thereafter, on May 28th, the Court granted preliminary approval of the Settlement, and set a Final Approval Hearing for October 4, 2013. (Dkt. 70.)

Following preliminary approval and as explained further *infra*, the Parties have since implemented the Court-approved Notice Plan through the Settlement Administrator and received an overwhelmingly favorable response from the Settlement Class. On August 6th, the Parties also jointly submitted to the Court their respective *cy pres* proposals[9] and Plaintiff filed his motion for attorneys' fees, costs, and an incentive award, all of which are currently pending before the Court. (Dkts. 71, 72.)[10]

---

Award and an incentive award to Plaintiff as Class Representative, both of which are obviously subject to Court approval. (Balabanian Decl. ¶ 6 n.2.)

[9]     The same procedure was used in the *LaGarde, et al. v. Support.com, et al.* matter and the court there ultimately determined that a *cy pres* distribution in the amount of $200,000.00, which is the number that plaintiffs' counsel proposed, was appropriate. No. 3:12-cv-00609-JSC, Dkt. 61 at 7. Class Counsel believes that a *cy pres* distribution in that amount would be appropriate in this case as well. (Balabanian Decl. ¶ 8 n.3.)

[10]     Less than twenty-four hours after their submission to the Court, both Plaintiff's motion for attorneys' fees and an incentive award, and the Parties' *cy pres* proposals, were posted to Settlement Website for review by the Settlement Class, which was two-weeks prior to the deadline for opt-outs and objections. (Balabanian Decl. ¶ 8 n.4.)

## III.    TERMS OF THE SETTLEMENT

The terms of the Parties' settlement are summarized as follows:

**A.     Class Definition:** The Settlement Class includes all individuals and entities in the United States and its territories that, prior to May 28, 2013, purchased any of the following software: PC Tools Registry Mechanic and PC Tools Performance Toolkit released since June 1, 2007, and Norton Utilities 14.0 through 16.0. (Settlement Agreement § II.)

**B.     Prospective Relief:**

***1.     Improvements to the Software Products*:** Symantec and PC Tools have agreed to modify the current versions of their respective Software Products to: (i) deactivate the "System Health" meter within the main Graphical User Interface ("GUI") so that a user's System Health is reported as "unknown" until after the individual performs a diagnostic scan, (ii) refrain from claiming that an upgrade to the full versions of the Software will "speed" up or make computers run "faster", (iii) eliminate representations within the Software that any specific errors require "immediate repair", (iv) stop characterizing invalid registry entries as "errors", and (v) include documentation within the Software's GUI "Help" section that clearly explains the detection and reporting methodologies of the Software's diagnostic scans. (*Id.* § VI.A.)

***2.     New Documentation Explaining the Software Products' Functionality*:** Defendants have further agreed to create and publish new documentation to be associated with the modified versions of the Software explaining in a clear and concise manner (i) the "System Health" meter and the factors considered in determining a computer's "System Health", and (ii) the potential harm that the issues detected by the Products might pose to a computer's operations, including what is meant by a "High Priority" issue. (*Id.* § VI.B.)

**C.     Monetary Relief:** Defendants have agreed to create a non-segregated Settlement Fund in the amount of $11 million, from which payments for all Notice and Administrative Expenses, the Fee Award, an Incentive Award to Plaintiff as Class Representative, payments for valid Settlement Class Member claims, and any *cy pres* distribution will be paid.

Each Settlement Class Member that submits a valid Claim Form will be entitled to receive a one-time payment of $9.00. (*Id.* § VI.C.2.) In the event that the amount in the Settlement Fund is

not sufficient to pay in full all valid Settlement Class Member claims, Notice and Administration Expenses, and the full amount of the Incentive Award and the Fee Award, the Settlement Administrator shall make payments to Settlement Class Members on a *pro rata* basis. (*Id.*)

**D.      Other Relief:** In addition to the individual and prospective relief described above, Defendants have agreed to the following relief.

*1.      Anti-Virus Software*: Each Settlement Class Member will be entitled to receive three (3) months of free access to Symantec's Norton Antivirus software. (*Id.* § VI.C.3.)

