1  Jay Edelson*
   jedelson@edelson.com
2  Rafey S. Balabanian (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
3  Benjamin H. Richman (Admitted *Pro Hac Vice*)
   brichman@edelson.com
4  Chandler R. Givens (Admitted *Pro Hac Vice*)
   cgivens@edelson.com
5  EDELSON PC
   350 North LaSalle Street, Suite 1300
6  Chicago, Illinois 60654
   Tel: 312.589.6370
7  Fax: 312.589.6378

8  Mark Eisen (SBN - 289009)
   meisen@edelson.com
9  EDELSON PC
   555 West Fifth Street, 31st Floor
10 Los Angeles, California 90013
   Tel: 213.533.4100
11 Fax: 213.947.4251

12 *Attorneys for Plaintiff and the Settlement Class*

13              **UNITED STATES DISTRICT COURT**

14        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                **SAN FRANCISCO DIVISION**

16 JAMES GROSS, individually and on behalf of        Case No. 3:12-cv-00154-CRB
   all others similarly situated,
17                                                    **PLAINTIFF'S RENEWED MOTION**
                    *Plaintiff,*                      **FOR AND MEMORANDUM IN**
18                                                    **SUPPORT OF FINAL APPROVAL OF**
        *v.*                                          **CLASS ACTION SETTLEMENT,**
19                                                    **INCENTIVE AWARD AND**
   SYMANTEC CORPORATION, a Delaware                   **ATTORNEYS' FEES**
20 corporation, and PC TOOLS, LTD., an Irish
   limited company,                                   Date: March 14, 2014
21                                                    Time: 10:00 a.m.
                    *Defendants.*                     Location: Courtroom 6, 17th Floor
22                                                    Judge: Honorable Charles R. Breyer

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

    **PLEASE TAKE NOTICE** that on March 14, 2014 at 10:00 a.m., or as soon thereafter as counsel may be heard, Plaintiff James Gross will appear for a final Fairness Hearing, through counsel, before the Honorable Charles R. Breyer, or any judge sitting in his stead, in Courtroom 6, 17th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, and then and there move the Court for an Order (i) granting final approval of the Parties' Settlement, (ii) awarding Class Counsel reasonable attorneys' fees, (iii) awarding Plaintiff Gross a reasonable incentive award, (iv) dismissing all Released Claims with prejudice, and (v) granting such other and further relief as the Court deems reasonable and just.

    Plaintiff's Renewed Motion is based on this Notice of Motion, the authorities cited in the attached Memorandum in Support, oral argument of counsel, all of the documents in the record in this matter, and any other matter that may be submitted or raised at the Fairness Hearing on the Motion.

                                      Respectfully submitted,

                                      **JAMES GROSS**, individually and on behalf of all others similarly situated,

Dated: February 7, 2014                    By: /s/ Rafey S. Balabanian
                                          One of Plaintiff's Attorneys

                                    Jay Edelson*
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
Chandler R. Givens (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

RENEWED MOTION FOR FINAL APPROVAL,
INCENTIVE AWARD, AND ATTORNEYS' FEES

CASE NO. 3:12-cv-00154-CRB

1

Mark Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RENEWED MOTION FOR FINAL APPROVAL,
INCENTIVE AWARD, AND ATTORNEYS' FEES

CASE NO. 3:12-cv-00154-CRB

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................1

II. FACTUAL BACKGROUND .................................................................................2

    A. Plaintiff's Allegations, the Litigation, and the Discussions and Mediations that Led to Settlement .................................................2

    B. The Court Grants Preliminary Approval of the Settlement After the Parties Address its Concerns .................................................3

    C. The First Final Fairness Hearing, the Court's Concerns about the Total Monetary Relief Provided by Defendants, and the Parties' Settlement Conference with Magistrate Judge Corley .................................................4

III. TERMS OF THE SETTLEMENT .................................................................4

    A. Class Definition .................................................4

    B. Prospective Relief .................................................5

        1. Improvements to the Software Products .................................................5

        2. New Documentation Explaining the Software Products' Functionality .................................................5

    C. Monetary Relief .................................................5

        1. Individual Relief .................................................5

        2. Cy Pres Relief .................................................5

    D. Other Relief .................................................6

        1. Anti-Virus Software .................................................6

        2. Payment of Notice and Administrative Expenses .................................................6

        3. Compensation for the Class Representative .................................................6

        4. Payment of Attorneys' Fees and Expenses .................................................6

    E. Release .................................................6

IV. NOTICE WAS DISSEMINATED TO THE CLASS, SATISFYING DUE PROCESS .................................................6

V. THE SETTLEMENT WARRANTS FINAL APPROVAL BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE .................................................8

    A. Final Approval is Appropriate in Light of the Risks of Further Litigation .................................................9

**B.**   **The Risks Involved in Maintaining Class Action Status Render Final Approval Appropriate** ...................................................................11

**C.**   **The Settlement is a Product of Significant Discovery and a Well-Developed Factual Record** .............................................12

**D.**   **The Experience and Views of Counsel Favor a Finding that the Settlement is Fair, Reasonable, and Adequate** ...................13

**E.**   **The Presence of a Governmental Participant** ...........................14

**F.**   **The Reaction of Settlement Class Members** .............................14

**G.**   **The Absence of Collusion in Reaching the Settlement Precludes Additional Scrutiny and Favors Final Approval** ......................15

**VI.**   **THE COURT SHOULD APPROVE THE AGREED-UPON FEE AWARD** ............16

**A.**   **The Settlement Provides Substantial Relief to the Class** ...........19

**B.**   **Class Counsel Expended a Significant Amount of Attorney Time, Effort and Expense in this Case and Were Precluded from Accepting Other Employment** ...........................................................................20

**C.**   **The Risk of Nonpayment** .........................................................21

**D.**   **Class Counsel Skillfully Prosecuted this Case** .........................22

**E.**   **Class Counsel's Requested Fee Award is Well Below Awards in Similar Cases** ...................................................................................22

**VII.**   **THE COURT SHOULD APPROVE THE AGREED-UPON INCENTIVE AWARD** ..................................................................................................23

**VIII.**   **CONCLUSION** ......................................................................................24

**TABLE OF AUTHORITIES**

**United States Supreme Court Cases:**

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ........................................................7

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...............................................................19

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ...........................................12

**United States Circuit Court of Appeals Cases:**

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ....................... 8, 14

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ................................ 8

*Cunningham v. City of Los Angeles*, 879 F.2d 481 (9th Cir. 1988) ..........................19

*D'Emanuele v. Montgomery Ward & Co.*, 904 F.2d 1379 (9th Cir. 1990) ...............17

*Fischel v. Equitable Life Assur., Soc'y of U.S.*, 307 F.3d 997 (9th Cir. 2002)...................... 17, 19 n.19

*Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115 (9th Cir. 2000).........................................19

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)..........................8, 10, 15, 16

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ...........15, 16, 19

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995).........................................13

*In re Wash. Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994)................................21

*Kerr v. Screen Extras Guild, Inc.*, 526 F. 2d 67 (9th Cir. 1975)...................18-19, 20, 21, 22

*McCown v. City of Fontana*, 565 F.3d 1097 (9th Cir. 2009).......................................19

*Morris v. Lifescan, Inc.*, 54 Fed. Appx. 663 (9th Cir. 2003) ....................................22

*Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615 (9th Cir. 1982) ..........................................................8, 9, 10, 11

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009).................................. 8-9, 10, 14, 23

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .......................................... 17, 23

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)....................................... *passim*

**United States District Court Cases:**

*Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413, 2008 WL 5458986 (S.D. Cal. Dec. 10, 2008)......................................................... 12

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979).......................................13

*Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010)..............................24 n.21

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ....................................8, 9, 10, 14, 19

*Gardner v. GC Servs., LP*, No. 10-cv-0997,
2012 WL 111953 (S.D. Cal. Apr. 2, 2012) ..........................................11, 12

*Hartless v. Clorox, Co.*, 273 F.R.D. 630 (S.D. Cal. 2011)................................ 8 n.11, 23

*Hopkins v. Stryker Sales Corp.*,
No. 11-cv-02786, 2013 WL 496358 (N.D. Cal. Feb. 6, 2013)......................15, 23