*2.      Payment of Notice and Administrative Expenses*: Defendants shall pay all Notice and Administration Expenses up to $150,000.00. (*Id.* §§ II, VI.C.) Any overage will be paid one half by Defendants and one half by Class Counsel. (*Id.* § VII.C.)

*3.      Compensation for the Class Representative*: Defendants have agreed to pay, from the Settlement Fund and subject to Court approval, an Incentive Award to Plaintiff as Class Representative up to an amount of $2,500. (*Id.* § XI.A.)

*4.      Payment of Attorneys' Fees and Expenses*: Defendants have agreed not to oppose Class Counsel's application for a Fee Award up to an amount of $1.65 million, subject to Court approval. The Fee Award shall include all attorneys' fees and reimbursement of expenses associated with this Action. (*Id.* § XI.B; *see also* Dkt. 71.)

*5.      Cy Pres Distribution*: The Parties have agreed that the Court may, in its discretion, distribute a portion of the Settlement fund equal to or less than the difference between the maximum allowable Fee Award contemplated by the Agreement and the actual Fee Award granted by the Court (in the event that it is less than the maximum) to *cy pres*. (*See* Dkt. 68-1.) Plaintiff has proposed (i) The U.C. Berkeley Center for Law and Technology, (ii) The Rose Foundation, and (iii) Consumer Watchdog as potential *cy pres* recipients. (Dkt. 72.) Defendants have proposed (i) National Cyber Security Alliance, (ii) Girls STEM Network Cybersecurity, and (iii) Common Sense Media as potential *cy pres* recipients.

**E.      Release:** Upon the entry of Judgment, and in consideration of the Settlement Benefits, each Settlement Class Member shall be deemed to have released Defendants and each of the Released Parties from any and all "Released Claims." (Settlement Agreement § V.)

**IV.     NOTICE WAS DISSEMINATED TO THE CLASS, SATISFYING DUE PROCESS.**

Notice to settlement class members is sufficient for purposes of approving a class settlement where the manner of notice is the best "practicable under the circumstances . . . ." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). The "best notice practicable" includes individual notice "to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). Actual receipt of notice by all members of a class is not required to comport with the Rule 23 or due process requirements. Instead, the Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable. *Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), p. 3, available at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf (last visited August 3, 2013).

Here, the Court-approved Notice Plan included direct notice via email to the last known email address of each Settlement Class member (provided during their purchase of the Software Products), publication of the Settlement Website,[11] which itself allows uninterrupted access to important case documents like the Court's Preliminary Approval Order, the Parties' Settlement Agreement, the Notice, and a downloadable Claim Form, and provided for the submission of Class member claims online,[12] and CAFA notice to the relevant governmental agencies. Additionally, the Settlement Administrator established and operated a toll-free telephone line (that remains active to this day) through which Class members could call to obtain information about the settlement,

---

[11]     The Agreement contemplates that the Settlement Website—www.gross-settlement.com—which went live on June 18, 2013, will remain active until after final approval has been granted, the appeals period has run, and all Class member claims have been paid. (*See* Declaration of Mallory Sander [cited as "Sander Decl."] ¶ 19, attached as Exhibit 4.)

[12]     As the Court knows well, the Notice provided to the Settlement Class was also neutral in tone and provided Class Members with a detailed explanation of their rights under the settlement, including how to obtain the available Settlement Benefits, how to "opt-out" of the settlement, and how to comment in support of or in opposition to it. (*See* Sander Decl., ¶¶ 3-5, 8.) This information gave Settlement Class Members the ability to make an informed decision about their participation (or not) in the settlement.

1   request copies of the Notice and Claim Form, and receive assistance with submitting claims.[13]

2   (Sander Decl. ¶¶ 4, 19.)

3          Since the Court granted preliminary approval, the Parties have successfully implemented the

4   approved Notice Plan through the Settlement Administrator. The Settlement Administrator has

5   transmitted more than 1 million notice e-mails, which were successfully delivered to more than 83%

6   of the Settlement Class, far surpassing the requisite 70% deliverability rate.[14] (*See* Sander Decl.