*In re AT & T Mobility Wireless Data Serv. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ...........14

*In re HP Laser Printer Litig.*, No. 07-cv-0667,
2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ...................................... 16

*In re Omnivision*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................ 13, 21

*In re TD Ameritrade Acc't Holder Litig.*,
Nos. 07-cv-2852, 07-cv-4903, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011)................14

*LaGarde, et al. v. Support.com, et al.*, No. 3:12-cv-00609 (N.D. Cal. 2013) ...............16, 23 n.20

*Ledet v. Ascentive LLC*, No. 2:11-cv-295 (E.D. Pa. Jan. 18, 2011) .................11 n.14, 16, 23 n.20

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ...........................14

*Martin v. Ameripride Serv., Inc.*, No. 08-cv-440,
2011 WL 2313604 (S.D. Cal. June 9, 2011) ...................................... 15

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)......9, 12, 13, 14

*Pelletz v. Weyerhaeuser Co.*, 592 F. Supp. 2d 1322 (W.D. Wash. 2009)............................23

*Reed v. 1-800 Contacts, Inc.*,
No. 12-cv-02359, 2014 WL 29011 (S.D. Cal. Jan. 2, 2014) ...........................15, 22

*Romero v. Producers Dairy Foods, Inc.*, No. 05-cv-0484,
2007 WL 3492841 (E.D. Cal. Nov. 14, 2007) ...................................... 9

*Shames v. Hertz Corp.*, No. 07-cv-2174,
2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ...................................... 9

*Struble v. Fallbrook Union High Sch. Dist.*,
No. 07-cv-2328, 2012 WL 4109157 (S.D. Cal. Sept. 12, 2012) ........................18

*Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995)...............15, 22

*Webb, et al. v. Cleverbridge, Inc., et al.*,
No. 1:11-cv-04141 (N.D. Ill. June 17, 2011) .....................11 n.14, 16, 23 n.20

**State Court Cases:**

*Drymon, et al. v. Cyberdefender Corp.*,
No. 11-CH-16779 (Cir. Ct. Cook County, Ill. May 6, 2011) ...................11 n.14

**Miscellaneous:**

28 U.S.C. § 1715 ................................................................................................ 14

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (3d ed. 1992).................... 19 n.19, 23

Fed. R. Civ. P. 23 ................................................................................................ 7

*Federal Judicial Center, Judges' Class Action Notice and
    Claims Process Checklist and Plain Language Guide* (2010) available at
    http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf............. 7, 8 n.11

1

## I.     INTRODUCTION

2      On October 18, 2013, the Court held a Final Fairness Hearing to determine whether the

3 Parties' proposed Class Action Settlement was a fair, reasonable and adequate resolution of the

4 Settlement Class's[1] claims in this matter, and whether final approval of the Settlement should be

5 granted. At the hearing, the Court expressed concern regarding the Defendants' total monetary

6 obligations under the Settlement in light of the low number of claims submitted by the Settlement

7 Class. In light of those concerns, the Court referred the Parties to Magistrate Judge Jacqueline

8 Scott Corley for a settlement conference in an effort to determine whether they could reach an

9 agreement to increase the amount of monetary benefits to the Class and in what form.

10      On December 10th, the Parties participated in a settlement conference before Magistrate

11 Judge Corley and with her assistance, were able to reach an agreement in principle on the terms of

12 a Second Addendum to their Stipulation of Class Action Settlement (the "Second Addendum").

13 The Second Addendum—now fully executed—requires that Defendants pay a guaranteed $1.25

14 million to *cy pres* recipients selected by the Parties and approved by the Court.  Additionally, the

15 Parties renegotiated the amount of attorneys' fees that Class Counsel would be seeking under the

16 Settlement, reducing their request from $1.65 million to $700,000.[2] (*See* Second Addendum,

17 attached as Exhibit 3 at 3.) And, with respect to the *cy pres* recipients, the Parties agreed upon and

18 propose (subject to Court approval) the following—The National Consumer Law Center, U.C.

19 Berkeley Center for Law and Technology, The Rose Foundation, Consumer Watchdog, and Girls

20 STEM Network: Cybersecurity.

21      Given the substantial increase in the amount of monetary relief (and total cash payments)

22 Defendants will provide under the Settlement, along with the significant prospective and in-kind

23

24 _____

[1]      Unless otherwise stated herein, capitalized terms shall have the same meaning as set forth
25 in the Parties' Stipulation of Class Action Settlement (the "Agreement"), attached as Exhibit 1.
[2]      Of course, that figure assumes that Class Counsel's request for an award of attorneys' fees
26 and costs in the amount of $700,000 is approved in-full. Although Plaintiff and Class Counsel
believe that the request is both fair and reasonable, and may be appropriately approved by the
27 Court (as explained further in Section VI, *infra*), in the event the Court awards an amount less than
$700,000, any un-awarded amounts will also be included in the *cy pres* distribution. (*See* Ex. 3 at
28 3.)

relief to the Settlement Class, Plaintiff and Class Counsel are confident that the proposed

Settlement is fair, reasonable and adequate, and deserving of final approval by the Court. For these

reasons and as discussed further below, Plaintiff respectfully requests that the Court grant final

approval to the Settlement, dismiss all Released Claims with prejudice, and grant Plaintiff's

requests for a reasonable incentive award and attorneys' fees and costs.[3]

## II.    FACTUAL BACKGROUND[4]

### A.    Plaintiff's Allegations, the Litigation, and the Discussions and Mediations that Led to Settlement.

On August 14, 2012, Plaintiff Gross filed his Second Amended Complaint (Dkt. 50, cited

herein as "SAC") alleging that Defendants deceptively designed and marketed their PC Tools

Registry Mechanic, PC Tools Performance Toolkit, and Norton Utilities software products to

function in ways that they could not. (SAC ¶¶ 2-4, 40-42, 48-52, 96.) Specifically, Plaintiff alleges

that Defendants offered consumers free trial versions of the Software Products to detect and report

errors and threats negatively impacting the performance of their personal computers ("PCs"). (*Id.*

¶¶ 3, 46-47.) The free scans, however, invariably reported myriad errors and threats—without

performing any meaningful analysis of the consumer's computer—and represented that purchase

of the full, registered versions of the Software Products (typically for $29.99) was needed to repair

the machines and protect them going forward. (*Id.* ¶¶ 3, 44-45.) Even then, the full versions of the

Software Products operated in the same way and ultimately, did not provide the promised level of

utility. (*Id.* ¶¶ 3-4, 46, 48, 51-52, 59.) Indeed, Class Counsel engaged a computer forensics expert

who ran a series of diagnostic tests in a controlled environment and ultimately concluded that the

Software Products were designed to invariably report the existence of numerous purported "errors",

---

[3]      Proposed Final Judgment and Fee and Incentive Award Orders are attached as Exhibits 6 and 7, respectively.

[4]      For the sake of efficiency and to avoid duplicative briefing here, Plaintiff provides an abbreviated version of the factual background and procedural posture of the case, which are set forth in further detail in his original Motion for Final Approval (Dkt. 73) and Motion for an Award of Attorneys' Fees. (Dkt. 71.)

1  arbitrarily report them as "High Priority" and thus, that the overall health of a computer was "LOW"—

2  regardless of the computer's actual "health" or functionality. (*Id.* ¶¶ 49, 52.)[5]

3      Prior to the filing of the Action, the Parties met (through counsel) and Class Counsel

4  presented their expert's conclusions about the Software Products and their underlying

5  methodologies, and the Parties discussed their respective views of the case. (*See* Declaration of

6  Rafey S. Balabanian ["Balabanian Decl."] ¶ 3, attached as Exhibit 4.) They then engaged in an all-

7  day mediation before Judge Ronald M. Sabraw (ret.) of JAMS on January 3, 2012 in an effort to

8  determine whether an early resolution of the case was possible. (*Id.*) They ultimately determined

9  that it was not and proceeded with the litigation. (*Id.*)

10      In the following months, the Parties fully briefed two motions to dismiss, served and

11  responded to written discovery requests, and engaged in countless discussions about the merits of

12  the case and potential resolution. As a result, the Parties were able to gain a better understanding

13  of the facts underlying their respective claims and defenses, and the strengths and weaknesses of

14  their positions. They ultimately determined that they had each gathered enough information and

15  evidence to appropriately evaluate whether a resolution of the case was possible and thus, determined

16  to proceed with a second all-day mediation before John B. Bates of JAMS on November 12, 2012.