7   ¶¶ 12-15). Immediately upon the Notice being distributed, Class members began submitting Claim

8   Forms—both online through the Settlement Website and by mail. In total, the Settlement

9   Administrator has received just shy of 2,000 Claim Forms and because the window to submit claims

10  will remain open for an additional thirteen (13) days until September 19th, expects to receive still

11  more. (*Id.* ¶ 18.) By contrast, the window for Settlement Class Members to request exclusion or object

12  to the settlement has now closed, and not a single Class Member has raised an objection and only six

13  have requested exclusion. (*Id.* ¶¶ 16-17.) From this overwhelmingly favorable response, it is evident

14  that the Settlement Class is satisfied with the results of the settlement.

15         It bears noting that the success of the e-mail notice was due, in large part, to the multi-step

16  approach Settlement Administrator Epiq Systems implemented here. First, Epiq confirmed that there

17  were no duplicate e-mails on the list of Settlement Class Members to whom the Notice would be

18  sent. (*Id.* ¶ 6.) Then, it ensured that the "From" display and address fields, and subject line included

19  terms that could easily be recognized by Class Members. (*Id.* ¶¶ 7, 9.) Each email also contained an

20  opt-out option so Class Members could prevent the receipt of future mailings. (*Id.* ¶ 8.) And, both a

21  text and HTML version of the e-mail notice were sent simultaneously in batches of 50,000—

22

23  [13]     Class Members were also able to submit paper Claim Forms to the Settlement Administrator
    by mail and many Class Members, in fact, did so. (Sander Decl. ¶ 18.)
24

25  [14]     A rate of 70-95% deliverable class notice is considered "high." *See, e.g., Federal Judicial
    Center, Class Action Notice* (2010); *see also Hartless v. Clorox, Co.*, 273 F.R.D. 630 (S.D. Cal. 2011)
    (finally approving a settlement with notice estimated to reach 75-83% of class members); *McCubbrey
26  v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62, 74 (N.D. Cal. 1976) (discussing adequate notice
    for large class actions) (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975)
27  (approving of a settlement without indirect notice and in which direct mail notice failed to reach
    "approximately one-third of the class")).
28

measures that have been proven to increase e-mail deliverability. (*Id.* ¶¶ 10-11.) After the initial round of e-mail Notice was sent, Epiq also employed safeguards to identify undeliverable e-mails and took steps to resend them, including identifying "soft" bounce-backs and monitoring an e-mail inbox to respond to "captcha" and other requests to be completed before an e-mail could be successfully delivered. (*Id.* ¶¶ 13-15.)

Given the foregoing, it should be clear that notice of the settlement has been disseminated to the Settlement Class by the best methods practicable and due process satisfied.

## V.    THE SETTLEMENT WARRANTS FINAL APPROVAL BECAUSE IT IS FAIR, ADEQUATE, AND REASONABLE.

Not only has the Notice Plan met the rigors of Rule 23 and due process, but the settlement itself is also fair, reasonable and adequate and thus, warrants final approval. *See Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983)). To determine whether a settlement is fair, adequate, and reasonable, courts in the Ninth Circuit typically evaluate it based upon the following non-exclusive list of factors:

> "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). No one factor controls, and the "importance to be attached to [each] will depend upon . . . the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625.

Moreover, in complex class action litigation like this, judicial policy favors settlement. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Accordingly, deference is often given "to the private consensual decision of the parties." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (quoting

1   *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in

2   the product of an arms-length, non-collusive, negotiated resolution . . . .")). Courts in the Ninth

3   Circuit afford settlements such a presumption of fairness if: "(1) the negotiations occurred at arm's

4   length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in

5   similar litigation; and (4) only a small fraction of the class objected." *Romero v. Producers Dairy*

6   *Foods, Inc.*, No. 05-cv-0484, 2007 WL 3492841, at *2 (E.D. Cal. Nov. 14, 2007). Each of these

7   factors is satisfied here.