17  With Mr. Bates' assistance, the Parties were able to reach an agreement in principle with respect to

18  the class-wide resolution of this matter and, after an additional three months of negotiation,

19  reduced their Agreement to writing in the form of their Stipulation of Class Action Settlement (the

20  "Agreement") now before the Court. (*Id* ¶ 7.)

21      **B.    The Court Grants Preliminary Approval of the Settlement After the Parties
            Address its Concerns.**

22

23      On April 19, 2013, the Parties appeared before the Court on Plaintiff's Motion for Preliminary

24  Approval. (Dkt. 67.) At the hearing, the Court found that the Agreement was within the range of

25  possible approval in terms of the benefits to the Class and the Notice Plan (Dkt. 70 at 2), but requested

26  _____

27  [5]     At all times, Defendants have denied and continue to deny any and all wrongdoing, and
    entered into the Agreement finding that the finality of the Settlement was desirable and beneficial
    relative to continued, risky litigation. (*See* Agreement § III.)

28

RENEWED MOTION FOR FINAL APPROVAL,        3        CASE NO. 3:12-cv-00154-CRB
INCENTIVE AWARD, AND ATTORNEYS' FEES

1   that the Parties change the Settlement so that any unawarded portion of the maximum allowable Fee

2   Award be distributed to appropriate cy *pres* recipients rather than revert to Defendants. (Dkt. 68-1 at

3   2.) The Parties did so (Dkt. 68-1),[6] and on May 28th, the Court granted preliminary approval of the

4   Settlement. (Dkt. 70.) Following preliminary approval, the Parties implemented the Notice Plan; six

5   Class Members have requested to be excluded from the Settlement and none have objected. On August

6   6th, the Parties also jointly submitted to the Court their respective cy *pres* proposals and Plaintiff filed

7   his motion for attorneys' fees, costs, and an incentive award. (Dkts. 71, 72.)

8           C.     **The First Final Fairness Hearing, the Court's Concerns about the Total**
                  **Monetary Relief Provided by Defendants, and the Parties' Settlement Conference**
9                 **with Magistrate Judge Corley.**

10          On October 18, 2013, the Parties appeared before the Court for a Final Fairness Hearing.

11  Though the Court found that the Notice Plan was appropriate and that the Settlement was otherwise

12  reasonable, it did express concern that the actual participation by absent Class Members was lower

13  than expected and would result in an unexpectedly low overall payout by Defendants. (Dkts. 76, 79.)

14  As a result, the Court (at Class Counsel's suggestion) referred the Parties to a settlement conference

15  with Magistrate Judge Corley to determine whether they could reach an agreement to increase the

16  amount of monetary relief to be provided to the Class and in what form. (*Id.*) On December 10,

17  2013, the Parties participated in a settlement conference before Magistrate Judge Corley (Dkt. 80), and

18  with her assistance, were able to reach an agreement in principle as to a Second Addendum to their

19  Stipulation of Class Action Settlement. In particular, the Parties agreed on (i) a guaranteed cy *pres*

20  distribution of $1.25 million to five potential recipients and (ii) a reduction in the amount of attorneys'

21  fees to be requested by Class Counsel from $1.65 million to $700,000. (Balabanian Decl. ¶ 11.)

22  **III.    TERMS OF THE SETTLEMENT**

23          The terms of the Parties' Settlement are summarized as follows:

24          **A.     Class Definition:** The Settlement Class includes all individuals and entities in the

25  United States and its territories that, prior to May 28, 2013, purchased any of the following

26  ───────────────────

27  [6]     In particular, the Parties agreed that the difference between the originally agreed-upon Fee
        Award of $1.65 million and the amount of attorneys' fees and costs actually awarded by the Court
        to Class Counsel would be distributed to appropriate cy *pres* recipients.

28

1 | software: PC Tools Registry Mechanic and PC Tools Performance Toolkit released since June 1,
2 | 2007, and Norton Utilities 14.0 through 16.0. (Agreement § II.)

3 | **B.   Prospective Relief:**

4 | **1.   *Improvements to the Software Products*:** Symantec and PC Tools have
5 | agreed to modify the current versions of their respective Software Products to: (i) deactivate the
6 | "System Health" meter within the main Graphical User Interface ("GUI") so that a user's System
7 | Health is reported as "unknown" until after the individual performs a diagnostic scan, (ii) refrain
8 | from claiming that an upgrade to the full versions of the Software will "speed" up or make
9 | computers run "faster", (iii) eliminate representations within the Software that any specific errors
10 | require "immediate repair", (iv) stop characterizing invalid registry entries as "errors", and (v)
11 | include documentation within the Software's GUI "Help" section that clearly explains the
12 | detection and reporting methodologies of the Software's diagnostic scans. (*Id.* § VI.A.)

13 | **2.   *New Documentation Explaining the Software Products' Functionality*:**
14 | Defendants have also agreed to publish new documentation for the modified versions of the
15 | Software that explains in a clear, concise and understandable manner (i) the "System Health"
16 | meter and the factors considered in determining a computer's "System Health" and (ii) the
17 | potential harm that the issues detected by the Products might pose to a computer's operations,
18 | including what is meant by a "High Priority" issue. (*Id.* § VI.B.)

19 | **C.   Monetary Relief:** Defendants have agreed to provide monetary relief directly to
20 | Class Members who submitted valid claims and indirectly to Class Members through a guaranteed
21 | $1.25 *cy pres* distribution.

22 | **1.   *Individual Relief:*** Each Settlement Class Member who submitted a valid
23 | Claim Form is entitled to receive a one-time payment of $9.00. (*Id.* § VI.C.2.)

24 | **2.   *Cy Pres Relief*:** Defendants have agreed to pay a *cy pres* distribution equal
25 | to no less than $1.25 million, plus the difference between Class Counsel's fee request of $700,000
26 | and the actual amount of attorneys' fees and expenses awarded to Class Counsel (if any). Subject
27 | to Court approval, the Parties propose the following *cy pres* allocation:

28 |

| Proposed *Cy Pres* Recipients | Proposed Allocation |
|---|---|
| National Consumer Law Center | 65% |
| The U.C. Berkeley Center for Law and Technology | 5% |
| The Rose Foundation | 5% |
| Consumer Watchdog | 5% |
| Girls STEM Network: Cybersecurity | 20% |

(Ex. 3.)

**D.     Other Relief:** In addition to the monetary and prospective relief described above, Defendants have agreed to the following relief:

*1.     Anti-Virus Software*: Each Settlement Class Member will be entitled to receive three (3) months of free access to Symantec's Norton Antivirus software, regardless of whether they submitted a claim. (Agreement § VI.C.3.)

*2.     Payment of Notice and Administrative Expenses*: Defendants shall pay all Notice and Administration Expenses up to $150,000.00. (*Id.* §§ II, VI.C.) Any overage will be paid one half by Defendants and one half by Class Counsel. (*Id.* § VII.C.)

*3.     Compensation for the Class Representative*: Defendants have agreed to pay, subject to Court approval, an Incentive Award to Plaintiff as Class Representative up to an amount of $2,500. (*Id.* § XI.A.)

*4.     Payment of Attorneys' Fees and Expenses*: Defendants have agreed not to oppose Class Counsel's application for a Fee Award up to $700,000, subject to Court approval. The Fee Award shall include all attorneys' fees and reimbursement of expenses associated with this Action. (Ex. 3.)

**E.     Release:** Upon the entry of Judgment, and in consideration of the Settlement Benefits, each Settlement Class Member shall be deemed to have released Defendants and each of the Released Parties from any and all "Released Claims." (Agreement § V.)

**IV.     NOTICE WAS DISSEMINATED TO THE CLASS, SATISFYING DUE PROCESS.**

Before final approval may be granted, the Court must determine that appropriate notice of the Settlement was disseminated to the Settlement Class and that due process has been satisfied.