8          Indeed, the Parties' settlement was the result of many months of discussions amongst

9   experienced counsel, negotiations and two separate private mediation sessions before well-respected

10  third-party neutrals. Those negotiations and mediation took place only after the Parties had sufficient

11  information—gathered through both formal and informal discovery—about their respective claims

12  and defenses, and the contours of the proposed Settlement Class. That, taken with the fact that not a

13  single Class Member has raised an objection to the settlement—but thousands have submitted Claim

14  Forms under its terms—strongly suggests that the settlement is fair and reasonable and that a

15  presumption of fairness should attach. But even if such a presumption wasn't appropriate (it is), as

16  explained further below, each of the eight factors this Court should typically consider in determining

17  the fairness, adequacy, and reasonableness of the settlement weighs strongly in favor of granting it

18  final approval.

19          **A.      Final Approval is Appropriate in Light of the Risks of Further Litigation.**

20          In determining whether a settlement is fair, adequate, and reasonable, courts first evaluate the

21  strength of the plaintiff's case and range of possible recovery in light of the risks of continued

22  litigation. *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159, at *5 (S.D.

23  Cal. Nov. 5, 2012); *see also In re Omnivision*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (citing

24  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)). Under this analysis, the court

25  balances "the vagaries of litigation and [] the significance of immediate recovery by way of the

26  compromise to the mere possibility of relief in the future, after protracted and expensive litigation."

27  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004); *see also*

28  *Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to

1   [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of

2   the compromise with the likely rewards of litigation."). Assessing a plaintiff's probability of success

3   does not require a rigid formula or an ultimate conclusion on the merits. *Garner*, 2010 WL 1687832,

4   at *9 (citing *Rodriguez*, 563 F.3d at 965; *Officers for Justice*, 688 F.2d at 625). Rather, "the Court's

5   assessment of the likelihood of success is . . . an amalgam of delicate balancing, gross

6   approximations and rough justice.'" *Garner*, 2010 WL 1687832, at *9 (citing *Officers for Justice*,

7   688 F.2d at 625). "[T]he Court may presume that through negotiation, the Parties, counsel, and

8   mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of

9   recovery." *Garner*, 2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965).

10         On balance, these factors weigh in favor of final approval of the settlement. Although

11   Plaintiff and Class Counsel are confident in the strength of their claims, there was a significant

12   risk that ongoing litigation would result in a diminished recovery for the Class (or no recovery at

13   all). That is, from the outset of the litigation, Defendants and their counsel have raised vigorous

14   arguments against the claims at issue, including numerous legal challenges that could have

15   reduced or eliminated their liability—for example, that Symantec could not be held vicariously

16   liable for the design and marketing practices of PC Tools. (Balabanian Decl. ¶ 9.) Recovery would

17   have also ultimately turned on the resolution of several complicated factual issues regarding the

18   underlying source code, design and functionality of the Software Products, which would have

19   been expensive and time consuming, requiring additional discovery, expert testing and analysis.

20   (*Id.*) And, even if Plaintiff was successful in overcoming those challenges, given the amount at

21   stake and their reputational interests, Defendants were likely to appeal any decision on the merits,

22   thereby delaying (and making uncertain) any recovery for the Class. (*Id.*) These significant risks—

23   weighed against the certainty of relief obtained for the Class through the Settlement—suggest that

24   the Settlement is more than fair, reasonable and adequate.

25         Indeed, the $11 million Settlement Fund is sufficient in size to compensate Class Members

26   for the damages they allegedly suffered by overpaying for the Software Products. (*Id.*)  In

27   addition, the Fund covers the costs of notice and administration (Settlement Agreement §§ II,

28   VI.C), attorneys' fees (*Id.* § XI.B), an incentive award to Plaintiff as Class Representative (*Id.*

§ XI.A), and any *cy pres* distribution the Court may deem appropriate. (Dkt. 64.) The individual $9 payments to Class Members who submit valid claims are similarly sufficient inasmuch as they represent a near complete recovery on Plaintiff's theory that they overpaid for the Software. (*Id.* § VI.C.2.)[15]

The non-monetary relief the Settlement provides is equally meaningful and was a primary goal of the litigation. Defendants have agreed to modify the Software Products so that they will no longer mislead consumers to believe that their computers are in imminent danger, that immediate repair is necessary, or that the Products can resolve such issues while also improving their computers' overall speed and performance. (Settlement Agreement § VI.A.) Instead, the Software will now give a more accurate assessment—in laymen's terms—of the health and actual system statuses of users' computers, and provide additional documentation that explains the Software Products' functionality, how the Products diagnose a particular system, and the potential harm to the system by the errors and threats detected. (*Id.* § VI.B.)