Generally, notice is sufficient for settlement purposes where it is the best "practicable under the circumstances[,]" *see* Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974), which includes individual notice "to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). Notice need not reach every class member; rather, a notice plan that reaches at least 70% of the class is generally reasonable. *Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), p. 3, available at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf (last visited Feb. 6, 2014).

Here, the Court-approved Notice Plan included direct notice via email to the last known email address of each Settlement Class Member (provided during their purchase of the Software Products), publication of the Settlement Website,[7] which itself allows uninterrupted access to important case documents like the Court's Preliminary Approval Order, the Parties' Settlement Agreement, the Notice, and a downloadable Claim Form, and provided for the submission of Class Member claims online,[8] and CAFA notice to the relevant governmental agencies. Additionally, the Settlement Administrator established and operated a toll-free telephone line (that remains active to this day) through which Class Members could call to obtain information about the Settlement, request copies of the Notice and Claim Form, and receive assistance with submitting claims.[9] (Sander Decl. ¶¶ 4, 19.)

The Parties have successfully implemented the Court-approved Notice Plan through the Settlement Administrator. The Settlement Administrator has transmitted more than 1 million notice emails, which were successfully delivered to more than 83% of the Settlement Class, far surpassing

---

[7]    The Agreement contemplates that the Settlement Website—www.gross-settlement.com— which went live on June 18, 2013, will remain active until after final approval has been granted, the appeals period has run, and all Class Member claims have been paid. (*See* Declaration of Mallory Sander [cited as "Sander Decl."] ¶ 19, attached as Exhibit 5.)

[8]    The Notice provided to the Settlement Class was also neutral in tone and provided Class Members with a detailed explanation of their rights under the Settlement, including how to obtain the available Settlement Benefits, how to "opt-out" of the Settlement, and how to comment in support of or in opposition to it. (*See* Sander Decl. ¶¶ 3-5, 8.)

[9]    Class Members were also able to submit paper Claim Forms to the Settlement Administrator by mail, and many Class Members did so. (Sander Decl. ¶ 18.)

the requisite 70% deliverability rate.[10] (*See id.* ¶¶ 12-15). In response to the Notice, Class Members submitted 1,808 valid Claim Forms, only six have requested exclusion, and none have raised objections. (*Id.* ¶¶ 16-17.)[11]

Given the foregoing, it should be clear that notice of the Settlement has been disseminated to the Settlement Class by the best methods practicable, satisfying Rule 23 and Due Process.

## V.     THE SETTLEMENT WARRANTS FINAL APPROVAL BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE.

Next, the Settlement itself is also fair, reasonable and adequate and thus, warrants final approval. *See Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983). To determine whether a settlement warrants final approval, courts typically evaluate it based upon the following non-exclusive list of factors:

> "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). No one factor controls, and the importance of each is determined on a case-by-case basis. *Officers for Justice*, 688 F.2d at 625.

Moreover, in complex class actions like this, judicial policy favors settlement, *see Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), and deference is often given "to the private consensual decision of the parties." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length,

---

[10]     A rate of 70-95% deliverability is considered "high." *See, e.g., Federal Judicial Center, Class Action Notice* (2010); *see also Hartless v. Clorox, Co.*, 273 F.R.D. 630 (S.D. Cal. 2011) (finally approving a settlement with notice estimated to reach 75-83% of class members).
[11]     It bears noting that the success of the email notice was due, in large part, to the multi-step approach Settlement Administrator Epiq Systems implemented, which is described in greater detail in the Sander Declaration. (Sander Decl. ¶¶ 5-15.)

non-collusive, negotiated resolution . . . .")). Courts in the Ninth Circuit afford this presumption of fairness if: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Romero v. Producers Dairy Foods, Inc.*, No. 05-cv-0484, 2007 WL 3492841, at *2 (E.D. Cal. Nov. 14, 2007). Each of these factors is satisfied here.

First, the Settlement comes after more than a year's worth of litigation, the exchange of formal and informal discovery, many months of discussions amongst experienced counsel, two private mediation sessions before well respected third-party neutrals and a settlement conference presided over by Magistrate Judge Corley. Further, these negotiations and mediations took place only after the Parties had sufficient information about their respective claims and defenses and the size and scope of the proposed Settlement Class. That, taken with the fact that notice of the Settlement reached a high percentage of the Settlement Class with not a single objection to the Settlement having been lodged, strongly suggests that the Settlement is fair and reasonable and that a presumption of fairness should attach. But even if it does not, when applied to the instant Settlement, each of the eight factors used to determine whether a class action settlement is fair, reasonable and adequate favors final approval.

**A.     Final Approval is Appropriate in Light of the Risks of Further Litigation.**

First, courts evaluate the strength of the plaintiff's case, the range of possible recovery in light of the risks of continued litigation, and the amount and nature of the relief offered under the settlement. *Shames v. Hertz Corp.*, No. 07-cv-2174, 2012 WL 5392159, at *5 (S.D. Cal. Nov. 5, 2012). Under this analysis, courts balance "the vagaries of litigation and [] the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004). Determining a plaintiff's likelihood of success, however, is "an amalgam of delicate balancing, gross approximations and rough justice.'" *Garner*, 2010 WL 1687832, at *9 (citing *Officers for Justice*, 688 F.2d at 625). But when the parties reach a settlement with the assistance of a mediator, courts may assume that they "arrived at a reasonable range of settlement by

considering Plaintiff's likelihood of recovery." *Garner*, 2010 WL 1687832, at \*9 (citing *Rodriguez*, 563 F.3d at 965).

Here, there is no doubt that the risks of further litigation support approval. That is, while Plaintiff and Class Counsel are confident that they would ultimately prevail, they are also aware of the risk that ongoing litigation could either (i) result in a diminished recovery for the Class or (ii) result in no recovery at all if Defendants did prevail on their defenses and because the Class's claims ultimately turn on complicated factual issues regarding the underlying source code, design and functionality of the Software Products. (Balabanian Decl. ¶ 12.) And, even if Plaintiff were ultimately successful, Defendants would be likely to appeal any decision on the merits, thereby delaying (and making uncertain) any recovery for the Class. (*Id.*)

These significant risks—weighed against the certainty of the relief obtained for the Class, which includes the chance to recover the approximate amount of their losses, valuable in-kind relief, and injunctive measures that not only change the way the Software is marketed going forward, but the Software's underlying source code—suggest that the Settlement is more than fair, reasonable and adequate. (*Id.*) Indeed, when determining whether the relief obtained is appropriate, courts should consider "the complete package" of a settlement rather than individual terms, *Officers for Justice*, 688 F.2d at 628, and defer "to the private consensual decision of the parties." *Rodriguez*, 563 F.3d at 965 (citing *Hanlon*, 150 F.3d at 1027) (noting that courts "put a good deal of stock" in an agreement where the settlement is the result of "an arm's-length, non-collusive, negotiated resolution.").

Here, and as described in greater detail in Plaintiff's original motion for final approval, each Class Member had the chance to claim a cash payment of $9 (Agreement § VI.C.2.),[12] which Plaintiff reasonably believes is the amount Class Members overpaid for the Software, and regardless of whether they made a claim, each Class Member gets three months of free access to

---

[12]    Because Plaintiff does not allege that the Software Products were without any value whatsoever, Class Counsel's analysis suggests that the deceptive design at issue resulted in a proportional reduction in the value of the Software. (Balabanian Decl. ¶ 12 n.3.) Therefore, a return of $9 for each Software purchase represents a significant return on the difference between the Software's actual value and the $29.99 purchase price. (*Id.*)

Symantec's Norton Antivirus software (which adds at least $6 in relief per Class Member). (*Id.*

§ VI.C.3.)[13] As important, Defendants have also agreed to modify the Software Products and

marketing materials to be more transparent with consumers about the functionality of the Software

and/or the health of their computers, as well as provide documentation detailing the actual errors

detected and how the Software functions. (*Id.* §§ VI.A-B.) Finally, addressing the Court's concern

about the claims rate and overall cash payout to the Class, the Settlement also provides for the

distribution of at least $1.25 million to appropriate *cy pres* recipients in the technology and

consumer protection arena, whose goals align with the interests of the Settlement Class in, *inter alia*,

protecting consumers from misleading online advertising and product designs. (*See* Ex. 3.)