Finally, the Settlement provides each Class Member three months of free access to Symantec's Norton Antivirus software, regardless of whether they submit a Claim Form under the settlement. (Settlement Agreement § VI.C.3.) Because this antivirus software retails for $24.99-$49.99 per year, this component of the settlement amounts to an additional $6-$12 of value to each Settlement Class Member, and more than $6-$12 million to the Class as a whole.[16]

With all that in mind, it should be clear that the first and second factors to be considered here weigh in favor of granting final approval to the settlement.

---

[15]     Because Plaintiff does not allege that the Software Products were without any value whatsoever, Class Counsel's analysis suggests that the deceptive design at issue in this case resulted in a proportional reduction in the value of the Software. (Balabanian Decl. ¶ 9 n.5.) Therefore, a return of $9 for each Software purchase represents a 30% return on the difference between the Software's alleged actual value and the approximately $30 average purchase price. (*Id.*)

[16]     Notably, this in-kind benefit is a significant increase in the amount of relief provided to the Class relative to the other settlements in the industry, which did not include such a component but nevertheless were found to be fair, reasonable and adequate, and were granted final approval by the federal and state courts that considered them. *See, e.g., Ledet*, No. 2:11-CV-295-PBT; *Drymon*, No. 11-CH-16779; *Webb*, No. 1:11-cv-04141.

### B.     The Risks Involved in Maintaining Class Action Status Render Final Approval Appropriate.

The risk in maintaining this case as a class action through trial and any appeals also weighs in favor of granting final approval to the settlement. *See Officers for Justice*, 688 F.2d at 625. This factor does not require a plaintiff to have moved for class certification as long as pre-certification concerns outweigh the risks both parties face should a plaintiff succeed or fail in certifying the class. *See Gardner v. GC Servs.*, *LP,* No. 10-CV-0997-IEG CAB, 2012 WL 1119534, at *4 (S.D. Cal. Apr. 2, 2012) (recognizing the risk class certification poses for both parties and acknowledging the benefits of settlement).

Given the uniform nature of Defendants' alleged design and marketing practices, Plaintiff and Class Counsel are confident that this case is appropriate for certification. For example, Defendants' uniform conduct toward the members of the Class raises several common (and predominant) issues of fact and law, including: (i) whether Defendants intentionally designed the Software to falsely report the existence of errors; (ii) whether the Software exaggerates the severity of errors detected on users' computers; (iii) whether Defendants intentionally designed the Software and its respective marketing materials to deceive consumers into purchasing the Products; (iv) whether Plaintiff and the Settlement Class overpaid for the Software Products; and (v) whether those common factual issues—if proven—support Defendants' liability for claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, fraudulent inducement, breach of express warranties, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 2556 (2011) (explaining that commonality is found where the claims of all class members "depend upon a common contention," and "even a single common question will do").

Despite the several common questions of law and fact in this case, adversarial class certification is not a forgone conclusion. Instead, Defendants are likely to argue that the Software had at least some utility—which Plaintiff already concedes—and raise potential individual issues that could make certification inappropriate—*e.g.*, variations in the conditions of users' computers and the effects that these variations may have on the Software's performance. For Plaintiff, failure to certify the Class would mean an immediate end to the Class's claims here and a total lack of

1    recovery. On the other side of the coin, a loss at the certification stage would pose severe

2    consequences for the remainder of the litigation—*e.g.*, increasing Defendants' potential liability.

3        Thus, given the risks to all Parties relating to maintaining class certification through the end

4    of the case, the Court should find that this factor also weighs in favor of final approval.