      With all that in mind, the first, second, and fourth factors to be considered weigh in favor of

granting final approval to the Settlement.

      **B.**      **The Risks Involved in Maintaining Class Action Status Render Final Approval Appropriate.**

      The next factor—the risks of maintaining this case as a class action through trial and any

appeals—also weighs in favor of granting final approval here. *See Officers for Justice*, 688 F.2d at

625. This factor does not require a plaintiff to have moved for certification as long as pre-

certification concerns outweigh the risks both parties face should a plaintiff succeed or fail in

certifying the class. *See Gardner v. GC Servs.*, *LP,* No. 10-cv-0997, 2012 WL 1119534, at *4 (S.D.

Cal. Apr. 2, 2012) (acknowledging the benefits of settlement in light of the risk class certification

poses for both parties).

      Given the uniform nature of Defendants' alleged design and marketing practices, and the

large number of consumers who purchased the Software Products, Plaintiff is confident that his

claims would be certified. For example, because Defendants are alleged to have uniformly

---

[13]     Notably, this in-kind benefit is a significant increase in the amount of relief provided to the Class relative to the other settlements in the industry, which did not include such a component but nevertheless were found to be fair, reasonable and adequate, and were granted final approval by the federal and state courts that considered them. *See, e.g., Ledet v. Ascentive, LLC*, No. 2:11-cv-294 (E.D. Penn. Nov. 29, 2011); *Drymon, et al. v. Cyberdefender Corp.*, No. 11-CH-16779 (Cir. Ct. Cook County, Ill. May 6, 2011); *Webb, et al. v. Cleverbridge, Inc., et al.*, No. 1:11-cv-04141 (N.D. Ill. June 17, 2011).

---

misrepresented the functionality of the Software Products, there are several legal and factual questions common (and predominant) to the Class's claims as a whole, such as: whether Defendants intentionally designed the Software to exaggerate the existence and severity of errors and threats on users' computers, and therefore, intentionally mislead them into purchasing the Software; whether the Class overpaid for the Software Products as a result of Defendants' alleged unlawful conduct; and whether these issues will allow Plaintiff and the Class to prevail on their claims. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 2556 (2011) (explaining that commonality is found where the claims of all class members "depend upon a common contention," and "even a single common question will do").

Despite these several common questions, certification is not a forgone conclusion, as Plaintiff concedes that the Software did have some utility and Defendants are likely to raise potential individual issues in an effort to make certification improper—i.e., the effects that variations in consumers' computers may have had on the Software's performance. And, if Plaintiff fails to certify the Class, then it goes without saying that the Class would get nothing. Thus, this factor weighs in favor of final approval as well.

### C.    The Settlement is a Product of Significant Discovery and a Well-Developed Factual Record.

The next factor—the extent of discovery completed and the stage of the proceedings—also warrants final approval here. Ultimately, settling parties need only reach a point in the litigation where they understand the respective strengths and weaknesses of their positions, *Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413, 2008 WL 5458986, at *8 (S.D. Cal. Dec. 10, 2008) (citation omitted), and formal discovery is not even necessary. *Gardner*, 2012 WL 1119534, at *5 (citation omitted). Compromise based on such a thorough understanding of the legal and factual issues and a "genuine arms-length negotiation is presumed fair." *Nat'l Rural Telecomms.*, 221 F.R.D. at 528 (citations omitted).

Here, the Parties only reached a settlement after more than a year of litigation—including briefing on several motions to dismiss, formal and informal discovery, months of settlement discussions, two in-person mediations, and a settlement conference before Magistrate Judge

1    Corley. Through those efforts, the Parties created a solid factual record and were able to approach

2    the negotiations with an understanding of the strengths of their respective claims and defenses.

3    (Balabanian Decl. ¶ 13.) As such, the litigation to date and the information available to the Parties

4    when they mediated the dispute suggest that the Settlement is a fair, reasonable and adequate result for

5    the Settlement Class, and this factor weighs in favor of final approval as well.

6           **D.      The Experience and Views of Counsel Favor a Finding that the Settlement is
                       Fair, Reasonable, and Adequate.**
7
8           Next, courts consider the experience and views of counsel in determining whether final

9    approval is appropriate. In cases such as this, where experienced counsel reach an agreement, "[t]he

     recommendations of plaintiff's counsel should be given a presumption of fairness." *In re*
10
     *OmniVision*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quoting *Boyd v. Bechtel Corp.*, 485 F.
11
     Supp. 610, 622 (N.D. Cal. 1979)); *see also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir.
12
     1995) ("[p]arties represented by competent counsel are better positioned than courts to produce a
13
     settlement that fairly reflects each party's expected outcome in litigation."); *Nat'l Rural Telcomms.*,
14
     221 F.R.D. at 528 ("noting that '[g]reat weight' is accorded to the recommendation of counsel, who
15
     are most closely acquainted with the facts of the underlying litigation").
16
            Here, and as described more extensively in Plaintiff's original motion for final approval,
17
     Class Counsel have significant experience litigating consumer class actions of similar size, scope,
18
     and complexity. (*See* Firm Resume of Edelson PC, attached as Exhibit 4-A to the Balabanian
19
     Declaration.) Not only have they been appointed class counsel in numerous other class actions by
20
     courts in this District and throughout the country, but they have also been appointed class counsel in
21
     actions asserting similar claims against Defendants' industry competitors. (Balabanian Decl. ¶ 14.) It
22
     was with that experience that they investigated and analyzed the functionality of Defendants'
23
     Software Products, the claims and defenses asserted in the case, and the discovery produced by
24
     Defendants, and then ultimately negotiated the Settlement now before the Court. (*Id.*) With all of
25
     that in mind, Class Counsel are confident that this Settlement—which exceeds the relief obtained
26
     in similar actions—is a strong result for the Settlement Class, especially considering the vigorous
27
     opposition by highly experienced defense counsel. (*Id.*)
28

1   As such, this factor also weighs in favor of final approval of the Settlement.

2   **E.   The Presence of a Governmental Participant.**

3   Courts next consider whether governmental participants were involved in the action. Here,

4   Defendants provided notice of the Agreement (on March 18, 2013) and the Addendum to the

5   Agreement (on May 21, 2013) to the United States Attorney General and appropriate state

6   officials. (Dkts. 65, 69); *see also* 28 U.S.C. § 1715. Though "put on notice," to date, no state or

7   federal official has raised any objection to the Settlement. Accordingly, this factor also supports

8   final approval. *See Garner*, 2010 WL 1687832, at *14.

9   **F.   The Reaction of Settlement Class Members.**

10   Finally, courts consider the class members' reactions to the settlement, which undoubtedly

11   supports final approval here. As described above, more than 83% of the Class received direct notice

12   of the Settlement, but not a single Class Member objected, only six sought exclusion, and 1,808

13   made valid claims for Settlement Benefits. *See Garner*, 2010 WL 1687832, at *14 ("Courts have

14   repeatedly recognized 'that the absence of a large number of objections to a proposed class action

15   settlement raises a strong presumption that the terms of a proposed class action settlement are

16   favorable to the class members.'") (quoting *Nat'l Rural Telecomms.*, 221 F.R.D. at 529); *Lipuma v.*

17   *Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (explaining that 1,159 opt-outs and

18   41 objections out of approximately nine-million notices sent supports approval); *Rodriguez*, 563

19   F.3d at 967 (explaining that a "court ha[s] discretion to find a favorable reaction . . . among class

20   members" where there were "only fifty-four submitted objections" out of 376,301 class members

21   receiving notice); *Churchill Village*, 361 F.3d at 577 (affirming approval of class action settlement

22   with 45 objections from a 90,000 person class); *In re TD Ameritrade Acc't Holder Litig.*, Nos. 07-

23   cv-2852, 07-cv-4903, 2011 WL 4079226, at *7 (N.D. Cal. Sept. 13, 2011) (finding that reaction of

24   class was "positive" where there were "only 23 [objections] and less than 200 [opt-outs]" out of

25   six million class members receiving notice); *see also In re AT & T Mobility Wireless Data Serv.*

26   *Sales Litig.*, 270 F.R.D. 330, 349 (N.D. Ill. 2010) ("silence [of a class] coupled with other indicia of

27   fairness . . . provides further support of approval.").