5        **C.    The Settlement Offers an Appropriate Amount of Monetary and Prospective
              Relief.**

6        The fourth factor—the amount and nature of the relief offered under the settlement—also

7    weighs in favor of final approval. In this regard, courts should consider "the complete package" of a

8    settlement rather than individual terms. *Officers for Justice*, 688 F.2d at 628. When evaluating this

9    factor, courts defer "to the private consensual decision of the parties." *Rodriguez*, 563 F.3d at 965

10   (citing *Hanlon*, 150 F.3d at 1027) (noting that courts "put a good deal of stock" in the agreement

11   reached by the parties where the settlement is the result of "an arm's-length, non-collusive,

12   negotiated resolution."); *see also Officers for Justice*, 688 F.2d at 628 (holding that even obtaining

13   through settlement a fraction of the ultimate potential recovery can be fair, reasonable and adequate.)

14       In this case, the negotiated relief under the Settlement is more than fair and represents a near

15   complete recovery for the Settlement Class. That is, each Class Member may claim a cash payment

16   of $9—approximately 30% of the average purchase price of the Software—from the $11 million

17   Settlement Fund. (Settlement Agreement § VI.C.2.) Regardless of whether he or she submits a

18   claim, each Class Member will also receive a substantial in-kind benefit in the form of access to

19   three free months of Symantec's award winning Norton Anitvirus software—valued at

20   approximately $6-$12 per Class Member, or more than $6-$12 million total. (*Id.* § VI.C.3.) Finally,

21   in addition to the monetary and in-kind benefits, Defendants have also agreed to multi-pronged

22   prospective relief that will modify the Software Products to provide additional clarity as to their

23   functions and the results they generate on users' computers, and include within the Software

24   additional documentation explaining those processes and the threats posed by the errors and

25   problems actually affecting users' machines. (*Id.* §§ VI.A, VI.B.)

26       Accordingly, the amount and nature of the relief provided to the Settlement Class also

27   weighs in favor of final approval.

28

### D.     The Settlement is a Product of Significant Discovery and a Well-Developed Factual Record.

Final approval of the settlement should also be granted because it's based upon a solid factual record developed through both formal and informal discovery, and Class Counsel's experience in analogous litigation. *See OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego*, 213 F. 3d at 459)). Even if that wasn't the case (it is), it is well settled that where parties "have sufficient information to make an informed decision about settlement, formal discovery is not a necessary ticket to the bargaining table." *Gardner*, 2012 WL 1119534, at *5 (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)) (internal quotations omitted). Ultimately, settling parties need only reach a point in the litigation where they understand the respective strengths and weaknesses of their positions. *Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413-W-AJB, 2008 WL 5458986, at *8 (S.D. Cal. Dec. 10, 2008) (quoting *In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985)). A compromise based on such a thorough understanding of the legal and factual issues and a "genuine arms-length negotiation is presumed fair." *Nat'l Rural Telecomms.*, 221 F.R.D. at 528 (citations omitted).

Throughout more than a year and a half of litigation, the Parties here have engaged in a significant amount of both formal discovery, informal informational exchanges and private discussions, negotiations and mediation—not to mention Class Counsel's pre-suit investigation and the Parties' briefing on several substantive motions aimed at testing the sufficiency of Plaintiff's claims and several of Defendants' potential defenses. (Balabanian Decl. ¶ 10; *see also* Dkts. 28, 38, 39, 40, 51, 52.)  As a result of those efforts, the Parties have gathered the information necessary to properly evaluate their respective claims and defenses and ultimately, negotiate the settlement now before the Court. (Balabanian Decl. ¶ 11.) As recognized by the Court's Preliminary Approval Order, the litigation to date and the information available to the Parties suggest that the settlement is a fair, reasonable and adequate result for the Settlement Class.

Accordingly, this factor weighs in favor of final approval as well.

**E.    The Experience and Views of Counsel Favor a Finding that the Settlement is Fair, Reasonable and Adequate.**

Next, the Court should defer (at least in part) to the Settlement because it was reached by experienced counsel who readily support its approval. Indeed, "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *see also OmniVision*, 559 F. Supp. 2d at 1043 (quoting *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)) "The recommendations of plaintiff's counsel should be given a presumption of reasonableness." *Id*. And, that presumption of fairness is strengthened when (as here) counsel have specific experience in the type of claims being litigated. *See Martin v. Ameripride Serv., Inc.*, No. 08-cv-440-MMA (JMA), 2011 WL 2313604, at *7 (S.D. Cal. June 9, 2011); *see also Nat'l Rural Telcomms.*, 221 F.R.D. at 528 ("noting that '[g]reat weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation").