28   Given the strength of the Notice Plan, and the complete lack of opposition to the Settlement, it

1   is clear that the members of the Class are aware of and have found the Settlement to be fair, reasonable

2   and adequate to resolve their claims. As such, this factor weighs in favor of final approval.

3       **G.      The Absence of Collusion in Reaching the Settlement Precludes Additional
                   Scrutiny and Favors Final Approval.**

4

5           In addition to the other factors, where, as here, a settlement is reached prior to class

6   certification, courts seek to ensure the parties have not engaged in collusion. *Martin v. Ameripride*

7   *Serv., Inc.*, No. 08-cv-440, 2011 WL 2313604, at *5 (S.D. Cal. June 9, 2011) (citing *Hanlon*, 150

8   F.3d at 1026). The factors most indicative of collusion between the parties are "(1) when counsel

9   receives a disproportionate distribution of the settlement, or when the class receives no monetary

10  distribution but class counsel are amply rewarded; (2) when the parties negotiate a 'clear sailing'

11  arrangement providing for the payment of attorneys' fees separate and apart from class funds . . . and

12  (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the

13  class fund." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal

14  citations and quotations omitted). None of these "warning signs" are present here.

15          First, Class Counsel are not receiving a disproportionate amount of the funds made available

16  for the Settlement. Rather, the proposed Fee Award of $700,000 represents Class Counsel's

17  lodestar up to the initial final fairness hearing (and therefore, is exclusive of the costs and fees

18  associated with the Parties' in-person mediation with Magistrate Judge Corley, the drafting and

19  execution of the Parties' Second Addendum, additional briefing relating to final approval, and

20  overseeing of the claims process). (*See* Balabanian Decl. ¶ 17 n.4.) This amount falls well below the

21  typical fees calculated using the lodestar method and enhanced with a risk multiplier. *See, e.g.,*

22  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047, 1051 n.6 (9th Cir. 2002) (affirming risk multiplier

23  of 3.65 and recognizing that typical multipliers range from 0.6 to 19.6); *Van Vranken v. Atlantic*

24  *Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (awarding fees equal to risk multiplier of 3.6);

25  *Reed v. 1-800 Contacts, Inc.*, No. 12-cv-02359, 2014 WL 29011, at *9 (S.D. Cal. Jan. 2, 2014)

26  (awarding fees equal to risk multiplier of 2.9); *Hopkins v. Stryker Sales Corp.*, No. 11-cv-02786, 2013

27  WL 496358, at *6 (N.D. Cal. Feb. 6, 2013) (awarding fees equal to risk "multiplier of 2.76, which falls

28  within the 'majority' range for risk multipliers.") (citation omitted). It also falls well below fee awards

1   granted in similar actions against Defendants' industry competitors. *See Webb*, No. 1:11-cv-04141

2   (N.D. Ill. June 17, 2011) (awarding fees equal to risk multiplier of 1.77); *Ledet*, No. 2:11-cv-294 (E.D.

3   Pa. Jan. 18, 2011) (awarding fees equal to risk multiplier of 1.73); *LaGarde v. Support.com*, No. 3:12-

4   cv-00609 (N.D. Cal. May 30, 2013) (awarding fees equal to risk multiplier of 1.4).

5        Second, there is no reversion of attorneys' fees here. *In re Bluetooth*, 654 F.3d at 947.

6   Instead, any portion of the requested attorneys' fees that is not awarded by the Court will be

7   distributed to appropriate *cy pres* recipients.  (*See* Exs. 2, 3.)

8        Next, while there is a "clear sailing" fee provision in the Agreement, the Parties negotiated

9   the current, proposed Fee Award only (i) after relief to the Settlement Class had already been agreed

10  upon, (ii) in light of—and not separate to—the relief obtained for the Class, and (iii) as part of the

11  settlement conference with Magistrate Judge Corley. (Balabanian Decl. ¶¶ 7 n.2, 11.) As such, this

12  component of the Settlement should not cause the Court concern, as the Ninth Circuit has only

13  cautioned against approving settlements where the requested fee is decided independently of the

14  amount provided to the class. *See In re Bluetooth*, 654 F.3d at 947.

15       Finally and most importantly, there was no collusion in this case. Here, the Court can look to

16  the assurances of counsel and the presence of three neutral mediators—including Magistrate Judge

17  Corley—all of which "weigh[] in favor of a finding of non-collusiveness." *Id.* at 948. With this as a

18  backdrop, and considering the substantive terms of the Settlement and more than a year of litigation

19  required to obtain them, there should be no question that collusion is not a concern here. *See In re*

20  *HP Laser Printer Litig.*, No. 07-cv-0667, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011).

21       Thus, this final factor is satisfied and the Court may properly grant final approval.

22  **VI.   THE COURT SHOULD APPROVE THE AGREED-UPON FEE AWARD.**

23       Next, the (reduced) agreed-upon fee award of $700,000—representing Class Counsel's

24  lodestar in this matter—is reasonable and warrants final approval as well. In the Ninth Circuit, district

25  courts have discretion to use either the lodestar or percentage of the fund methods to calculate

26  reasonable attorneys' fee awards. *See Hanlon,* 150 F.3d at 1029. Here, Class Counsel seeks an award

27  of attorneys' fees based upon the lodestar method, which multiplies the number of hours that class

28  counsel reasonably expended on the litigation by an hourly rate that takes into consideration the

1  experience of the lawyers and their geographic location. *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th

2  Cir. 2001); *see also Vizcaino*, 290 F.3d at 1051. When courts utilize this method, "there is a 'strong

3  presumption' that the lodestar figure represents a reasonable fee." *See Fischel v. Equitable Life Assur.,*

4  *Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002) (quoting *D'Emanuele v. Montgomery Ward & Co.*,

5  904 F.2d 1379, 1384 (9th Cir. 1990)).[14]

6       As an initial matter, while Class Counsel seeks a fee award of its lodestar in the amount of

7  $700,000, as reflected in the chart below, Class Counsel's actual lodestar exceeds that amount

8  ($720,733.00 to be exact). Nevertheless, as the Parties agreed at the settlement conference with

9  Magistrate Judge Corley, Class Counsel will not seek any more than $700,000 in attorneys' fees,

10  despite the fact that their lodestar is well in excess of that amount at this point. Further, Class

11  Counsel also incurred approximately $19,000 in litigation costs, but does not seek to recover that

12  amount either.

13       In any event, given the results achieved for the Settlement Class and the motion practice,

14  discovery, and settlement proceedings required to obtain them, there should be little doubt that Class

15  Counsel's request for a fee award in the amount of $700,000 is reasonable. That is especially true

16  given that Class Counsel has agreed to request no more than their adjusted-lodestar[15] as of the Parties'

17  December 10th settlement conference, despite having expended additional attorney and staff hours

18  since that time. As reflected by the chart below, Class Counsel's actual lodestar as of that date was

19  $720,733.00.[16] (Balabanian Decl. ¶ 17.)

20

21

---

22  [14]    Courts often also apply a reasonable risk-multiplier to the base lodestar to account for the
risk Class Counsel takes of recovering nothing at all in complex class actions such as this. *See*
23  *Fischel*, 307 F.3d at 1008. However, Class Counsel does not seek the application of a multiplier
here.

24  [15]    Class Counsel have reviewed the hours expended by the attorneys and staff working on the
Action and reduced any hours deemed duplicative or excessive. (Balabanian Decl. ¶ 17 n.4.)
25  Furthermore, we have limited our lodestar figure to include only time and fees incurred up to and
including Plaintiff's filing of his original motions for final approval and attorneys' fees, thereby
excluding all time and fees incurred for attendance at the settlement conference with Magistrate
26  Judge Corley, the drafting and exchanging of the Parties' Second Addendum to Class Action
Settlement, Plaintiff's briefing of his renewed motion, and completion of the claims process. (*Id.*)
27  [16]    Class Counsel has also incurred $19,606.50 in reimbursable expenses (including filing and
appearance fees, and case administration expenses). (Balabanian Decl. ¶ 16.)