Class Counsel here have significant experience litigating consumer class actions of similar size, scope, and complexity, and have been appointed class counsel in numerous other class actions by courts throughout the country. (*See* Edelson LLC Firm Resume, attached as Exhibit 3-A to the Balabanian Decl.) Particularly relevant to this case, Class Counsel have developed a unique and specific set of expertise while prosecuting more than a dozen similar nationwide class actions related to claims against Defendants' industry competitors for their own alleged deceptive design and marketing of utility software products. (Balabanian Decl. ¶ 11.) It was with that experience that they investigated and analyzed Plaintiff's and the Class's claims, Defendants' potential defenses, the formal and informal discovery produced by Defendants, and ultimately, negotiated the Settlement now before the Court. With all of that in mind and faced with a formidable opposition by defense counsel highly experienced in complex litigation from a prominent multi-national law firm, Class Counsel is confident that the settlement is an exceptional result for the Settlement Class. (*Id*.)

As such, this factor also weighs in favor of final approval of the Settlement.

**F.    The Presence of a Governmental Participant.**

There were no "governmental coattails for the class to ride" in this case, *Rodriguez*, 563

1   F.3d at 964, but Defendants were nonetheless obligated to provide notice of the United States

2   Attorney General and appropriate state officials as a condition of obtaining Court approval. 28

3   U.S.C. § 1715; *Garner*, 2010 WL 1687832, at *14. "Although CAFA does not create an

4   affirmative duty for either the state or federal officials to take any action in response to a class

5   action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any

6   concerns that they may have during the normal course of the class action settlement procedures."

7   *Garner*, 2010 WL 1687832, at *14. The Parties complied with CAFA's notice requirement and

8   provided the requisite notice on March 18, 2013 (Stipulation of Settlement) and May 21, 2013

9   (Addendum to Settlement). (Dkts. 65, 69.) To date, no state or federal official has raised any

10  objection to the settlement. Accordingly, this factor also supports final approval.

11          **G.      The Reaction of Settlement Class Members.**

12          Perhaps most telling, the Settlement Class has had an overwhelmingly positive reaction to

13  the Settlement. *Garner*, 2010 WL 1687832, at *14. As described above, more than 83% of the Class

14  received direct notice of the Settlement, but not a single objection to the Settlement was raised, only

15  six Class Members have sought exclusion, and thousands have already made claims for Settlement

16  Benefits. *See id.* ("Courts have repeatedly recognized 'that the absence of a large number of

17  objections to a proposed class action settlement raises a strong presumption that the terms of a

18  proposed class action settlement are favorable to the class members.'") (quoting *Nat'l Rural

19  Telecomms.*, 221 F.R.D. at 529)); *see also Churchill Vill.*, 361 F.3d at 577 (affirming the district

20  court's approval where 45 of 90,000 notified class members objected to the settlement and 500 class

21  members opted out of the settlement); *In re Mego*, 213 F.3d at 459 (final approval granted in

22  settlement with one objection out of a potential class of 5,400). Given the strength of the Notice Plan,

23  combined with the complete lack of opposition to the Settlement, it's clear that the members of the

24  Class are aware of and have found the Settlement to be fair, reasonable and adequate to resolve their

25  claims. *See In re AT & T Mobility Wireless Data Serv. Sales Litig.*, 270 F.R.D. 330, 349 (N.D. Ill.

26  2010) ("silence [of a class] coupled with other indicia of fairness . . . provides further support of

27  approval.").

28          As such, this factor weighs heavily in favor of final approval.

**H.**     **The Absence of Collusion in Reaching the Settlement Precludes Additional Scrutiny and Favors Final Approval.**

In addition to the other factors, where, as here, a settlement is reached prior to class certification, courts often require a higher standard of fairness "to ensure class counsel and defendant have not colluded in settling the case." *Martin*, 2011 WL 2313604, at *5 (citing *Hanlon*, 150 F.3d at 1026). The factors most indicative of collusion between the parties are "(1) when counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded; (2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class'; and (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal citations and quotations omitted). None of these "warning signs" are present here.