28

| ATTORNEY | HOURLY RATE | HOURS | TOTAL |
|---|---|---|---|
| Jay Edelson (Partner) | $675.00 | 171.9 | $116,041.50 |
| Rafey S. Balabanian (Partner) | $550.00 | 414.3 | $227,850.50 |
| Benjamin H. Richman (Associate) | $390.00 | 488.9 | $190,656.50 |
| Chandler R. Givens (Associate) | $335.00 | 305.5 | $102,342.50 |
| David Mindell (Associate) | $295.00 | 34.1 | $10,059.50 |
| Alicia Hwang (Associate) | $295.00 | 30.0 | $8,850.00 |
| Benjamin Thomassen (Associate) | $335.00 | 29.7 | $9,949.50 |
| Nick Larry (Associate) | $295.00 | 14.1 | $4,159.50 |
| Steven Woodrow (Partner) | $550.00 | 13.2 | $7,260.00 |
| Various Law Clerks | $215.00 | 31.5 | $6,762.50 |
| Steven W. Teppler (Former Partner) | $600.00 | 11.3 | $6,780.00 |
| William Gray (Former Associate) | $395.00 | 76.0 | $30,020.00 |
| | TOTAL | 1,620.5 | $720,733.00 |

The attorney and staff rates used to calculate Class Counsel's base lodestar (depicted in the table above) are comparable to those charged by attorneys with equivalent experience, skill, and reputation for similar services in the Chicago and San Francisco legal markets, as well as other comparable markets throughout the country, and they have previously been approved by courts in this District, this Circuit, and nationwide. (*Id.* ¶ 18.) Additionally, the hourly rates used to calculate Class Counsel's lodestar are the same as those charged to Class Counsel's hourly-paying clients, which supports a finding that their fee request is reasonable. (*Id.* ¶ 19); *see Struble v. Fallbrook Union High Sch. Dist.*, No. 07-cv-2328, 2012 WL 4109157, at *5 (S.D. Cal. Sept. 12, 2012) (holding that when attorneys' actual hourly rates match their requested hourly rates that is "*prima facie* evidence" the fee request is "reasonable, and [at] a rate the market would bear"). As such, there should be no question that Counsel's base lodestar is both fair and reasonable.

The lodestar calculation, however, does not end with this base amount. Instead, the base lodestar is often enhanced with a multiplier according to the factors enumerated by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.*:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

526 F.2d 67, 70 (9th Cir. 1975); *see also Cunningham v. City of Los Angeles*, 879 F.2d 481, 486 (9th

Cir. 1988). Although many of these factors are "subsumed within the initial calculation of hours

reasonably expended at a reasonable rate," *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983), the most

important remains the benefit obtained for the class. *See In re Bluetooth*, 654 F.3d at 942 (the

reasonableness of fees "is determined primarily by reference to the level of success achieved by the

plaintiff"); *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009). The use of a lodestar

multiplier accounts for the risk that attorneys will receive no payment if they do not succeed on their

claims. *Vizcaino*, 290 F.3d at 1051; *see also Garner*, 2010 WL 1687829, at *2 (explaining that it

serves "the public interest" to use a lodestar multiplier to compensate attorneys "who assume

representation on a contingent basis").[17]

      Although Class Counsel does not seek the application of a risk-multiplier in this case, the *Kerr*

factors are still relevant to establishing the reasonableness of their fee request and therefore, each

factor is taken in turn below. *See, e.g., Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir.

2000).

    **A.**    **The Settlement Provides Substantial Relief to the Class.**

      First, and most importantly, courts consider the relief provided to the class. *See In re Bluetooth*,

654 F.3d at 942; *Kerr*, 526 F.2d at 70. Here, the Settlement provides significant relief—monetary,

prospective, in-kind and otherwise—to the Settlement Class. To begin with, Defendants have agreed

to distribute no less than $1.25 million (and potentially more) to appropriate *cy pres* recipients in the

technology and consumer protection arena, whose goals align with the interests of the Settlement Class

in, *inter alia*, protecting consumers from misleading online advertising and product designs. (*See* Ex.

3.) That is in addition to the individual cash payments to each Class Member who submitted a valid

---

[17]    Notably, the Ninth Circuit conducted a historical review of class action settlements and found that typical multipliers ranged from 0.6 to 19.6, with 83% falling between 1 and 4, and 54% falling between 1.5 and 3. *Vizcaino*, 290 F.3d at 1051 n.6 and Appendix; *see also* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (3d ed. 1992) § 14:03 (recognizing that multipliers from 1 to 4 are frequently awarded). In fact, in some instances, it has even been found an abuse of discretion for a court to not apply a lodestar multiplier. *Fischel*, 307 F.3d at 1008 ("It is an abuse of discretion to fail to apply a risk multiplier, however, when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky").

1  Claim Form and Defendants' payment for notice and administration expenses, reasonable attorneys'

2  fees and expenses, and an incentive award to Plaintiff Gross as Class Representative.

3        That aside, Defendants have also agreed to certain prospective relief that requires them to

4  modify the Software Products and to more accurately advertise the utility of the Software and report

5  the statuses of consumers' computers. (Agreement § VI.A–B.) These measures provide valuable relief

6  to the Class (and the public at-large, for that matter) as they guard against the sorts of allegedly

7  deceptive design and marketing tactics at issue in this Action. Further, the Settlement also provides

8  valuable in-kind relief in the form of three free months of access to Symantec's Norton Antivirus

9  software to each Class Member—regardless of whether they have submitted a claim under the

10  Settlement.  (*Id.* § VI.C.3; Dkt. 64-1.)

11        As a result and as explained further above, it is clear that the Settlement provides significant

12  relief to the Class and for this reason, that Class Counsel's fee request is reasonable.

13  **B.      Class Counsel Expended a Significant Amount of Attorney Time, Effort and Expense in this Case and Were Precluded from Accepting Other Employment.**

14

15        Next, courts also consider "the time and labor required," "the preclusion of other employment

16  by the attorney due to acceptance of the case," and "the time limitations imposed by . . . the

   circumstances." *See Kerr*, 526 F.2d at 70. Here, Class Counsel expended substantial time and effort in

17  prosecuting this Action. In particular, Class Counsel engaged in an extensive investigation and the

18  Parties exchanged both formal and informal discovery, briefed several motions to dismiss, engaged in

19  countless settlement discussions, participated in two separate private mediations and one settlement

20  conference with Magistrate Judge Corley, and continuously worked to ensure the Settlement Class

21  received the best relief possible—even though it ultimately required dozens of additional attorney and

22  staff hours, and expenses, which Class Counsel knew they would not seek to recover. (*See, e.g.,*

23  Balabanian Decl. ¶¶ 3-7, 11, 15.) Those efforts not only required more than 1,600 attorney and staff

24  hours total, but also precluded Class Counsel from accepting other employment (*Id.* ¶ 15.)

25        Thus, this factor also militates in favor of a finding that Class Counsel's requested fee award is

26  reasonable.

27

28

## C.     The Risk of Nonpayment.

Further, the Court may consider the "novelty and difficulty of the questions involved," the contingent nature of the fee award, and the undesirability of the instant action. *See Kerr*, 526 F.2d at 70. Such factors are particularly relevant in cases like this, where there are complicated legal and factual issues to be resolved, *see Vizcaino*, 290 F.3d at 1048, especially when counsel advances all fees and expenses. *In re OmniVision*, 559 F. Supp. 2d. at 1047 (citing *In re Wash. Public Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1299-1300 (9th Cir. 1994)). Indeed, "[i]t is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases . . . ." *In re Wash.*, 19 F.3d at 1299.