First, Class Counsel is not receiving a disproportionate amount of the Settlement Fund. Rather, the proposed Fee Award amounts to just 15% of the Settlement Fund and just over 9.7% of the total cash and in-kind benefits combined.[17] (*See* Dkt. 51.) These amounts fall well below the Ninth Circuit's benchmark of 25% in common fund cases, *In re Bluetooth*, 654 F.3d at 942, and even further below the Ninth Circuit's typical fee award of 30-50% in cases with a total recovery of less than $50 million. *See Martin*, 2011 WL 2313604, at *8. In addition, rather than seek attorneys' fees separate and apart from funds paid to the Class, Class Counsel seeks the Fee Award as a percentage of the total value created by the Settlement, further weighing in favor of a finding of fairness and reasonableness. *See Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir. 2003); *In re Bluetooth*, 654 F.3d at 948-49.

Second, while there is a reversion to Defendants, there is no reversion of attorneys' fees, which is what the court *In re Bluetooth* warned against. 654 F.3d at 947. Instead, any portion of the

---

[17]     Plaintiff's request for the Fee Award does not, however, take into account the value of the prospective measures and modifications to Defendants' Software Products, even though those benefits are valuable as well.

1   requested attorneys' fees that is not awarded by the Court will remain in the Settlement Fund to pay

2   for Class Member claims and the other costs of the settlement, and/or be distributed to appropriate

3   *cy pres* recipients as directed by the Court. (Settlement Agreement § VI.C; *see also* Dkts. 68-1, 70.)

4   Thus, any reversion to Defendants will be only after all such payments have been made.

5          Third, while there is a "clear sailing" fee provision in the Agreement, the Parties negotiated

6   the proposed Fee Award only after relief to the Settlement Class had already been agreed upon.

7   (Balabanian Decl. ¶ 6 n.2.) The maximum allowable Fee Award was thus negotiated in the context

8   of knowing the actual value of the total Settlement Fund, with the Parties agreeing to a maximum

9   allowable Fee Award that amounted to 15% of the total Settlement Fund. As such, this component

10  of the Settlement should not cause concern, as the Ninth Circuit has only cautioned against approval

11  in settlements where the requested fee is decided *independently* of the amount provided to the class,

12  which is not the case here. *See In re Bluetooth*, 654 F.3d at 947.

13         Finally and most importantly, there was no collusion in this case. On this issue, the Court can

14  look to the assurances of counsel and the presence of not one, but two neutral mediators, all of which

15  "weigh[] in favor of a finding of non-collusiveness." *Id.* at 948. As explained above, despite keeping

16  the lines of communication open and considering a potential early resolution of this matter, the

17  instant settlement was reached only after more than a year of litigation and discovery, additional

18  informal exchanges of information and several in-person meetings between counsel. (*See*

19  Balabanian Decl. ¶¶ 3-6.) Even still, it took the assistance of two third-party neutrals—Judge Sabraw

20  (ret.) and Mr. Bates, and two separate all-day mediation sessions to reach a settlement. (*Id.*) With

21  this as the backdrop and considering the substantive terms of the Settlement, there should be no

22  question that collusion is not a concern here. *See In re HP Laser Printer Litig.*, No. SACV 07-0667

23  AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011).

24         Thus, this final factor is satisfied and the Court may properly grant final approval.

25  **VI.    CONCLUSION**

26         For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order (i)

27  granting final approval of the Parties' Settlement, (ii) dismissing all Released Claims with

28  prejudice, and (iii) granting such other and further relief as the Court deems reasonable and just.

Respectfully Submitted,

**JAMES GROSS**, individually and on behalf of all others similarly situated,

Dated: September 6, 2013

By: /s/ Rafey S. Balabanian
One of Plaintiff's Attorneys

JAY EDELSON
jedelson@edelson.com
RAFEY S. BALABANIAN
rbalabanian@edelson.com
BENJAMIN H. RICHMAN
brichman@edelson.com
CHANDLER R. GIVENS
cgivens@edelson.com
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370

SEAN P. REIS (SBN 184044)
sreis@edelson.com
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123