In this case, although Plaintiff and Class Counsel are confident in the merits of the claims asserted, there was a significant risk here (as in every class action) that this Action would result in a lesser recovery for the Class than that afforded under the Settlement, or no recovery at all. Had the Action proceeded to trial, any recovery for the Class would have ultimately turned on several extremely technical factual issues regarding the underlying coding, design and functionality of the Software. Even in the best case scenario, had Plaintiff managed to overcome each of those challenges, given the amount of damages at issue and the potential ramifications to Defendants and their business, they would likely appeal, thereby further delaying (and making uncertain) the ultimate disposition of the case.

Despite those sizable risks, Class Counsel took on and diligently investigated and prosecuted Plaintiff's and the Class's claims on a contingent basis, investing more than a year's time and advancing all expenses—as detailed *supra*—with the knowledge that they may never recover anything for their efforts. *See Vizcaino*, 290 F.3d at 1051 ("'attorneys whose compensation depends on their winning the case[ ] must make up in compensation in the cases they win for the lack of compensation in the cases they lose.'") (quoting *In re Wash.*, 19 F.3d at 1300-01). Given that, and in the face of the strength of the instant Settlement, it would arguably be irresponsible for them to try and push forward with litigation.

Accordingly, the risk that Class Counsel may have recovered less, or nothing at all, also supports the fairness and reasonableness of the requested fee award.

**D.     Class Counsel Skillfully Prosecuted this Case.**

Courts also consider the skill required to perform legal services properly and "the experience, reputation, and ability of the attorneys . . . ." *See Kerr,* 526 F.2d at 70. In doing so, they consider both the "unique skills and abilities" required by counsel in such inherently complex litigation generally, *see In re OmniVision*, 559 F. Supp. 2d at 1047; *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977), as well as the "vigorous opposition" defense counsel has shown in the case. *See Morris v. Lifescan, Inc.*, 54 Fed. Appx. 663, 664 (9th Cir. 2003).

Class Counsel have a proven record of effectively and successfully prosecuting complex nationwide consumer class actions, which they extended to their representation of Plaintiff and the Class here. (*See* Ex. 4-A.) In addition to their general experience prosecuting class actions, Class Counsel have developed a unique and specific area of expertise while prosecuting nearly a dozen similar nationwide class actions against Defendants' industry competitors. (*Id.* ¶ 14.) They utilized this specialized experience to meet formidable opposition by defense counsel from one of the nation's most prominent law firms—who themselves vigorously defended against the claims at issue (and remain willing to do so). (*Id.*)

Despite the resistance they faced, however, Class Counsel were able to successfully litigate this matter and ultimately negotiate a valuable Settlement to the benefit of the entire Class. Their ability to do so also weighs in favor of approving the requested fee award.

**E.     Class Counsel's Requested Fee Award is Well Below Awards in Similar Cases.**

Finally, courts consider the "customary fee" and fee awards in similar cases. *See Kerr,* 526 F.2d at 70. Here, Class Counsel's requested fee award falls well below those awarded in similar cases. For instance, and as described in Section III, *supra*, when analyzing fees under the lodestar approach, courts often enhance the base lodestar with a multiplier given the risks assumed by class counsel in prosecuting the action. *See Vizcaino*, 290 F.3d at 1047, 1051 n.6 (affirming risk multiplier of 3.65 and recognizing that typical multipliers range from 0.6 to 19.6); *see also Van Vranken*, 901 F. Supp. at 299 (awarding fees equal to risk multiplier of 3.6); *Reed*, 2014 WL 29011, at *9 (awarding fees equal to risk multiplier of 2.9); *Hopkins*, 2013 WL 496358, at *6 (awarding fees equal to risk "multiplier of 2.76, which falls within the 'majority' range for risk multipliers.") (citing *Vizcaino*, 290 F.3d at 1051

n.6); *Pelletz v. Weyerhaeuser Co.*, 592 F. Supp. 2d 1322, 1338 (W.D. Wash. 2009) (awarding fees equal to "[t]he modest 1.82 multiplier requested by Class Counsel [which] falls well within the range of multipliers approved by Ninth Circuit courts.") (citation omitted); *Newberg on Class Actions* § 14:03 (recognizing that courts frequently award risk multipliers between 1 and 4). Class Counsel seeks no multiplier here, though they would assuredly be within reason in doing so.[18]

Here, Class Counsel seek a fee award equal to a lodestar that excludes months of their expenses and costs, and which falls well below the fee awards in similar actions alleging nearly identical claims against Defendants' industry competitors. As such, Class Counsel's requested fee award is undeniably reasonable in this regard as well.

*        *        *

For all of these reasons, Class Counsel's requested fee award is fair and reasonable, and may be approved by the Court.

## VII.   THE COURT SHOULD APPROVE THE AGREED-UPON INCENTIVE AWARD.

Finally, the negotiated incentive award of $2,500 to Plaintiff Gross as Class Representative should be approved as well. (Agreement § XI.A.) It is common practice in class actions to grant incentive awards in order to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken…and, sometimes, to recognize their willingness to act as a private attorney general." *Hartless*, 273 F.R.D. at 646 (quoting *Rodriguez*, 563 F.3d 948, 958–59). Courts have broad discretion to approve incentive awards and in doing so typically weigh (i) the actions the plaintiff has taken to protect the interests of the class, (ii) the degree to which the class benefited from those actions, and (iii) the amount of time and effort the plaintiff expended in pursuing the litigation. *Staton*, 327 F.3d at 977.

Based on his efforts on behalf of the Class, the requested incentive award to Plaintiff Gross as Class Representative is also reasonable. In particular, without an expectation that he might recover

---

[18]    Moreover, the requested fee also amounts to far less than those granted in settlements reached with Defendants' industry competitors. *See Webb*, No. 1:11-cv-04141 (N.D. Ill. June 17, 2011) (awarding fees equal to risk multiplier of 1.77); *Ledet*, No. 2:11-cv-294 (E.D. Penn. Jan. 18, 2011) (awarding fees equal to risk multiplier of 1.73); *LaGarde*, No. 3:12-cv-00609 (N.D. Cal. May 30, 2013) (awarding fees equal to risk multiplier of 1.4).

1   such an award, or anything at all, Gross devoted his own time and effort to pursuing claims on behalf

2   of the Class, and otherwise exhibited a willingness to participate in and undertake the responsibilities

3   and risks attendant with bringing such an action. (Balabanian Decl. ¶ 22.) At all times, he willingly

4   assisted Class Counsel with the investigation of his claims and provided them with valuable

5   information regarding his purchase, use, and experiences with the Software Products. (*Id.* ¶ 23.) He

6   also consulted with Class Counsel on multiple occasions over the phone and by email, and reviewed

7   numerous pages of documents, including filings and settlement papers, among others. (*Id.* ¶ 24.)

8   Simply put, his active participation in the litigation was instrumental to ensuring that the Class

9   ultimately recovered and in obtaining the substantial benefits represented by the Parties' Settlement.

10  (*Id.* ¶ 25.) As such, the agreed-upon incentive award of $2,500 is reasonable[19] and should also be

11  approved.

12  **VIII.   CONCLUSION**

13          For the foregoing reasons, Plaintiff James Gross, on behalf of himself and the Settlement

14  Class, respectfully requests that the Court enter an Order (i) granting final approval of the Parties'

15  Settlement, (ii) awarding Class Counsel reasonable attorneys' fees, (iii) awarding Plaintiff Gross a

16  reasonable incentive award, (iv) dismissing all Released Claims with prejudice, and (v) granting

17  such other and further relief as the Court deems reasonable and just.

18                                          Respectfully Submitted,

19                                          **JAMES GROSS**, individually and on behalf of all
                                            others similarly situated,
20
    Dated: February 7, 2014                 By:  /s/ Rafey S. Balabanian
21                                               One of Plaintiff's Attorneys

22

23

24

25  _____
    [19]      Notably, this request is lower than many of those approved for class representatives who did
26  comparable work during the course of litigation. *See, e.g., Chun-Hoon v. McKee Foods Corp.*, 716 F.
    Supp. 2d 848, 854 (N.D. Cal. 2010) (awarding two named-plaintiffs $5,000 each for their joint efforts
27  reviewing court documents, producing personal and business records for review, and participating in
    mediation).
28

Jay Edelson*
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
Chandler R. Givens (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Mark Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251